**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

In re:                                    )
                                          )
LaShari W. Scott,                         )      Case No.: 05-10595-BGC-7
                                          )
        Debtor.                           )
                                          )
Mary Nell Allen,                          )
                                          )
        Plaintiff,                        )
                                          )
vs.                                       )      A. P. No.: 06-00011
                                          )
LaShari W. Scott,                         )
                                          )
        Defendant.                        )

**MEMORANDUM OPINION**

The matters before the Court are:

1.     The plaintiff's <u>Complaint</u> for nondischargeability filed in this Court on
       January 7, 2006, A.P. Docket No. 1, incorporating the state court
       <u>Complaint</u> the plaintiff filed in the Circuit Court of Jefferson County,
       Alabama, Bessemer Division on December 22, 2005; and

2.     The plaintiff's <u>First Amended Complaint</u> for nondischargeability and
       revocation of discharge filed in this Court on June 8, 2006. A.P. Docket
       No. 11.

       A trial on the merits was held on May 10, 2007, May 11, 2007, and July 18,
2007. Appearing were: the plaintiff, Mary Nell Allen and her attorney Brian Bugge, and
the defendant LaShari Woods Scott and her attorney Debra Winston. Six witnesses
testified. Fifty-seven exhibits were admitted.

**I.  SUMMARY OF THE BACKGROUND FACTS
AND THE PARTIES' CONTENTIONS**

       Maddie Jenkins Woods, the parties' common relative, died on May 31, 2003.
The plaintiff is the executrix of her estate. The debtor-defendant held a power of

attorney from Mrs. Woods and was her guardian and conservator before Mrs. Woods died. Each party is related to her by marriage.[1]

## A. THE PARTIES' RELATIONSHIPS TO MADDIE WOODS

### 1. The Debtor-Defendant's Relationship to Maddie Woods

Maddie Jenkins Woods' mother and father were Albert and Viola Jenkins.[2] Maddie married Eddie Woods.[3] Eddie Woods had five siblings. Those were: Josephine Woods; Hez Woods; Betty Woods (Greer); Mary Lou Woods (Hibbler); and Tom Woods (the defendant's father). Tom Woods married Mattie Woods.[4] Tom and Mattie Woods had seven children. Those were: Michael Woods; Earl Woods; Tommy Woods; William Woods; Robert Woods; Larry Woods; and the defendant **LaShari Woods (Scott)**. LaShari married the Reverend Frederick Scott. LaShari and Fredrick Scott had two children. Therefore, the defendant's direct relationship with Maddie Woods is as the daughter of Maddie Woods' brother-in-law Tom Woods – or as a "niece-in-law."

### 2. The Plaintiff's Relationship to Maddie Woods

Maddie Jenkins Woods' mother Viola Jenkins married again to a Mr. Hunt.[5] They had a daughter Betty Hunt. Betty Hunt married Louis Allen. They had two sons, both deceased at the time of trial. They were: Johnnie C. Allen and Melvin Allen. The plaintiff **Mary Nell Allen** married Johnnie C. Allen. They had three children. Those were: Betty Allen; Melvin Allen (nicknamed "Coot"); and Ethel Allen (nicknamed "Moonie"). Therefore, the plaintiff's direct relationship to Maddie Woods is as the daughter-in-law of Maddie Woods' half-sister – or as a "niece-in-law."

---

[1]The parties' attorneys assisted the Court in preparing a genealogical record. It was accurate as of a few months after the final day of trial in 2007.

[2]Some relatives are deceased. The record is not complete as to which ones. If that information is available and pertinent, it is noted.

[3]Maddie and Eddie had a son that died in infancy.

[4]The record does not contain maiden names for all married females whose name changed.

[5]The record does not contain full names for all family members.

2

## B.  THE PARTIES' STATE COURT RELATIONSHIP

Maddie Woods gave the defendant power of attorney on October 16, 2000. Def. Substitute Ex. 5.[6] The defendant maintained that agency until Mrs. Woods died. In addition, the Probate Court of Jefferson County Alabama, Bessemer Division appointed the defendant guardian and conservator for Maddie Woods on March 14, 2002.  Order Appointing Guardian and Conservator upon Posting Bond.  Def. Ex. 4; Pla. Ex. 4.

After Maddie Woods died on May 31, 2003, a will was offered for probate. It named the plaintiff, Mary Nell Allen, as executrix. Pla. Exs. 28 & 29.  Letters Testamentary were issued by the probate court to the plaintiff on January 30, 2004. Pla. Ex. 25.[7]

The plaintiff filed a complaint against the defendant in the state Circuit Court of Jefferson County, Alabama, Bessemer Division on December 22, 2004.[8]  Exhibit A to A.P. Docket No. 1 and Pla. Ex. 19. The plaintiff alleged conversion, undue influence, wantonness, felonious injury, and unjust enrichment in that complaint.

## C.  THE PARTIES' BANKRUPTCY COURT RELATIONSHIP

### 1.  The Defendant's Bankruptcy Filing

The defendant filed her Chapter 7 bankruptcy petition in this Court on October 8, 2005.  Case Docket No. 1.  A "suggestion of bankruptcy" was filed in the state court case on December 29, 2005.  Based on the bankruptcy filing, the state court placed its case on its administrative docket on January 29, 2006. Pla. Ex. 19. The debtor's discharge was entered on February 6, 2006.  Case Docket No. 23.

---

[6]Admissibility of Defendant's Substitute Exhibit 5 is discussed below.

[7] The defendant argues that anything that happened before Maddie Woods died is irrelevant.  As this opinion demonstrates, the determinative issue before this Court is whether the defendant failed to account for funds she held in trust under a power of attorney or as a guardian or as a conservator of Maddie Woods, and if she did, whether that failure creates a debt that is not dischargeable in this case.  Consequently, any evidence about the property the defendant must account for is relevant, whether that evidence relates to property administered before or after Maddie Woods' death.

[8]Under Alabama law, only a decedent's personal representative has specific statutory authority to file and prosecute lawsuits on behalf of a decedent's estate. See this Court's opinion in In re Eldridge, 348 B.R. 834 (Bankr. N.D. Ala. 2006).  The plaintiff here is the executrix of Maddie Woods' estate which qualifies her as the "personal representative" to bring the pending claims.

3

## 2. The Plaintiff's Bankruptcy Complaints

The plaintiff filed her original <u>Complaint</u> in this Court on January 6, 2007. A.P. Docket No. 1. She filed an <u>Amended Complaint</u> on June 8, 2006. A.P. Docket No. 11.

### a. The Plaintiff's Contentions

The plaintiff's contentions conveniently divide into two groups. Those are: (1) state law causes of actions; and (2) bankruptcy law arguments.

### (1) State Law Causes of Action

The plaintiff's "bankruptcy court" state law causes of action are the same as those she filed in the state court.[9] They are: conversion, undue influence, wantonness, felonious injury, and unjust enrichment. See <u>Complaint</u>, A.P. Docket No. 1 at 6-11 (incorporating the state court complaint).

### (2) Bankruptcy Law Arguments

The plaintiff's bankruptcy law arguments are included in the <u>Amended Complaint</u> she filed in this Court. See A. P. Docket No. 11. Three relate to dischargeability of debts. One relates to the debtor's discharge.

The three dischargeability arguments are: (a) any debt the defendant owes to the plaintiff is not dischargeable under section 523(a)(2) of the Bankruptcy Code because the defendant committed fraud during her care of Maddie Woods; (b) any debt the defendant owes to the plaintiff is not dischargeable under section 523(a)(2) of the Bankruptcy Code because the defendant obtained money by deceit during her care of Maddie Woods; and (c) any debt the defendant owes to the plaintiff is not dischargeable under section 523(a)(4) of the Bankruptcy Code because the defendant committed a defalcation of fiduciary duties during her care of Maddie Woods.

The discharge argument is that the defendant's discharge in this case should be revoked under section 727(d)(1) of the Bankruptcy Code because the defendant procured her discharge by fraud.

### b. The Defendant's Contentions

In response, the defendant contends she acted at all times for the benefit of Maddie Woods and did not misappropriate any property. She concludes that she does not owe the plaintiff any debt, but if she does, it would be dischargeable in this case.

---

[9]The original complaint filed in this Court described the state law causes of action through a copy of the state court complaint attached to that original complaint.

4

## II.  THE THRESHOLD ISSUE

If this case were in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, or Wyoming, there would be no threshold issue.[10]  But it is not. It is in Alabama.  And because it is, this Court must ask: Did any of the causes of action the plaintiff alleges survive Maddie Woods' death? If they did not, there is little else to say.

### A.  LAW APPLICABLE TO THE THRESHOLD ISSUE

Sections 6-5-462 and 6-5-464 of the Code of Alabama, 1975 answer the Court's question.

### 1.  Survival of Causes of Action

### a.  Section 6-5-462

Section 6-5-462, entitled "Survival – Claims by and against personal representative in proceedings <u>not</u> of an equitable nature" reads:

> In all proceedings not of an equitable nature, all claims upon which an action has been filed and all claims upon which no action has been filed on a contract, express or implied, and all personal claims upon which an action has been filed, except for injuries to the reputation, survive in favor of and against personal representatives; and all personal claims upon which no action has been filed survive against the personal representative of a deceased tort-feasor.

Ala.Code 1975, § 6-5-462 (emphasis added).

### b.  Section 6-5-464

Section 6-5-464, entitled, "Survival -- Claims equitable in nature" reads:

(a) All claims equitable in nature upon which an action has been filed shall survive in favor of and against the heirs, successors or personal representative of any deceased party to such an action.

---

[10]See <u>Only in Alabama: A Modest Tort Agenda</u>, 60 ALLR 987 (2009).

5

(b) All claims equitable in nature upon which no action has been filed shall survive in favor of and against the personal representatives, heirs, or successors of deceased persons who, but for their death, could have enforced such claims or against whom such claims could have been enforced.

Ala.Code 1975, § 6-5-464.[11]

## 2. Summary of Alabama's Survival Statutes

In other words, unless a cause of action was filed before the claimant died, or is not an equitable one, one for breach of contract, or one for injuries to the reputation, it does not survive in favor of the claimant's personal representative.[12]

## 3. Two General Rules

In addition to the above, two "Black Letter Law" general rules apply in this situation. Those are:

**General Rule No.1** – As a general rule, unfiled causes of action in tort do not survive in favor of the personal representative of the deceased. Continental Nat. Indem. Co. v. Fields, 926 So.2d 1033, 1037 (Ala. 2005).[13] See also Bassie v. Obstetrics &

---

[11]As discussed below, qualification as an equitable claim may be as simple as this:

Shareholder-derivative actions are historically equitable in nature. Finance, Inv. & Rediscount Co. v. Wells, 409 So.2d 1341, 1341 (Ala.1981). All equitable claims upon which no action has been filed survive in favor of the personal representative of a decedent who, but for death, could have enforced such claims. § 6-5-464, Ala.Code 1975. Therefore, the shareholder-derivative claim asserted by the estates in this action does not present a survivability problem.

Robbins v. Sanders, 927 So.2d 777, 780-81 n.15 (Ala. 2005) (emphasis added).

[12]The plaintiff did not plead, and this Court cannot find, any breach of contract or injury to reputation causes of action. And as we all know, Maddie Woods did not file any action against the defendant before she died. Therefore, unless some of these causes of action are equitable, nothing the plaintiff has plead survived.

[13]Case law explains, "At common law the death of either party put an end to an action, whether real or personal." State ex rel. King v. Pearce, 14 Ala.App. 628, 629 71 So. 656,657 (1916). Because this rule was not changed by section 6-5-462, it remains the general rule. See Continental National Indemnity Company v. Fields, 926 So.2d 1033, 1036 (Ala. 2005) (citing Malcolm v. King, 686 So.2d 231, 236 (Ala.1996) (under § 6-5-462, "an unfiled tort claim will generally not survive the death of the person with the claim")." From these pronouncements, the theory is that the rule remains a "general rule" unless an exception is made by statute. There is

6

<u>Gynecology Associates of Northwest Alabama</u>, 828 So. 2d 280, 285 (Ala. 2002) (Justice J. Gorman Houston Jr., concurring specially) ("a deceased's unfiled tort claims do not survive the death of the putative plaintiff.")

This rule remains true as recently cited by the Court of Appeals for the Eleventh Circuit in <u>Estate of Gilliam ex rel. Waldrop v. City of Prattville</u>, 639 F.3d 1041 (11th Cir.(Ala.) Apr 26, 2011). Writing for the Court, Senior Circuit Judge Emmett R. Cox explained:

> The applicable Alabama survivorship law is Ala.Code § 6–5–462. Under that provision, "a deceased's unfiled tort claims do not survive the death of the putative plaintiff." <u>Bassie v. Obstetrics & Gynecology Assocs. of Northwest Ala., P.C.</u>, 828 So.2d 280, 282 (Ala. 2002); see also <u>Cont'l Nat'l Indem. Co. v. Fields</u>, 926 So.2d 1033, 1037 (Ala.2005) ("As a general rule, causes of action in tort do not survive in favor of the personal representative of the deceased."); <u>Malcolm v. King</u>, 686 So.2d 231, 236 (Ala.1996) ("The general rule is that under Ala.Code 1975, § 6–5–462, an unfiled tort claim does not survive the death of the person with the claim."). It is clear that if this Alabama survivorship statute applies, then Gilliam's §1983 excessive force claim against Emmanuel cannot survive his death.

<u>Id</u>. at 1046 (footnote omitted).[14]

Alabama is unique among other states in this regard.[15]

---

no such exception applicable to the instant case.

[14]<u>Gilliam</u> included the issue of, "whether application of Alabama survivorship law is 'inconsistent with the Constitution and laws of the United States.'" <u>Id</u>. at 1046. For reasons not related to the instant case, the court in <u>Gilliam</u> concluded, "that Ala.Code § 6–5–462 is not inconsistent with federal law and therefore must apply in this case." <u>Id</u>. at 1047.

[15]Again, according to the University of Alabama Law School author of <u>Only in Alabama: A Modest Tort Agenda</u>, 60 ALLR 987 (2009):

> Alabama is the only state in which a tort claim does not survive the death of the victim. If the victim filed a lawsuit before death, the tort action survives; but an unfiled tort claim is lost. In every other jurisdiction, the claim survives, either as an independent action or as part of the recovery in a wrongful death action. It is hard to conceive of good reasons for the Alabama approach.

<u>Id</u>. at 986-87 (footnotes omitted). Article cited and law recognized in <u>Estate of Gilliam ex rel. Waldrop v. City of Prattville</u>, 639 F.3d 1041, 1053 (11th Cir. 2011) (in dissent).

7

**General Rule No. 2** – A claim based on a fraud perpetrated on the decedent does not survive in favor of the personal representative of the deceased. Miller v. Dobbs Mobile Bay, Inc., 661 So.2d 203, 205 (Ala.1995).

In A.W. Herndon Oil Co. v. Transamerica Occidental Life Ins. Co., 201 F.Supp.2d 1213 (M.D. Ala. 2002), where a joinder action of a particular party may have altered the court's jurisdiction, the defendants, (the parties opposing joinder), argued that under section 6-5-462, the plaintiffs could not prove a cause of action against the joined party. District Court Judge Ira DeMent wrote, "Defendants argue that, pursuant to section 6-5-462, the fraud claims do not survive in favor of A.W. Herndon's personal representatives because the Complaint was not filed before his death. Defendants are correct." Id. at 1215 (emphasis added)(citing Miller v. Dobbs Mobile Bay supra).

## B. APPLICATION OF ALABAMA'S SURVIVORSHIP LAW
## TO THE PLAINTIFF'S ALLEGED STATE LAW CAUSES OF ACTION

As stated above, the plaintiff alleged five state law causes of action. Those are: conversion, undue influence, wantonness, felonious injury, and unjust enrichment.[16] The question is: Did any of those alleged causes of action survive Maddie Woods' death? Each is discussed below.

### 1. Conversion

By way of her incorporated state court complaint, the plaintiff alleged:

In and around the years 2002 to 2004, defendants, primarily defendant LaShari Woods Scott, converted to their own use the personal funds and property of the Plaintiff in value no less then One Hundred Fifty Thousand Dollars ($150,000.00).

Complaint, A.P. Docket No.1 at 8.

Conversion is a tort in Alabama. Alexander v. City of Birmingham, Case No. 2100974, 2012 WL 2477914 (Ala.Civ.App. June 29, 2012 ). Therefore, under General Rule No. 1, this cause of action did not survive Maddie Woods' death.

### 2. Undue Influence

By way of her incorporated state court complaint, the plaintiff alleged:

---

[16]No one, including the Court, has raised the issue of the Court's jurisdiction to hear these state law causes of action.  See Stern v. Marshall, __ U.S. __, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

8

Defendant caused injury to plaintiff via the exertion of undue influence over the decedent at a time when decedent was unable to make decisions for herself.

Defendant lacked the authority to exert the stated undue influence, and furthermore, defendants profited from the exertion of said undue influence.

Complaint, A. P. Docket No 1 at 9.

Undue influence is quite a bit more difficult to corral than was conversion. Magistrate Judge David L. Martin's Report and Recommendation in Umsted v. Umsted, Case No. CA 03-219S, 2004 WL 5308782 (D.R.I. Nov 30, 2004), report and recommendation adopted at 2005 WL 5438379 (D.R.I. Feb 18, 2005), affirmed by 446 F.3d 17 (1st Cir. 2006), includes this explanation:

There is disagreement among courts regarding the nature of a claim for undue influence. Some courts consider it to be a tort, see Arena v. McShane, No. Civ.A. 02–7639, 2004 WL 1925048, at *1 (E.D.Pa., Aug. 30, 2004)(referring to "the torts of intentional interference with inheritance and undue influence"); In re Niles, 823 A.2d 1, 9 (N.J.2003) ("Undue influence is a pernicious tort that has been referred to as a species of fraud.")(internal quotation marks omitted). Other courts hold that "[a] claim for undue influence sounds in tort." Calautti v. Pasquarello, No. CA962445E, 2000 WL 1273851, at *5 (Mass.Super.Ct. May 24, 2000); accord D'Agostino v. D'Addio, 504 A.2d 528, 528 (Conn.App.Ct. 1986) (holding that action to set aside conveyance of real estate made to defendant "sounded in tort."); Falby v. New England Forestry Found., No. 011793C, 2003 WL 734453, at *2, (Mass.Super.Ct. Feb. 6, 2003) ("There is no doubt that claims alleging fraudulent misrepresentation and undue influence both sound in tort.").

Taking an opposite view, some courts have firmly rejected the proposition that undue influence is a tort. See Bragdon v. Twenty–Five Twelve Assocs. Ltd. P'ship, 856 A.2d 1165, 1173 (D.C.2004)("there is no tort of undue influence, and there is no right to damages, as distinct from restitution, because of such influence")(quoting 2 Dobbs, Law of Remedies § 10.3, at 658 (2d ed.1993)); Rich v. Fuller, 666 A.2d 71, 76 (Me.1995)("Undue influence is not an intentional tort ... but rather a set of circumstances that gives rise to the equitable remedy of rescission.") (citing Restatement (Second) of Contracts, ch. 7, Topic 2, introductory note at 474 (1981)("Since duress and undue influence, unlike deceit, are not generally of themselves actionable torts, the victim of duress or undue influence is usually limited to avoidance and does not have an affirmative action for damages.")); Fell v. Rambo, 36 S.W.3d 837, 849 n. 18 (Tenn.Ct.App.2001)("undue influence is not a tort").

9

Id. at *8-*9.[17]

Similar to the situation here, "undue influence" typically comes up in situations involving "tortious interference" in regard to inheritance. The article Disappointed Heir's Revenge, Southern Style: Tortious Interference with Expectation of Inheritance—A Survey with Analysis of State Approaches in the Fifth and Eleventh Circuits, 55 Baylor L.Rev. 79 (2003) includes what it calls , "A Brief Description of the Tort and Its Rationale." It reads:

> Under American law, testators have a right to completely disinherit nearly anyone, and there is no right to inherit. Of course, tortious conduct relating to wills, such as the use of **undue influence**, threats, or coercion to procure a particular disposition, or destruction of a will, has long been understood as a legal wrong, but only against the testator whose right of free testation is infringed upon, not the beneficiary. A purported injury to an intended recipient is not cognizable (because there is no right to inherit); instead, the probate system through the will contest or caveat proceeding aims to offer all interested parties a forum in which to litigate the testator's true intentions.

> By contrast, although an injury to the testator is a natural concomitant to the tort (for example, **undue influence** may be exerted on him to execute or revoke a will), the tort is not a testator-centered remedy. As the Restatement formulation of the tort illustrates, the tort represents a fundamental and significant shift of focus away from the testator and onto the wronged would-be beneficiary. While a will contest centers on what the testator intended, a tort suit requires a determination of the alleged tortfeasor's intent as well. The focus is on the wrongful conduct of the tortfeasor vis-à-vis the beneficiary.

Id. at 88-89 (emphasis added) (footnotes omitted).

The article explains Alabama's relationship to other states in the Eleventh Circuit by stating:

> Although less than half of the states currently recognize the tort, four of the six states in the Fifth and Eleventh Circuits do. Georgia was one of the first, in the 1915 case of Mitchell v. Langley. The tort is also recognized in Florida and Texas, and probably in Louisiana as well. In 2001, the Alabama Supreme Court recognized the tort, and then reversed itself later

---

[17]The court in Umsted was persuaded more that undue influence was a set of circumstances giving rise to an equitable remedy rather than it being a tort. Id. at *9.

the same year. There are no reported cases addressing the tort in Mississippi.

Id. at 85-86 (citing See Ex parte Batchelor, No. 1991507, (Ala. Jan. 5, 2001) withdrawn at 803 So. 2d 515, 515 (Ala. 2001)).

Writing a concurring opinion in McGee v. McGee, Case Nos. 1091798 and 1100247, 2012 WL 104879 (Ala. Sup. Ct. Jan. 13, 2012), Associate Justice Glenn Murdock discussed the undue influence cause of action in Alabama law. He stated:

By 1977, if not before, our cases had begun to speak in terms of three distinct elements that, if proven, would aid a will contestant by giving rise to a presumption of undue influence, thereby shifting the burden of proof to the proponent of the will to establish that the will was the free act of the testator. In Pruitt v. Pruitt, 343 So.2d 495, 499 (Ala.1977), this Court stated:

"Our cases have consistently held that when undue influence is asserted in a will contest, the contestant has the burden, in order to raise a presumption of undue influence, to prove a dominant confidential relationship and undue activity in the execution of the will by or for a favored beneficiary. In other words, evidence must establish: (1) a confidential relationship between a favored beneficiary and testator; (2) that the influence of or for the beneficiary was dominant and controlling in that relationship; and (3) undue activity on the part of the dominant party in procuring the execution of the will."

343 So.2d at 499 (citation and original emphasis omitted and emphasis added). As indicated in cases such as Pruitt, however, the "elements" necessary to give rise to a presumption of undue influence and to shift the burden of proof are one thing; the definition of undue influence is another.

Not unexpectedly, as Pruitt explained, if a contestant is able to prove those elements for purposes of creating that presumption, he or she will have "go[ne] far, of course, in proving the principal charge of undue influence." 343 So.2d at 499. That "principal charge," i.e., the wrongdoing known as "undue influence," was itself defined at common law and in our cases as simply this: the assertion of such " 'influence ... as, in some measure, destroys the free agency of the testator, and prevents the exercise of that discretion which the law requires a party should possess as essential to a valid testamentary disposition of his property.' " Id. (quoting the well established definition of undue influence stated over 20

11

years earlier in <u>Locke v. Sparks</u>, 263 Ala. 137, 140, 81 So.2d 670, 673 (1955)). As this Court indicated in the 1861 case of <u>Hall's Heirs v. Hall's Executors</u>, 38 Ala. 131, 134 (1861), what is necessary to demonstrate undue influence is simply a showing "that an influence was exerted upon the mind of the testator, which was equivalent to moral coercion, and constrained him to do that which was against his will, but which, from fear, the desire of peace, or some other feeling than affection, he was unable to resist." Black's Law Dictionary 1666 (9th ed.2009) defines "undue influence" in relation to a will as simply "[c]oercion that destroys a testator's free will and substitutes another's objectives in its place" and then notes that "a presumption of undue influence" (emphasis added) may arise "based on the confidential relationship between the influencer and the person influenced" "[w]hen a beneficiary actively procures the execution of a will." See also 36 Am.Jur. Proof of Facts 2d 109 Undue Influence in Execution of Will § 2 (1983)(discussing the elements of a claim of undue influence); 36 Am.Jur. Proof of Facts 2d 109 Undue Influence in Execution of Will § 7 (1983)(discussing the elements for establishing a presumption of undue influence).

<u>Id</u>. at *10-*11 (footnote omitted).

Based on the above, this Court concludes, if there is a cause of action in Alabama for "undue influence," and if it is not a tort, it certainly sounds like one to this Court.[18] Consequently, because "undue influence" sounds in tort, this Court finds that any cause of action for it did not survive Maddie Woods' death.

---

[18]The court in <u>Bush v. Teachers Ins. & Annuity Ass'n of Am.</u>, No. 1:05cv378–VPM, 2006 WL 3075539 (M.D. Ala. Oct. 30, 2006) wrote:

> The court takes judicial notice of a possibility that... [the plaintiff] owed... a legal duty not to interfere with their expectancy in the benefits of the contracts at issue. <u>Holt v. First Nat'l Bank of Mobile</u>, 418 So.2d 77, 79-81 (Ala.1982) (indicating a willingness to recognize a cause of action for tortious interference with an expectancy or inheritance under appropriate circumstances). Their failure to argue that she did in fact owe them a legal duty or to attempt to state a cause of action for tortious interference, when considered in conjunction with the uncertainty of the existence of such a duty, relieves the court of the burden of determining whether such a duty exists.

<u>Id</u>. at *3 (parenthetical added).

12

### 3. Wantonness

By way of her incorporated state court complaint, the plaintiff also alleged:

> Defendants wantonly breached duties of reasonable care owed the
> plaintiff, proximately causing plaintiff's damages.

Complaint, A.P. Docket No 1 at 9.

The per curiam opinion in Alfa Mut. Ins. Co. v. Roush, 723 So.2d 1250 (Ala. 1998) includes:

> "Wantonness" is statutorily defined as "[c]onduct which is carried on with a
> reckless or conscious disregard of the rights or safety of others." Ala.Code
> 1975, § 6-11-20(b)(3). "Wantonness" has been defined by this Court as
> the conscious doing of some act or the omission of some duty, while
> knowing of the existing conditions and being conscious that, from doing or
> omitting to do an act, injury will likely or probably result. Bozeman v.
> Central Bank of the South, 646 So.2d 601 (Ala.1994). To prove
> wantonness, it is not essential to prove that the defendant entertained a
> specific design or intent to injure the plaintiff. Joseph v. Staggs, 519 So.2d
> 952 (Ala.1988).

Id. at 1256.

In that light, the Alabama Supreme Court has recognized over and over that, "Wantonness, however, is "not merely a higher degree of negligence; instead, **it is a 'qualitatively different tort'** concept of actionable culpability.' " Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17, 19 (Ala.1996) (quoting Lynn Strickland Sales & Serv. Inc. v. Aero–Lane Fabricators, Inc., 510 So.2d 142, 145 (Ala.1987)). See Miller v. Bailey, 60 So.3d 857, 867 (Ala. 2010); Cheshire v. Putman, 54 So.3d 336, 342 (Ala. 2010); Ferguson v. Baptist Health System, Inc., 910 So.2d 85, 92 (Ala. 2005); Cessna Aircraft Co. v. Trzcinski, 682 So.2d 17, 19 (Ala. 1996). See also In re William Walker v. Capstone Building Corporation (Ex parte Capstone Building Corp.), Case No. 1090966, 2012 WL 887497 (Ala. Sup. Ct. March 16, 2012) for a detailed discussion of the intent and recklessness attributes of wantonness.

Because wantonness is a tort, like conversion and undue influence, any cause of action based on it did not survive Maddie Woods' death.

### 4. Felonious Injury

By way of her incorporated state court complaint, the plaintiff also alleged:

13

Defendants' actions, and the injuries resulting therefrom, could be held to constitute a felony under Alabama law.

Under § 6-5-370 of the Code of Alabama (1977), plaintiffs bring this civil action to recover for the felonious injury caused by defendants.

Complaint at 9, A.P. Docket No 1.

Section 6-5-370 of the Code of Alabama 1975 includes, "For any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender." Ala.Code 1975, § 6-5-370. This has come to be knows as "felonious injury," but it is of little help to the plaintiff here.

District Judge Myron H. Thompson explains why in Bell Aerospace Services, Inc. v. U.S. Aero Services, Inc., 690 F.Supp.2d 1267 (M.D. Ala. 2010). He wrote:

Bell Aerospace asserts a theft-of-intellectual-property claim, based on 1975 Ala.Code § 6-5-370, against all defendants. Section 6-5-370 states that, "For any injury, either to person or property, amounting to a felony, a civil action may be commenced by the party injured without prosecution of the offender." Bell Aerospace's reliance on the provision is mistaken: "Section 6-5-370 does not create a cause of action; rather, it merely allows a plaintiff to commence a civil action even if the plaintiff does not pursue criminal prosecution of the defendant." Lewis v. Fraunfelder, 796 So.2d 1067, 1070 (Ala.2000); see also Preskitt v. Lyons, 865 So.2d 424, 429 (Ala.2003) ("§ 6-5-370 only eliminates an obstacle for plaintiffs with a valid cause of action; it does not create a civil cause of action for any injury that amounts to a felony.") (emphasis added); Thomas v. McKee, 205 F.Supp.2d 1275, 1291 (M.D. Ala. 2002) (De Ment, J.) (Section 6-5-370 "was merely intended to abrogate the common law rule of suspension which precluded civil damages claims in these circumstances absent the prosecution of the felonious offender."). Therefore, § 6-5-370 does not provide a means for Bell Aerospace to bring a claim for theft of intellectual property. Bell Aerospace's theft-of-intellectual-property claim must fail.

Id. at 1274 (footnote omitted).

Based on the above, the Court finds that the plaintiff's "felonious injury" claim must also fail. It is not its own cause of action, and therefore could not have survived Maddie Woods' death.

### 5. Unjust Enrichment

By way of her incorporated state court complaint, the plaintiff also alleged:

14

Defendants have been unjustly enriched at the expense of, and to the proximate damage of, the plaintiff, entitling plaintiff to an award of damages.

Complaint, A.P. Docket No. 1 at 10.

Unjust enrichment was defined by the Alabama Supreme Court in Funliner of Alabama, L.L.C. v. Pickard, 873 So.2d 198 (Ala.2003). Writing for the court, Associate Justice Jacquelyn L. Stuart explained, "To prevail on... [a claim for unjust enrichment], the plaintiffs must establish that the defendants hold money that, in equity and good conscience, belongs to the plaintiffs, or that the defendants hold money that was improperly paid to the defendants because of mistake or fraud." Id. at 209 (parenthetical added).

From this description, it is not difficult to understand why unjust enrichment, unlike the other causes of action discussed above, is equitable in nature. Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1264 (11th Cir.2000); Chevron U.S.A., Inc. v. Belco Petroleum Corp., 755 F.2d 1151, 1154 (5th Cir.1985), reh'g denied, 761 F.2d 695 (5th Cir.1985), State Farm Fire & Cas. Co. v. Evans, Case No. 1021370, 2006 WL 1667657 at *10 (Ala. June 16, 2006).[19] And because it is, it is even easier to understand why, in the context of this proceeding, it is treated differently from the other causes of action discussed above.

As quoted above, section 6-5-464 excepts "equitable remedies" from section 6-5-462's restriction on survivorship of causes of action. Section 6-5-464 reads in part, "All claims equitable in nature upon which no action has been filed shall survive in favor of... the [decedent's] personal representative...." Id. (parenthetical added). Because "unjust enrichment" is "equitable in nature," that exception applies to it here.

Consequently, because unjust enrichment is an equitable remedy, it survived Maddie Woods' death.

### 6. Conclusion to Application of Alabama's Survivorship Law to the Plaintiff's Alleged State Law Causes of Action

Based on the above, this Court concludes that only one of the plaintiff's state law causes of action survived Maddie Woods' death. That is "unjust enrichment." The actions filed for conversion, undue influence, wantonness, and felonious injury did not survive.

---

[19] This Court reached the same conclusion in Sharpe v. Wells Farco Home Mortgage (In re Sharpe), A.P. No. 06-00250, 2007 WL 1876368 (Bkrtcy. N.D. Ala. June 27, 2007), in the context of a plaintiff's request for a jury trial on an unjust enrichment claim.

## C. APPLICATION OF ALABAMA'S SURVIVORSHIP LAW
## TO THE PLAINTIFF'S BANKRUPTCY ARGUMENTS

As stated above, in addition to five state law causes of action, the plaintiff makes four bankruptcy law arguments.[20] Three involve dischargeability of debts. One involves the debtor's discharge. The question remains: Did any of these arguments survive Maddie Woods' death? Each is discussed below.

### 1. Dischargeability

Count Six of the plaintiff's <u>First Amended Complaint</u> includes all three dischargeability claims. It reads:

COUNT SIX

4.      This complaint is brought pursuant to Rule 7001(6) to determine dischargeability of a debt under §523 (a)(2)(A), §523 (A)(2)(B)(iv) and §523 (a)(4) of the Bankruptcy Code.

5.      In the course of her dealings with Maddie Woods and with the money and property of Maddie Woods, the defendant intentionally made misrepresentations of material fact with the intention of inducing reliance on said misrepresentations, and forthwith misappropriated monies of Maddie Woods.

6.      This activity constitutes fraud and has proximately damaged plaintiff, in her capacity as executor of the Estate of Maddie Woods.

WHEREFORE, plaintiff respectfully requests that judgment be entered against the defendant and for the plaintiff for damages incurred as a result of debtor's tortious conduct, and that said damages be ruled non-dischargeable under S 523 [sic] of the bankruptcy code.

<u>First Amended Complaint</u>, A. P. Docket No. 11 at 3.

The question again is: Did these alleged claims survive Maddie Woods' death?

---

[20]This Court is careful not to describe the plaintiff's Bankruptcy Code arguments as "causes of action." Whether they are, or not, is well beyond the already far reaching scope of this opinion.

16

### a. The Three Bankruptcy Dischargeability Statutes

As stated in the complaint, the plaintiff's dischargeability arguments are based on three Bankruptcy Code sections. Those are: section 523(a)(2)(A), section 523(a)(2)(B)(iv), and section 523(a)(4) of the Bankruptcy Code. Each is quoted below.

### (1) Section 523(a)(2)(A) – Fraud

Section 523(a)(2)(A) reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(A) false pretenses, a false representation, or actual **fraud**, other than a statement respecting the debtor's or an insider's financial condition;

11 U.S.C. § 523(a)(2)(A) (emphasis added).

### (2) Section 523(a)(2)(B)(iv) – Deceit

Section 523(a)(2)(B)(iv) reads:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

(B) use of a statement in writing--

(iv) that the debtor caused to be made or published with intent to **deceive**;

11 U.S.C. § 523(a)(2)(B)(iv) (emphasis added).

### (3) Section 523(a)(4) – Breach of Fiduciary Duty

Section 523(a)(4) reads:

17

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

> (4) for fraud or defalcation while acting in a **fiduciary** capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4) (emphasis added).

### b. State Law Determines Whether These Arguments Survived

Whether these three bankruptcy arguments survived Maddie Woods' death is a question of state law. Why is this? Are the dischargeability arguments not based on federal law? Do they not rise from the Bankruptcy Code? Why would they not be exempt from Alabama's civil procedural survival statutes under any circumstances?

While potentially complex, the initial answers to these questions are simple. Whether a plaintiff has standing to object to the dischargeability of a debt is, of course, based on whether that party <u>has</u> a debt to object to. In bankruptcy, whether there is a debt is a question of state law. The court in <u>In re Bailey</u>, 197 F.3d 997 (9th Cir.1999) explained, "While bankruptcy law governs whether a claim is nondischargeable under § 523(a)(6), this court looks to state law to determine whether an act falls within the tort of conversion." <u>Id</u>. at 1000. With that support, the same court noted in <u>Petralia v. Jercich (In re Jercich)</u>, 238 F.3d 1202,(9th Cir.2001) that, "To determine whether Jercich's conduct was tortious, we look to California state law." <u>Id</u>. at 1206 (citing <u>Bailey</u>) (footnotes omitted). The court in <u>In re Brock</u>, Case No. 08-6087, 2009 WL 1559528 (Bkrtcy. D.Idaho, June 02, 2009), closes the circle by recognizing, "Although bankruptcy law determines the dischargeability of debts, state law determines whether a conversion has occurred." <u>Id</u>. at *8. See also the Court of Appeals for the Fifth Circuit opinion in <u>In re Hickman</u>, 260 F.3d 400 (5th Cir. 2001) which includes, "we look to state law to determine whether the debt at issue possesses the attributes of a forfeiture." <u>Id</u>. at 405 (citation omitted).

Therefore, based on the above, this Court will consider Alabama law to decide whether these bankruptcy arguments survived Maddie Woods' death.

### c. Deciding Survivorship

The state law basis of the plaintiff's section 523(a)(2)(A) argument is fraud; the basis of her section 523(a)(2)(B)(iv) argument is deceit; and the basis of her section 523(a)(4) argument is breach of fiduciary duty. Each is discussed below.

Case 06-00011-BGC   Doc 49   Filed 09/27/12   Entered 09/27/12 09:07:32   Desc Main
Document       Page 18 of 128

### (1)  Fraud and Deceit

General Rule No. 2, of course, answers the question as to the dischargeability arguments based on fraud and deceit.  As stated above, that rule reads, "A claim based on a fraud perpetrated on the decedent does not survive in favor of the personal representative of the deceased. <u>Miller v. Dobbs Mobile Bay, Inc.</u>, 661 So.2d 203, 205 (Ala.1995)." Consequently, because the plaintiff's arguments under Bankruptcy Code sections 523(a)(2)(A) and 523(a)(2)(B)(iv) are based on fraud and deceit, they did not survive Maddie Woods' death.

### (2)  Breach of Fiduciary Duty

The provisions of Section 6-5-464, Code of Alabama 1975, that excepted "unjust enrichment" from the exclusionary result of section 6-5-462's restriction on survivorship of causes of action, also exempt "breach of a fiduciary duty." As quoted above, section 6-5-462 reads in part, "All claims equitable in nature upon which no action has been filed shall survive in favor of... the [decedent's] personal representative...." <u>Id</u>. (parenthetical added). Like "unjust enrichment," "breach of a fiduciary duty" is an equitable remedy.[21]  The discussion below explains.

Historically, an action for the breach of a fiduciary duty was an equitable remedy. Writing for the Court in <u>Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry</u>,494 U.S. 558 (1990), Justice Thurgood Marshall explained, "The Union next argues that respondents' duty of fair representation action is comparable to an action by a trust beneficiary against a trustee for breach of fiduciary duty. Such actions were within the exclusive jurisdiction of courts of equity. 2 Story, supra, § 960, p. 266; Restatement (Second) of Trusts § 199(c) (1959)." <u>Id</u>. at 567.

The court in <u>Turner v. J.P. Bolduc, et al. (In re Crowe Rope Industries, LLC)</u>, 307 B.R. 1 (Bkrtcy. D.Me. 2004) updated this explanation. It wrote:

> Federal courts are nearly unanimous in holding that a breach of fiduciary duty claim is an action in equity, to which no jury right attaches. See <u>Chauffeurs, Teamsters and Helpers Local No. 391 v. Terry</u>, 494 U.S. 558, 567, 110 S.Ct. 1339, 108 L.Ed.2d 519 (1990)(citing 2 J.Story, Commentaries on Equity Jurisprudence § 960, at 266 (13th ed. 1886) and Restatement (Second) of Trusts § 199(c)(1959)); <u>In re Evangelist</u>, 760 F.2d 27, 29 (1st Cir.1985)("Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions in equity—carrying with them no right to trial by jury." citing Restatement of Restitution, introductory note at

---

[21] This Court reached the same conclusion in <u>Sharpe v. Wells Farco Home Mortgage (In re Sharpe)</u>, A.P. No. 06-00250, 2007 WL 1876368 (Bkrtcy. N.D. Ala. June 27, 2007), in the context of a plaintiff's request for a jury trial on a claim of breach of fiduciary duty.

19

9 (1937)); <u>In re Jensen</u>, 946 F.2d 369, 372 (5th Cir.1991); <u>Broadnax Mills, Inc. v. Blue Cross and Blue Shield of Virginia</u>, 876 F.Supp. 809, 816 (E.D.Va.1995); <u>Pereira v. Cogan</u>, 2002 WL 989460 at *3 (S.D.N.Y.2002).

<u>Id</u>. at 5.

Based on the above, this Court finds that the plaintiff's breach of fiduciary duty argument under section 523(a)(4) of the Bankruptcy Code survived Maddie Woods' death because breach of a fiduciary duty is an equitable remedy under Alabama law.

### 2. Discharge

The plaintiff's final bankruptcy law argument is that the debtor's discharge should be revoked. Count Seven of the plaintiff's <u>First Amended Complaint</u> reads:

COUNT SEVEN

7.     This complaint is brought pursuant to Rule 7001(4) to request revocation of defendant's discharge obtained in case number BK-05-10595-BGC-7, under §727(d)(1) of the Bankruptcy Code.

8.     Upon information and belief, defendant has concealed assets converted from the Estate of Maddie Woods.

9.     Defendant failed to notify plaintiff of the referenced chapter 7 bankruptcy in spite of having already responded to the lawsuit filed in state court against her by plaintiff.

10.    Defendant lied at her 341 hearing about her knowledge of the state court complaint.

11.    Defendant lied in her statement of financial affairs, stating that she was not a party to any suits or administrative proceedings, when in fact she had been recently served with process in a state court action brought by plaintiff.

12.    Plaintiff contends that defendant intentionally neglected to list plaintiff as a creditor in the hopes of subverting plaintiff's pending state court action via her bankruptcy filing.

<u>First Amended Complaint</u>, A. P. Docket No. 11 at 3.

Pertinent, of course, is section 727(d)(1) of the Bankruptcy Code.  It reads:

20

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if--

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

11 U.S.C. § 727(d)(1).

By definition, section 6-5-462 applies only to actions that arose before a claimant's death. Because the debtor filed the pending bankruptcy on October 8, 2005, and her discharge was entered on February 6, 2006, both well over two years after Maddie Woods died, section 6-5-462, Code of Alabama 1975 does not apply here. Therefore, this argument survived Maddie Woods' death.

There is, however, one caveat. As section 727(d)(1) states that, only, "the trustee, a creditor, or the United States trustee" may request revocation of a discharge. We know the plaintiff is neither the trustee nor the U.S. trustee, therefore, unless she is a creditor, she would not have standing to request revocation of a discharge. Consequently, unless she is able to recover under one of two of her other remaining claims, that is unjust enrichment or breach of fiduciary duty, she would not be a creditor. Therefore, those claims must be resolved prior to deciding whether the plaintiff may request a revocation of a discharge.

## D. CONCLUSION TO THE THRESHOLD ISSUE

The threshold issue was whether any of the plaintiff's "causes of action" survived Maddie Woods' death under Alabama's unique law. The answer is yes. As discussed above, this Court finds that two actions, and possibly a third, did survive. Those are: (1) unjust enrichment; (2) breach of a fiduciary duty; and (3) possibly the objection to discharge.

With the threshold issue decided, the Court may now address the important substantive issues that brought these parties to this point.

## III. FINDINGS OF FACT

## A. THE PARTIES' OPENING STATEMENTS

The parties' opening statements captured the emotional complexities of their dispute and demonstrate both the complex relationships of the parties and the complex legal issues before this Court.

Case 06-00011-BGC   Doc 49   Filed 09/27/12   Entered 09/27/12 09:07:32   Desc Main
Document      Page 21 of 128

Brian Bugge for the Plaintiff:

Thank you. Judge, my client is trying today to finally obtain an answer to a question she has had since she has hired me, and that question is what happened to the approximately two hundred and eighty-four thousand dollars of Maddie Woods' money that was spent by this defendant during the last eighteen months of Maddie Woods' life.

Until today we have been shut out at every pass. We have been trying to get answers to these questions since shortly after May 31 of 2003 when Maddie Woods passed away. We think we will get those answers today.

We expect to demonstrate to the court that not only does the defendant owe the estate of Maddie Woods a large portion of that two hundred and eighty-four thousand but that this debt is nondischargeable, due to the fraud committed by the defendant in taking this money, and based also on what we believe to have been a fiduciary relationship the defendant tried to establish with the deceased, Maddie Woods.

Now we could easily be caught up in an argument over who cared more for the deceased, Maddie Woods. We have got family members from two sides of the family here. I think it is safe to say we have got some hard feelings but to get into that would leave us far short of resolving the legal questions and resolving the most significant legal issue, which is was a debt created and was it created through fraud.

We are going to try to stay focused on these issues and get a brief overview of what we believe the issues to be. First, we believe we are going to show that the defendant in this case spent or caused to be spent approximately this dollar figure, two hundred and eighty-four thousand dollars of Maddie Woods' money, during the last eighteen months of her life.

Two, that the money was not all spent on the care of Maddie Woods and the defendant will not be able to account for how this money was all spent.

Three, the defendant had over fifty thousand dollars in credit card debt at the time of her bankruptcy filing in October of 2005 and was obviously in financial straits during the time that she had control over Ms. Woods' finances from late 2001 through her death in May of 2003.

Four, the defendant initiated a guardianship and conservatorship case in probate court, Jefferson County Probate Court in Bessemer, and was ordered to post a three hundred thousand dollar bond before she began

22

acting as a conservator for Ms. Woods. She never posted that bond, which essentially leaves my clients with no recourse other than to go directly after the defendant.

And because she didn't post the bond, she was never properly acting as a conservator for Ms. Woods in spite of upon information and belief presenting an order appointing her as conservator upon posting bond in accessing accounts and then taking action on behalf of Ms. Woods.

Five, we believe the defendant misrepresented her marital status and her interest in her present home at the time of her bankruptcy filing and that she is essentially hiding assets that otherwise would be subject to garnishment or collection efforts.

Six, we believe that the defendant interfered with my client's exercise of her responsibilities when she was serving as executor by subverting the mail of Ms. Woods, by converting funds payable to Ms. Woods after Ms. Woods died, and these would have been monies that properly belonged only to her estate.

And we believe, of course, any acts of signing checks made payable to the deceased after she died and any acts of, you know, withdrawing money from accounts that properly belonged to the estate essentially are felonies, felony acts, and we believe they are still civilly actionable as felony acts, but we also believe that they go to our basic efforts to demonstrate the fraud perpetrated by the defendant.

The seventh point is that the defendant was still accessing money, and this has been alluded to just a minute ago, but the defendant was still accessing money properly belonging to the estate of Maddie Woods as late as March of 2004, and we will prove that today. That is almost a year after Ms. Woods died.

Lastly, for our main points, we are going to show the defendant opened accounts in her sons' names, her two minor sons at Citizens Trust Bank, using money taken from a joint account with Maddie Woods; and she has lied about the existence of these accounts and she has never accounted for the money deposited into these accounts. She has never accounted for the vast majority of the money in spite of all of our efforts. And keeping in mind that the defendant in October of 2005 filed a Chapter 7 bankruptcy stating that she had no real property, seventeen hundred and fifty dollars worth of personal property and over fifty thousand dollars in credit card debt, and this is a lady who is well-employed, a longtime nurse, you know, netting somewhere in the neighborhood of twenty thousand dollars a year and yet she winds up with fifty thousand in credit card debt

23

with nothing to show for it and she was involved in this lady's sizable estate during the last eighteen months of her life where there was an enormous amount of waste and there is no explanation for it.

The explanation for all of this is simple. We are going to demonstrate that, in addition to the money that came out of Ms. Woods' estate, if you look over the last five years prior to Ms. Scott's bankruptcy filing, if you look at her income, if you look at her credit card debt and you look at all of the money that was spent out of Maddie's estate, you're looking at close to a half million dollars in five years, and at the time she filed her bankruptcy she claimed no real property, seventeen hundred and fifty dollars in personal property and there is no accounting for what happened to all of this money.

We believe the explanation is simple and what the plaintiff, and our other witnesses we expect to testify to, is that Ms. Scott has either just spent all of this money with nothing to show for it or she is hiding assets and she has never made any acknowledgments or explanations one way or the other, and we hope to find out today and make a determination of the amount of debt that she owes to the estate and we will be relying, in part, on her testimony for that.

We thank you, Your Honor, for the opportunity to present this case.

Tr. 4-9.

Debra Winston for the defendant:

May it please the court, first of all, Your Honor, we intend to prove that Maddie Woods was in complete control of her own finances. The guardianship and conservatorship are very explicit. It says that Maddie Woods was incapacitated. It did not say that Maddie Woods was incompetent period. I expect the evidence to show this court that a number of people took Maddie Woods to the bank and there were some withdrawals, sizable withdrawals made.

The problem, I believe, comes in because my client was taken care of by Ms. Woods even as a child. She lived with her. Ms. Woods bought her, her first car. Ms. Woods' husband died and she came in and lived with her again after her husband died.

The problem I'm having, if Maddie Woods is in complete control of her finances, there is no issue, there is no standing for anyone to come in and object to how the owner of the funds spent their money. And I really don't think Ms. Allen has any standing with respect to Ms. Maddie Woods'

24

money while she was alive. She didn't have any interest in it, nothing was due her while she was alive. She only became an interested party on the death of Maddie Woods. I understand there was a will that was found by Ms. Allen out of town and Ms. Scott knew nothing about it.

Further, I would expect the evidence to show that, once Ms. Woods became ill, she had to retain sitters twenty-four hours, around-the-clock, for Ms. Woods. No one else helped Ms. Woods. Ms. Woods didn't have any children. The only child she had was Ms. Scott. That was the only child for Ms. Woods, as well as Mr. Woods. She was the caretaker of all of them, but she did not take care of the money. Maddie Woods was the one in complete control.

I expect the evidence to show you that a sitter had to call Ms. Scott and say she just withdrew fifty thousand dollars out of the bank account, and I expect the evidence to show that that money that was withdrawn, Ms. Scott redeposited in another bank account where Maddie Woods' name was on it. They both were joint owners of the account.

Now Ms. Woods, I expect the evidence to further show, that Ms. Woods totally trust Ms. Scott and would give Ms. Scott whatever she needed to handle any of her business.

Further, I understand that Ms. Woods would just give money away, and Ms. Scott is not the culprit here. Ms. Scott is the one who took care of Ms. Woods, wrote checks to the sitters, to the cooks, to the cleaners, I mean to the people who came in and cleaned up for Ms. Woods.

Ms. Woods was not out of her mind. I expect testimony to show you today that there was never a time that Ms. Woods did not know what was going on until the day she closed her eyes. Now the doctor's report, the court reports, everything shows that she was simply incapacitated. To me, Your Honor, that simply means her mobility was restricted. It does not mean that her mind was misfunctioning.

And if Ms. Woods takes her money out of her bank account, I don't care if it is ten years or the day before she dies, that is Ms. Woods' business, and I strenuously object to anything that should come into the court about Ms. Maddie Woods' money prior to her death. Ms. Allen had no standing, no interest in any of that money at that time.

And I expect that, once the evidence is presented to this court, that Ms. Scott would be exonerated of all of these allegations that counselor has alleged.

Case 06-00011-BGC   Doc 49   Filed 09/27/12   Entered 09/27/12 09:07:32   Desc Main
Document      Page 25 of 128

Tr. 9-11.

## B. WITNESSES

Six witnesses testified at the trial. They were:

1.  LaShari Woods Scott, the defendant, called by the plaintiff and also testified on her own behalf.

2.  Mary Nell Allen, the plaintiff, testified on her own behalf.

3.  Betty F. Allen, the plaintiff's daughter, testified for the plaintiff.

4.  Viola Mae Lett, one of Maddie Woods' caregivers, testified for the defendant.

5.  Lizzie (Green) Bell, another caregiver, testified for the defendant.

6.  Frederick Scott, the defendant's husband, testified for the defendant.

## C. EXHIBITS

Fifty-seven exhibits were admitted. Each is described below.

### 1. Plaintiff's Exhibits

Exhibit 1    Deposition of LaShari Scott:

This deposition was taken on July 12, 2006, in the pending adversary proceeding. Attending were the deponent-defendant, Brian Bugge for the plaintiff, and Debra Winston for the defendant. There were no exhibits offered. The copy before the Court appears to be the entire deposition of 108 pages, including an index.

Exhibit 2    Debtor's Bankruptcy Petition and Schedules:

The debtor filed her bankruptcy case on October 8, 2005. This exhibit includes the debtor's bankruptcy petition, schedules and related material. Case Docket No. 1.

Exhibit 3    Amendment to Debtor's Schedules:

The debtor amended her list of creditors on October 25, 2005, to include a $12,000 credit card debt to NCO Financial Systems, Inc. incurred on February 10, 2005. (Case Docket No. 10). This exhibit also includes an

26

amendment, filed on December 17, 2005, to Schedule B Personal Property and Schedule C Property Claimed as Exempt. (Case Docket Nos. 18 and 19).

Exhibit 4    Documents relating to Debtor's Guardianship and Conservatorship:

This exhibit includes four pages. Page 1 is an, "Order Appointing Guardian and Conservator Upon Posting Bond" signed by the Judge of Probate of Jefferson County, Alabama, on March 14, 2002. It is quoted later in this opinion.

Page 2 is the, "Letters of Guardianship" signed by the Judge of Probate on March 14, 2002.

Page 3 is a letter dated April 22, 2003, from the Judge of Probate to Ms. LaShari Woods Scott in which the probate court is attempting to collect $640.50 in court costs in the Estate of Maddie Jenkins Woods, Probate Court Case No. 37270.

Page 4 is a letter from the probate court to Mr. Leon Garmon, Attorney at Law, acknowledging receipt of a check for $640.50 for the Estate of Maddie Jenkins Woods. The letter also includes, "We need a $300,000.00 bond on LaShari Woods Scott as conservator over the estate of Maddie Jenkins Woods a/k/a Maddie J. Woods, an incapacitated person, within 15 days or the County Conservator may be appointed."

Exhibit 5    Mutual Savings Credit Union Statement:

This exhibit includes statements of a joint account of Maddie Woods and Johnnie C. Allen at the Mutual Savings Credit Union in Birmingham, Alabama. This account was Maddie Woods' dominant account.

Exhibit 6    Mutual Savings Credit Union Statement:

This exhibit includes additional statements of the same joint account of Maddie Woods and Johnnie C. Allen at the Mutual Savings Credit Union in Birmingham, Alabama.

Exhibit 7    Mutual Savings Credit Union Statement:

This exhibit includes copies of checks drawn on the same Mutual Savings Credit Union account. The pertinent checks are discussed later.

Exhibit 8          Mutual Savings Credit Union Statement:

                   This exhibit includes copies of additional checks drawn on this same
                   account. These are also described below.

Exhibit 9          Citizens Federal Savings Bank Statement:

                   This exhibit is an Ownership of Account statement for a bank account
                   from Citizens Federal Savings Bank, Birmingham, Alabama under the
                   account name of "Maddie Woods" depositor for Johnnie C. Allen
                   (Beneficiary).  The account was opened on October 16, 1996, with an
                   initial deposit of $105,028.98. The defendant testified that she did not
                   have any knowledge of this account and that the funds from this account
                   were not the funds that were used to open the account identified in Pla.
                   Ex. 10.

Exhibit 10         Citizens Federal Savings Bank Statement:

                   This exhibit is another account at Citizens Federal Savings Bank,
                   Birmingham, Alabama.  This one is under the account name of "LaShari
                   Woods Scott POA Maddie Woods Beneficiary," meaning "power of
                   attorney." The account was opened December 18, 2001, with an initial
                   deposit of $113,433.82. Testimony explained that this initial deposit came
                   from Eddie Woods' and Maddie Woods' Citizens Federal Savings Bank
                   account.

Exhibit 11         Citizens Federal Savings Bank Statement:

                   This exhibit includes history for the Citizens Federal Savings Bank POA
                   account for January 1, 2002, through December 31, 2002.

                   The beginning balance was $113,499.08.  Four specific withdrawals listed
                   on this statement were highlighted in the testimony.  $25,500 was
                   withdrawn on January 14, 2002. $25,000 was withdrawn on January 14,
                   2002. $6,000 was withdrawn on February 14, 2002. $40,000 was
                   withdrawn on February 22, 2002.

Exhibit 12         Citizens Federal Savings Bank Statement:

                   This exhibit is 7 pages.  The first page appears to be an institutional reply
                   to a subpoena regarding the Citizens Federal Savings Bank POA account.
                   Page 2 includes photocopies of two savings withdrawals.  One is dated
                   July 5, 2002, and is a cash withdrawal payable to LaShari W. Scott for
                   $3,000.  The second dated July 13, 2002, is also a withdrawal by LaShari
                   W. Scott.  This one is for $6,000.  Page 3 is the reverse of the July 5,

28

2002, savings withdrawal slip. Page 4 includes copies of two additional savings withdrawal slips. The first dated February 14, 2002, is a cash withdrawal by LaShari W. Scott, for $6,000. The second dated April 24, 2002, is another $6,000 cash withdrawal by LaShari Woods Scott. Page 5 includes the reverse sides of the February 14 and April 24 savings withdrawal slips. Page 6 is a receipt from Teller No. 22 for $2,237.77. Page 7 is a copy enlargement of page 6.

Exhibit 13    SouthTrust Bank Statement 3-31-04:

This exhibit is a bank statement for a SouthTrust Bank Savings account in the name of "Maddie Woods or LaShari W. Scott." The statement lists transactions for the period January 2004 through March 2004.

Exhibit 14    Letter from Terrill Sanders:

This exhibit is a letter from the law offices of Wiggins, Childs, Quinn and Pantazis dated September 6, 2005, to Brian Bugge, Attorney at Law, regarding the estate of Eddie Woods. The letter refers to, and the exhibit includes, a copy of the check register for the Estate of Eddie Woods from October 5, 1994, through March 14, 2005. According to the letter and the attachment, Maddie Woods was the administratrix of Eddie Woods' estate through December 7, 1995. LaShari Scott was appointed successor administratrix thereafter.

Exhibit 15    Letter dated December 27, 2005 with checks:

This exhibit begins with a letter dated December 27, 2005, from the law offices of Wiggins, Childs, Quinn and Pantazis to Brian Bugge, Attorney at Law. The letter refers to settlement activities of both administratrixes of Eddie Woods' estate. The exhibit includes copies of a few checks from a SouthTrust Bank account in the name of "Gordon, Silberman, Wiggins and Childs, P.C. Environmental Litigation Trust Account." The exhibit includes the reverse side of the checks showing when, where, and by whom the checks were negotiated.

Exhibit 17    Interrogatory Responses:

This exhibit includes "Defendant's Answers to Plaintiff's, Mary Nell Allen's, Interrogatories" for the case of Mary Nell Allen vs. LaShari Woods Scott in the Circuit Court of Jefferson County, Alabama, Bessemer Division, Case No. CV-04-1715.

29

Exhibit 18    Defendant's Responses to Request for Admissions:

This exhibit includes "Defendant's Response to Plaintiff's Request for Admissions" for the case of Mary Nell Allen vs. LaShari Woods Scott in the Circuit Court of Jefferson County, Alabama, Bessemer Division, Case No. CV-04-1715.

Exhibit 20    Pre-Arrangement Funeral Contract:

This exhibit is a statement from Roberts Funeral Home, Inc. entitled, "Pre-Need Funeral Arrangement Contract." It is signed by a representative of the corporation and LaShari W. Scott on May 20, 2003. The total amount for the services is represented as $7,136.

Exhibit 22    Citizens Federal Savings Bank Savings Journal for February 22, 2002:

This exhibit is a Savings Transaction Journal from the Citizens Federal Savings Bank POA account for February 22, 2002, indicating a withdrawal of $40,000. Page 2 indicates deposits of $20,000 each on the same date to the two Citizens Federal Savings Bank accounts listed next.

Exhibit 23    Citizens Federal Savings Bank Account Information:

This exhibit consists of numerous pages. Page 1 is an Ownership of Account statement for a Citizens Federal Savings Bank account in the name of "C.A.S. (Court substituted initials for one of the defendant's minor sons) or LaShari Woods Scott." The account was opened on February 21, 2002, with an initial cash deposit of $20,000. Page 2 includes copies of Social Security cards for C.A.S. and S.D.S. and the driver's license for LaShari W. Scott.[22]

Exhibit 24    Citizens Federal Savings Bank Statement:

This exhibit consists of numerous pages. Page 1 is an Ownership of Account statement for Citizens Federal Savings Bank account in the name of "S.D.S. (Court substituted initials for one of the defendant's minor sons) or LaShari Woods Scott." The account was opened on February 21, 2002, with an initial cash deposit of $20,000. Page 2 includes copies of Social Security cards for C.A.S. and S.D.S. and the driver's license for LaShari W. Scott.

---

[22]While neither of the parties redacted identifying information from their exhibits, the Court has attempted not to reproduce any in this opinion.

30

Exhibit 25     Letters Testamentary for the Estate of Maddie Woods:

This exhibit is "Letters Testamentary" issued to Mary Nell Allen in the matter of the Estate of Maddie Woods a/k/a Maddie Jenkins Woods by the Probate Court of Jefferson County, Alabama, Bessemer Division, Case No. 38834 on January 30, 2004.

Exhibit 26     Maddie Woods' Death Certificate:

This exhibit is the Alabama Certificate of Death for Maddie Woods indicating death on May 31, 2003, in Jefferson County, Alabama.  The certifying physician is Dick Owens, M.D.  The medical certification lists the immediate cause of death as Myocardial Infarction.  One of the other significant conditions contributing to death was "Advanced Dementia."

Exhibit 27     Johnnie C. Allen's Death Certificate:

This exhibit is the State of Illinois Medical Examiner's - Coroner's Certificate of Death for Johnnie C. Allen.  The date of death was May 23, 1999.

Exhibit 28     Maddie Woods' Will Dated October 16, 1996:

This exhibit is a copy of the "Last Will and Testament of Maddie Woods" executed on October 16, 1996, by Maddie Woods.  Witnesses were Mary Nell Allen and Henry Clay Lockett.  An affidavit was executed by a notary public.

Exhibit 29     Maddie Woods' Will Dated March 13, 1999:

This exhibit is a copy of the "Last Will and Testament of Maddie Woods" executed on March 13, 1999, by Maddie Woods.  Witnesses were Johnnie C. Allen and Mary Allen.  An affidavit was executed by a notary public.

Exhibit 30     Copies of Maddie Woods' and LaShari Scott's Driver's Licenses:

This exhibit includes copies of State of Alabama Driver's Licenses for Maddie Woods and LaShari W. Scott.

Exhibit 31     Handout from Maddie Woods' funeral:

This exhibit is a copy of the Galilee Baptist Church funeral service program for Maddie Woods dated June 7, 2003.

Exhibit 32    Notice of Deposition:

This exhibit is a copy of the notice of deposition prepared by Brian Bugge for an examination of LaShari Woods Scott in the instant proceeding.

Exhibit 33    Discovery Requests:

This exhibit is "Plaintiff's First Consolidated Discovery Requests from the Plaintiff to the Defendant."

Exhibit 34    Documents from LaShari Scott's and Maddie Woods' Joint Bank Account at SouthTrust Bank:

This exhibit consists of numerous pages of documents of records from the joint SouthTrust Bank Account.

Exhibit 35    Documents from LaShari Scott's and Maddie Woods' Joint Bank Account at SouthTrust Bank:

This exhibit consists of numerous pages of documents of additional records from the joint SouthTrust Bank account.

## 2. Defendant's Exhibits

Exhibit 1    Receipt for funeral expense:

This exhibit includes two receipts from Roberts' Funeral Home. One is for $7,136.00; the other is for $350.24.

Exhibit 2    Copy of Bond:

This exhibit is a bond in which LaShari Woods Scott as principal is bound to the Judge of Probate of Jefferson County, Alabama for $10,000. The bond is dated August 12, 2002, from the Fidelity and Deposit Company of Maryland. The bond was obtained because of the defendant's appointment as "Successor Administratrix of Estate of Eddie Woods."

Exhibit 3    Copy of receipt, Hall Printing:

This exhibit is an invoice from Hall Printing Service for Maddie Woods' funeral program.

32

Exhibit 4    Court ordered appointment of guardianship:

This exhibit is the, "Order Appointing Guardian and Conservator Upon Posting Bond" signed by the Judge of Probate of Jefferson County, Alabama, on March 14, 2002.

Exhibit 5    General Power of Attorney:

This exhibit is Maddie Woods' General Power of Attorney dated October 16, 2000.[23]

Exhibit 9    Letters of Guardianship:

This exhibit is a copy of The Letters of Guardianship issued to the Defendant by the Probate Court of Jefferson County, Alabama, Bessemer Division, on March 14, 2002.

Exhibit 11    Signature Card:

This exhibit is a copy of LaShari Woods' Signature Card for the Mutual Savings Credit Union account.

Exhibits 12 through 23 are copies of receipts for payments to Maddie Woods' Caregivers.

Exhibit 12    Twelve receipts to Bessie Alexander, one of Maddie Woods' sitters, for $3,872 in cash payments for work in December 2002 - April 2003.

Exhibit 13    Thirty receipts to Delores Amous, one of Maddie Woods' sitters, for $400 in checks and $11,541 in cash, for a total of $11,981 for work in November 2002 - February 2003.[24]

---

[23]See the discussion below as to Defendant's Substitute Exhibit 5.

[24]The Court had some difficulty calculating the amount the defendant expended for sitter services because some of the sitters, Delores Amos for example, received two receipts for different amounts for the same number of hours worked on the same day. The defendant's testimony explains that the different amounts reflect different work, or work that could qualify for two different task classifications, done at the same time. The defendant testified:

Q.    Can you explain to me why there would be the receipt written out to Delores Amos for February 17 through February 21 of '03 for eighty-four dollars per day and then another receipt written out to Delores Amos from February 17 to February 21, '03, for sixty dollars a day out of a different receipt book?

33

A.      According to Helping Hands, their pay was at that time seven dollars for twelve hour shifts to sit.  If they cook, they got paid money for cooking and it is down at the bottom, it may be like somewhere for gas. They charged a certain amount a day for gas.  So I had a check receipt if it was a check or, if it was cash, a cashier's.  And as I have answered that earlier, how they paid their taxes and what they did and how much they had to turn back in to the agency, that's the way they were asked to be paid.

Q.      Why the two different receipts for the same day for the same person?

A.      One is for cash.  One is for – they are both for the same sitter but one is for cash, the amount that she turned in to the agency and the other one she didn't turn in.  I had to have a track of what I paid.

Q.      Which ones were cash and which ones are the check?

A.      On Exhibit No. 13, at the bottom of it, it says cash.  This one also says cash.  I don't know how far you are going back but all of them that says cash, they got cash if it says cash and, if it says cashier's check or check, it is a check number.

Q.      Now tell me again how we know that Delores Amos got any of this money?

A.      I gave a receipt –

Q.      Do you have any proof other than your testimony?

A.       A receipt and my testimony and you can subpoena her.

Q.      I could.  You could.  There is nothing, though, that you have got right now other than your testimony and your piece of paper that you wrote out to substantiate that she received any of this money; correct?

A.      That's correct.

Q.      And you say the reason why you were using two different check registers – why couldn't you just use the same check register and do two receipts right back to back?

A.      You will have to ask Helping Hands as to how they filed these to pay for taxes.  I didn't.

Q.      They wanted different kinds of paper receipts?

A.      The agency itself said their sitters were only to sit.  It was left up to Ms. Woods and me as to how much they charged if they cooked, or bathed, or cleaned.

34

Exhibit 14        Four cashier's checks totaling $2,708 to Lizzie Green Bell, one of Maddie Woods' sitters, for an unknown time period.

Exhibit 15        Seven receipts to Stella Foster, one of Maddie Woods' sitters, for $1,144 in cash payments for work during February 2003 - March 2003.

Exhibit 16        One receipt to Shelia Green, one of Maddie Woods' sitters, for $88 in cash payments for work in December 2002.

Exhibit 17        Forty-three receipts and checks to Marilyn Hall, one of Maddie Woods' sitters, for $21,512 in cash payments and $616 in checks, for a total of $22,128 for work in November 2002 - April 2003.

Exhibit 18        Two receipts to Florence Harris, one of Maddie Woods' sitters, for $352 in cash payments for work in January 2003 - February 2003.

Exhibit 19        Seven receipts to Mrs. Viola Mae Lett, one of Maddie Woods' sitters and cooks, for $635 in cash payments for work in January 2003 - February 2003.

Exhibit 20        One receipt to Mary McQueen, one of Maddie Woods' sitters, for $88 in cash payments for work in March 2003.

---

Q.      It looks to me like there is one receipt done, you know, maybe one receipt done at the time somebody actually did something and then another receipt done out of a totally separate book.  I am just asking why are you using two separate receipt books?  Why not just use the same book; if you needed two separate receipts, just do them back to back?

A.      I did use the same receipt books with some of them.

Q.      Well, let's look at the one that's February 17 through February 21, February 10 through February 14.  I mean, for every receipt you have at eighty-four dollars a day, you have got another receipt for sixty dollars a day out of a different book.  I am just trying to understand why you are using a different book, why not use the same book?

A.      The agency was the receipt for eighty-four dollars.  That's what they charged, twelve times even is eighty-four.  That was to be turned in that they had to turn in to the agency.  The other cash amount that you may see is a book that I had that said cash, was what they charged for cooking and cleaning, not to sit.

Tr. 647-49. Based on this testimony, the Court added all receipts in calculating the amount spent for caregivers for Maddie Woods.

35

Exhibit 21     Two receipts to Sandra Moody, one of Maddie Woods' sitters, for $264 in cash payments for work in December 2002.

Exhibit 22     One receipt to Rose Moreland, one of Maddie Woods' sitters, for $126 in cash payments for work in November 2002 - December 2002.

Exhibit 23     One check for $160 to Jackie Williams, one of Maddie Woods' sitters, for an unknown time period.

Admitted exhibits from 24 through 46 (but not 27) are copies of receipts for some of Maddie Woods' other expenses.

Exhibit 24     Receipt from Fairview Health and Rehab for $1,155.00

Exhibit 25     One receipt for repair of oven for $55.00[25]

Exhibit 26     One receipt for Jack-Wash Construction for $ 465.00

Exhibit 27     Withdrawal of $50,000:

               This exhibit includes a "teller" receipt for withdrawal of $50,000 from Maddie Woods Mutual Savings Credit Union account and a deposit slip for deposit of $50,000 into Maddie Woods' and LaShari Woods Scott's joint account at SouthTrust Bank. These are the same funds from Plaintiff's Exhibit 35.

Exhibit 28     Twenty-five receipts from Wal-Mart for a total of $1,207.96[26]

Exhibit 29     One receipt from Home Depot for $277.47

Exhibit 30     Six receipts from Sam's Club for $223.80

Exhibit 31     Two receipts from Payless Drugs for $22.39

Exhibit 32     One receipt from Birmingham Surgical, PC for $206.22

Exhibit 33     Six receipts from Food World for $201.50

---

[25]The Transcript list Defendant's Exhibit 25 as "Copy of Receipt for gas." Tr. 456.

[26]The Court notes that these receipts do support the defendant's defense that she handled many of Maddie Woods' purchases in cash. On the other hand, these and all the other receipts admitted into evidence demonstrate how inadequate the defendant has documented Maddie Woods' expenses.

36

Exhibit 34    One receipt for a car tag for $39.02

Exhibit 39    One receipt for plumbing repairs for $225.00

Exhibit 44    One receipt from Midfield Dental Center for $390.00

Exhibit 45    One receipt (with corresponding cashiers check for payment) from Baptist Health System for $812.00.

Exhibit 46    One receipt from Redin Heating & Cooling for $200.00

Exhibit 47    Letter from Terrill Sanders:

This exhibit is a one page letter from Terrill W. Sanders, an attorney with the law firm of Wiggins, Childs, Quinn & Pantazis dated June 4, 2007. Attached is a four page "Quickbook" account sheet of the funds paid into and out of Eddie Woods' estate. Also attached are copies of checks payable to Maddie Woods from the law firm of Gordon, Silberman, Wiggins and Childs, Environmental Litigation Trust Account. The specific checks are: (1) October 1, 2003 for $3,496.32, negotiated by LaShari Woods Scott; (2) April 24, 2002 for $1.440.00 negotiated by LaShari Woods Scott and Maddie Woods; (3) April 27, 2004 for $2,629.27 negotiated by Mary N. Allen; (4) July 1, 2002 for $2,330.50, negotiated by LaShari Woods Scott and Maddie Woods; (5) May 22, 2002 for $964.80, negotiated by LaShari Woods Scott and Maddie Woods; and (6) November 6, 2003 for $1,728.00, negotiated by LaShari Woods Scott and Maddie Woods, although Maddie Woods signature is not in her hand.

Exhibit 48    Mutual Savings Statement:

This is a Statement of Account from the Maddie Woods - Johnnie Allen Mutual account for July 1, 2003 through July 31, 2003. This statement shows a balance in the account of $50,099.22 about two months after Maddie Woods died.

Exhibit 49    "Consent to Settlement" of the Estate of Eddie Woods in the Probate Court of Jefferson County, Alabama, Bessemer Division.

### 3. Defendant's "Substitute Exhibit 5" Maddie Woods' Power of Attorney

The plaintiff objected to Defendant's Exhibit 5 on authentication grounds. After a lengthy discussion, the Court left the question open for a later ruling. Afterwards, the defendant provided the Court with a certified copy of Defendant's Exhibit 5 and identified it as Defendant's Substitute Exhibit 5.

37

Defendant's Substitute Exhibit 5 includes a certification on 18th day of July, 2007, by The Honorable Alan L. King, Judge of the Probate Court, Jefferson County, Alabama, "that the foregoing is a true, correct and full copy of the instrument herewith set out as appears of record in said Court." Id.

Based on that certification, the plaintiff's objection is overruled. Defendant's Substitute Exhibit 5 is admitted.

## D. MADDIE WOODS' MENTAL CAPACITY

The parties made an issue of Maddie Woods' mental capacity, primarily in the context of the guardianship and conservatorship. The plaintiff argued that Maddie Woods was mentally incompetent to manage her own affairs, and she was left to rely on the defendant. The defendant argued that Maddie Woods was physically incapacitated only and could mentally manage her own affairs.[27]

As discussed below, this Court believes, in the context of the issues before it, that Maddie Woods was not capable of managing her own financial affairs. In contrast, this Court has not, will not, and does not have to, make a finding that Maddie Woods was or was not mentally incompetent.[28]

---

[27]In her written closing arguments, the defendant argues that "incapacitated" refers to physical disability where "incompetent" refers to mental. Presumably the defendant contends that when the probate court found Maddie Woods to be "incapacitated" it found her to be physically disabled only and not mentally disabled. Alabama law defines "incapacitated" as:

> Any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, physical or mental infirmities accompanying advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions.

§ 26-2A-20, Ala.Code 1975. Clearly the Act recognizes both physical and mental problems.

[28]How is Maddie Woods' mental capacity relevant? The defendant's primary defense to the plaintiff's allegations is that she, the defendant, was doing only what Maddie Woods told her to do. The defendant argued that Maddie Woods was completely competent to act for herself, and that any decisions made to transfer or give away money were Maddie Woods', not the defendant's. Tr. at 129; 161-62; 429. That defense of course begs the question: If Maddie Woods was competent to handle her own affairs, why did the probate court appoint the defendant her guardian and conservator? On the other hand, as the discussion below on the law of fiduciary defalcation explains, Maddie Woods' mental capacity may not be relevant at all. The law in this Circuit on defalcation is whether the defendant's, "conduct can be characterized as objectively reckless." Bullock v. BankChampaign (In re Bullock), 670 F.3d 1160, 1166 (11th Cir.2012). To this Court, that question is independent of Maddie Woods' mental capacity.

## 1. Background

The Alabama Department of Human Resources opened a file on Maddie Woods in November 2001. Tr. 42. In response to the Court's question, the defendant explained why and how this issue arose. She testified:

> THE COURT: How did you all end up at DHR in the first place, Ms. Scott? Why did you all end up before Judge Bolin?

> THE WITNESS: It goes back to – she would fall a lot and I took her to Metro West Health South to the hospital. And one night when I took her to the hospital, I mean, she had been working in the yard and, you know, she just wasn't upkept and they called them.

> THE COURT: Somebody at the hospital called –

> THE WITNESS: Someone turned it in, yes.

> THE COURT: Called DHR?

> THE WITNESS: DHR from my understanding from one of the employees there, that they had made a call to DHR when I had stepped out for someone to come in and investigate to see who was caring for her.

> THE COURT: So from that one incident, you had a hearing before the probate judge to determine whether Ms. Woods should have a guardian or not?

> THE WITNESS: Well, when I found out what had happened, I, myself, called DHR and that's when I got connected with Deborah Hill, and then she wanted to come out and talk with Ms. Woods and see her surroundings and see who was caring for her. So we went from there.
>
> And especially once Ms. Woods – what she, Deborah Hill, told me that Ms. Woods mentioned to her the amount of money that she had, and she just didn't feel, according to Deborah Hill said that I should see to her finances or anything from that point. So it went from there.

Tr. 638-39.

Case 06-00011-BGC    Doc 49    Filed 09/27/12    Entered 09/27/12 09:07:32    Desc Main
Document    Page 39 of 128

The above was consistent with the defendant's previous testimony that:

> [Maddie Woods]... was deemed to require twenty-four hour sitters because I kept taking her to Metro West, HealthSouth Hospital for falling, and they wanted to know who was caring for this lady. And one particular day I took her, she looked like a bag lady. She was dirty, filthy from head to toe. So that's how.

Tr. 557 (parenthetical added).

In response, the defendant filed a petition seeking <u>her</u> appointment for guardian and conservator of Maddie Woods. Tr. 42-43.

### 3. Independent Evidence of Maddie Woods' Mental Capacity

Both parties offered testimony about Maddie Woods' mental capacity. The plaintiff testified that she did not believe Maddie Woods could manage her own affairs. The defendant testified exactly opposite. The subjective nature of these contentions is hard to reconcile.

Plaintiff's Exhibit 21 contains independent evidence that at least in 2003 Maddie Woods was suffering from dementia. Exhibit 21 is a "Discharge Summary" from Maddie Woods April 9 through 24 hospital stay. That summary includes "significant for dementia" in her past medical history.

Plaintiff's Exhibit 26 is Maddie Woods' death certificate. It states that prior to Maddie Woods' death on May 31, 2003, she suffered from "Advanced Dementia," as that condition was listed on her death certificate as one of the "significant conditions contributing to death...." <u>Id</u>.

Of course, the Court cannot draw exact conclusions from these bare diagnoses. Consequently, the Court cannot know the extent or degree of Maddie Woods' dementia. What the Court can do, however, is draw reasonable conclusions from this evidence. The actions of the probate court are an important aid in that regard.

<u>As discussed in detail later in this opinion</u>, the probate court's order implies strongly that it did not believe Maddie Woods was in the least competent to manage her financial affairs. Its appointment order stated, "**that said guardian and conservator shall have all the powers and authority as set forth in Section 26-2A-152 of the Code of Alabama, 1975.**" Pla. Ex. 4 (emphasis added). The Letters of Guardianship issued to the defendant stated, "**the...Guardian is authorized and directed to exercise... [a]ll powers and duties conferred under Alabama Code §26-2A-78**...." Pla. Ex. 4 (emphasis added).

40

These directives are telling when read in conjunction with section 26-2A-105 of the Code of Alabama 1975 which directs the appointing court to include powers, "**only to the extent necessitated by the incapacitated person's mental and adaptive limitations or other conditions warranting the procedure,**" Id. at §26-2A-105 (emphasis added). Similarly, section 26-2A-148 allows an order which specifies, "**only a part of the property of the protected person vests in the conservator [which] creates a limited conservatorship.**" Id. at §26-2A-148(a).

In light of these standards, the probate court bestowed every power it had the authority to convey on the defendant. That action alone is more than sufficient to support the conclusion that the probate court believed that Maddie Woods was so lacking in her ability to manage her own affairs that it gave her guardian and her conservator the most extensive powers it had the authority to convey. In that sense, it really does not matter whether the probate court made a specific finding of incompetency. It is, however, enough for this Court to find the defendant's fiduciary relationships to Maddie Woods were about as important as could be imagined.[29]

### 4. Conclusion

The plaintiff's attorney asked the defendant the one question that common sense demanded. He asked, "Okay. So if your eighty-seven year-old aunt, who you filed a petition for guardianship and conservatorship for, and DHR opened a case on, asked you to bring her large amounts of cash, you would bring it to her and not really have a concern about what happened to it; is that your testimony?" Tr. 161.

The defendant replied:

I had a concern but I had no control over what she did.

*****

---

[29]As discussed below, in her written Closing Argument the defendant argues that when the probate court appointed the defendant guardian and conservator it could not have found that Maddie Woods was mentally incompetent. Citing section 26-2-43, Code of Ala. 1975, the defendant argues that a physician's (or some other qualified person's) testimony is required before a probate court in Alabama may declare someone mentally incompetent. She states that no such qualified person testified at the hearing on Maddie Woods' competency. She concludes that without that testimony there cannot be a finding of mental incompetence. In that regard, this Court is not concluding that the probate court found Maddie Woods to be mentally incompetent. This Court is concluding that based on the actions of the probate court, this Court finds that the probate court believed that Maddie Woods was so lacking in her ability to manage her own affairs that it gave her guardian and conservator the most extensive powers it had the authority to convey. In that sense, it really does not matter whether the probate court made a finding of incompetency with or without the assistance of a physician or some other qualified person.

41

I had a concern about a lot of things that she did. I wasn't in total agreement with anything she did. If it was left up to me, I would have turned her over to the state and placed her in a nursing home years before she went there, but I was asked not to do it.

So I really didn't have control; I just had to go along with what Aunt Maddie said do basically. I didn't agree with a lot of things. I didn't agree with anything that she did as far as giving people, but it wasn't for me to say.

Tr. 161-62.

Based on all of the above, this Court concludes that Maddie Woods was not capable of managing her own affairs. She was therefore dependant on the defendant for the assistance the defendant's fiduciary relationships were intended to give.

### E. MADDIE WOODS' POWER OF ATTORNEY

The facts surrounding the history, nature, and extent of the power of attorney Maddie Woods gave the defendant are central pieces of evidence before the Court. Of exceptional importance are the defendant's understandings of her role under that power of attorney.[30]

The defendant testified:

> Q.    Okay. What documents would you show people?
> A.    When I had to do what? Meaning –
> Q.    Dealing with banks, going to Southtrust Bank, opening joint accounts –
> A.    I had a power of attorney on her that was established back in 2000.
> Q.    Okay. So you filed the petition for guardianship and conservatorship and got these letters of guardianship and this order, but then you were still just using your old power of attorney?
> A.    Yes.
> Q.    Why is that?
> A.    Because I had the power of attorney in place before all of this started.

Tr. 49.

The defendant also testified that she understood that this power of attorney gave her authority to, "take independent action regarding Maddie Woods' money..." Tr. 23-

---

[30]The full "Power of Attorney" is reproduced later.

42

24, and that this document allowed her to do whatever Maddie Woods needed her to do. Tr. 24.

The defendant especially understood that not handling these matters properly had consequences. She testified:

> Q.    You said something a minute ago about feeling comfortable having your name on some checks and not on others. What do you mean by that?
> A.    Utility bills, I would write it and sign her name on it. For things like this, I just did not touch it, you know, I really didn't.
> Q.    Why?
> A.    Because this would be saying, if I wrote this, that I am doing it.
> Q.    Okay.
> A.    Even though I had the power of attorney to do, but I did not.
> Q.    **You were concerned about people thinking that you were handling this inappropriately or something?**
> A.    **Yes, sir.**

Tr. 87-88.

## F.  BANK ACCOUNTS

The evidence relating to the numerous bank accounts identified in this proceeding is crucial to resolving the matters before the Court. Each is discussed below.

### 1.  Mutual Savings Credit Union

Maddie Woods' Mutual Savings Credit Union account was her dominant account.[31] Many of the transactions mentioned in this litigation occurred in this account.

Historically, the defendant had signing authority on this account as early as 1996, but that authority was later withdrawn.[32] She became involved with this account

---

[31] Plaintiff's Exhibits 5-8 contain the admitted records for this account.

[32] The defendant had signing authority on this account as early as 1996. She was asked, "I'm going to ask you about a statement you had made regarding being put on Maddie Woods' account at Mutual Savings Credit Union in 1996. Do you recall that?" She replied:

> A.    Yes.
> Q.    Okay. What happened there? Were you taken off of that account?
> A.    Yes, I was.
> Q.    Okay. And after that point in time, is it your understanding that Johnnie

43

again in 2000 when she received Maddie Woods' power of attorney. Tr. 23-24. The account remained in existence during the time subject to this opinion. During that time, Maddie Woods and the defendant wrote checks from the account. And according to the testimony reviewed below, some checks were even written by unauthorized individuals.

Generally, the checks from this account were written either for expected expenses, such as: electrical power (Pla. Ex. 7); natural gas (Pla. Ex. 7); telephone service (Pla. Ex. 7); water (Pla. Ex. 7); insurance (Pla. Ex. 7); medical bills (Pla. Ex. 8); directly to Maddie Woods' caregivers (Pla. Exs. 7 and 8); or indirectly for cash or deposit. A few checks were written to the defendant or her husband for, as the defendant testified, gifts or as payment for services.

The defendant testified extensively about many of these checks. In doing so, she described what this Court considers the troubling nature of her method of paying expenses, especially Maddie Woods' caregivers, and her failure to properly account for those payments.[33] Specifically, the defendant testified that her normal pattern was first to take money from the Mutual account by way of a check payable to herself (either written by herself or someone else and then signed by Maddie Woods (or even someone else.)[34] She would then deposit those funds into either her personal bank

_____

           C. Allen was put on that account with Maddie Woods?
    A.       Yes.

    ****

    Q.       Okay. Tell us about why you were put on and taken off of that account in '96?
    A.       I was put on by Ms. Woods but, to my understanding, I was taken off by Johnnie C. Allen. I never questioned it.

Tr. 18-19.

[33]The parties agree that Maddie Woods had 24-hour "sitters" for most of the last two years of her life.

[34]The defendant was asked about one particular person who signed checks without any authority. The testimony reads:

    Q.       Did she have a power of attorney?
    A.       No.
    Q.       Okay. Anybody else?
    A.       No.
    Q.       Okay. And would she sign – she would just sign Maddie Woods' name?
    A.       Yes.
    Q.       Okay. Do you know who would ask her to do that? Do you think Maddie Woods asked her to do that?

account at the University Federal Credit Union, as described below, or a joint account she had with Maddie Woods at Southtrust Bank, also described below. She would then pay the caregivers in the cash she withdrew from the deposit accounts or with cashiers checks she purchased with funds from those accounts.

While the defendant kept records of how much she paid some of those caregivers, (Defendant's Exhibits 12-23 discussed above and certain checks from Plaintiff's Exhibits 7-8 discussed herein), she did not keep any cumulative accounting, such as a ledger or spreadsheet. There were no reconciliations of the specific amounts withdrawn taken from the Mutual account, the amounts deposited into her personal account, or the amounts paid for expenses. Simply put, the defendant did not keep, and did not provide this Court with, even the simplest form of her credit and debit transactions, that is, balanced bank statements.

The defendant's testimony about some of the checks drawn on the Mutual account supports many of this Court's factual conclusions. That testimony is discussed below as divided into six different categories. Those are: (a) Checks Written to the Defendant for Funds to Be Paid to Caregivers; (b) Checks Written Directly to Caregivers; (c) Checks Written to the Defendant, Her Husband, or Her Mother which were Not Associated with Payments to Caregivers; (d) Checks Written to the Defendant for Maddie Woods' Pre-Funeral Arrangements; (e) The $50,000 Transfer to SouthTrust Bank; and (f) The Final Transaction from Mutual Savings Account.

### a. Checks Written to the Defendant for Funds to Be Paid to Caregivers

#### (1) Check No. 738 - Plaintiff's Exhibit 7

Check No. 738, dated June 11, 2002, was made payable to LaShari W. Scott for $5,500. The caption states it was for "Attorney Fees Court costs & Sitters." Pla. Ex. 7. The testimony about this check is an excellent explanation of the defendant's typical method of accounting for the expenses she paid for Maddie Woods.[35]

> Q.   Let's look at the next one, check 738. This is still in Plaintiff's Exhibit 7, and this is a check that is made payable to you for five thousand, five hundred dollars and then on the "for" line, it says for attorney's fees, court costs and sitters. Do you recall this check?

---

> A.   Maddie Woods.

Tr. 65.

[35]Unlike other checks payable to the defendant that she deposited into a personal bank account, she deposited this check into a joint account with Maddie Woods.

45

A.     Yes.

Q.     And what you did with that money?

A.     Yes.

Q.     What was that, that you did with the money?

A.     I paid additional sitters that had been sitting that was hounding me for money and I had another attorney's fee that I had to pay.

Q.     What was that other attorney's fee?

A.     It was some papers. I don't know exactly from what court they came, but I had to send Leon Garmon for some back money that I was owed on this same case.

Q.     What case?

A.     Maddie Woods' uh –

Q.     Guardianship and conservatorship?

A.     Yes.

Q.     You're talking about money that you were owed or money that you owed?

A.     That she owed.

Q.     **Who did she owe money to?**

A.     **That, I do not know.**

Q.     And now it says attorney's fees, court costs and sitters. So you're saying that attorney's fees and court costs were some money that Maddie Woods owed to Leon Garmon?

A.     Yes.

Q.     **And you don't know what for?**

A.     I was still receiving papers from different ones that this fee had to be paid and this fee had to be paid that had not been paid.

Q.     Would this potentially have been related – but **you say you don't know what this was for. It wasn't for the bond or the court costs that we talked about earlier?**

A.     **I really can't say** but I know I am aware of this check. I am aware of it.

Q.     But you don't know what the attorney's fees or costs are for?

A.     No.

Q.     They weren't for his attorney's fees for the guardianship and conservatorship case?

A.     It was a check paid out for that, too.

Q.     Let me ask you this. I mean, if you had to write a check or if you owed money to an attorney or if Maddie Woods owed money to an attorney for fees or costs, **why was this check written to you?**

A.     **I cashed the check. I wrote a check out of my account.**

Q.     **Why?**

A.     **That's the way I did it so I would have a record of what I did, and I also put on here attorney's fees, court costs and such, and plus Ms. Woods would tell me from time to time, not just**

**me, you know, just give me something. So I am aware of this check and I did write the check and Maddie Woods signed it.**

Q.    I don't understand that at all, I guess. What would be the difference between writing a check out of your account versus writing a check out of this account directly –

A.    This was her money that she was giving. This is her account.

Q.    That she was doing what with?

A.    This is her account. This is not my account. This is written out of Maddie Woods' account.

Q.    Now didn't you say that Maddie Woods was the one that owed the attorney's fees and court cost?

A.    Yes.

Q.    **So why couldn't they be paid out of her account if she is the one that owed them? Why would they be paid to you?**

A.    **Court cost and sitters, plus the money that was given to me. Now what part of that did I not make clear? I have said it three times. I am aware of the check and she gave it to me.**

Q.    Okay. Let's make sure we are looking at the same thing, check number 738.

A.    We are looking at check number 738 for **five thousand, five hundred dollars**, dated June 11, 2002, five thousand, five hundred dollars.

Q.    **What does it say on the line for what it is for?**

A.    **It says attorney's fees, court costs and sitters.**

Q.    **Now are you saying that that money went to you, for you?**

A.    **It went into my account.**

Q.    **Okay.**

A.    **Yes, sir, I deposited that check** at University Federal Credit Union.

Q.    Okay. I see. And what is your testimony of what was done with that money because I missed it? I missed your response. I know you said you wrote checks, but did you say some of it was written out to pay – some of it was cash to pay sitters, some of it was written to pay court costs, and **then some of it you just kept, it was for you?**

A.    **No, I didn't say I kept. I said she gave me money out of it, also.**

Q.    **You didn't keep it, though, or did you?**

A.    **Yes.**

Q.    **Okay.**

A.    **I spent it.**

Q.    **Okay. But it doesn't say anything on there that the money was given to you, right?**

A.    **No.**

47

| | |
|---|---|
| Q. | Okay.  **Is there a reason why that wasn't put on there, that some of the money was for you?** |
| A. | **No.** |
| Q. | **Do you remember?** |
| A. | **No reason.** |
| Q. | No reason, and you do not remember what the attorney's fees or court costs were; you just know that they were money that she owed? |
| A. | Yes. |

Tr. 76-79 (emphasis added).

As mentioned above, Defendant's Exhibits 12 through 23 and some of the checks from Plaintiff's Exhibits 7 and 8, confirm that the defendant had some records of payments she made on behalf of Maddie Woods, albeit in the form of receipts only. In contrast, this testimony confirms that because the defendant did not keep any other records, or at least did not provide them to this Court, she cannot either remember or explain, important details.

### (2)  Check No. 749 - Plaintiff's Exhibit No. 8

Check No. 749, dated July 15, 2002, was made payable to LaShari Woods Scott for $3,600. The caption states it was for "Sitters salaries & Cook salaries" Pla. Ex. 8.

The defendant testified that she did not fill out this check and she did not know who did. It does appear to be signed by Maddie Woods.[36] The defendant deposited this check in her personal account at University Federal Credit Union. All of this was done without keeping a check register or ledger.[37] Her testimony includes:

| | |
|---|---|
| Q. | Okay.  Then let's go on to – that might be it for this batch of checks.  Let's look at Plaintiff's Exhibit 8.  Let's look at the very first check there, which is check 749, and this is another check that was made payable to you, correct? |
| A. | Yes. |

---

[36]At this point, the defendant not only held power of attorney from Maddie Woods, she had been appointed guardian for Maddie Woods and was the conservator of her estate. Considering the duties and responsibilities that those fiduciary relationships imposed on her, the Court is shocked that not only did the defendant accept a check payable to her for $3,600 from her ward's bank account without any further documentation, the defendant did not know who filled out the check.

[37]If she did keep these documents, no one introduced them at trial.

48

Q.    **Now tell me why this check was made payable to you rather than just having checks directly written to the sitters**?

A.    Now, **I did not write this check.  I don't know who wrote this check but I do remember depositing this check**.

Q.    Who gave it to you?

A.    Maddie.

Q.    Oh, I see.  But you don't know who filled it in for her?

A.    No.

Q.    You didn't ask her?

A.    No, sir.

Q.    Did you think it was important to know who was involved with Maddie Woods in terms of filling in checks for her and things of that nature, considering all of the money she had?

A.    Yes, sir, but sometimes she would just write the – if I was out of town and, if I remember correctly, I probably was or whatever, but the check, I do recall.  Any check that I can say I wrote or I can say that she wrote or someone else, I can identify it, okay.

Q.    Yes, ma'am.  I understand, and I appreciate your honesty but tell me how – I mean, who else – can you think of anybody else who would have been writing out checks for thirty-six hundred dollars?  I mean, who would have known how much to write it for?

A.    When she told them, Maddie Woods told them.

Q.    So you think she told them to fill out this check for three thousand, six hundred, to Shari?

A.    Yes.

Q.    So that you could do what with it?

A.    That says sitters' salaries and cook's salaries.

Q.    So you were out-of-town and she needed to pay you –

A.    I am not saying I was out-of-town then, but I said I may have been, where I wasn't available to write the check.

Q.    I see.

A.    Uh-huh.

Q.    But how were these sitters' salaries and cooks' salaries paid if the check is written to you?

A.    **I deposited the checks and, if they did not want a check written to them, which some of them did not, I would cash the check and give them cash money.  A lot of people did not want checks or cashier's checks, so they were paid with cash**.

Q.    Okay.  Why couldn't they just do a cash withdrawal of Mutual Savings Credit Union?

A.    I didn't go to Mutual Savings Credit Union.  I just did whatever she told me to do.

Q.    Well, did she just tell you to pay these people or did she tell you to take the money out of my account and put it in your account –

49

| | |
|---|---|
| A. | She told me to pay them. |
| Q. | Is there a reason why you didn't just cash – draw the money, cash, out of that account? Why did it have to go to your account? |
| A. | **We just wrote checks to keep records. There was no reason specifically why, but most of it, like I said, if they did not – some sitters wanted cash. They did not want checks, and that's the way I did it.** |
| Q. | Okay. For a particular check like this where it doesn't even name any of the sitters or the cooks, would you still believe that you would have an accurate record of exactly who was paid this money? |
| A. | Yes, sir, because I have dates when they were sitting. |
| Q. | Dates when they were sitting or – |
| A. | When the sitters were there, I have dates of who was there at what time. |
| Q. | I see. And was any of this money just for you? |
| A. | Out of this? No. |
| Q. | Yeah, this check 749. |
| A. | No. |
| Q. | Okay. And you don't know who filled it in? |
| A. | No, sir. |
| Q. | This account number that's under your endorsement, is that your **University Federal Credit Union account**; is that what that account number is? |
| A. | Yes. |

Tr. 79-83.

As the fiduciary, she deposited the funds into a personal account and then paid expenses from that account, some in cash. From the inadequate records she kept, we cannot know how much of this specific withdrawal was paid to sitters and how much was left in the defendant's personal account. This not an accounting.

### (3) Check No. 786 - Plaintiff's Exhibit 8

The defendant also testified about Mutual Savings Credit Union check number 786. This check was dated December 3, 2002, made payable to LaShari Woods-Scott for $7,992.00, and deposited by the defendant into her personal account at University Federal Credit Union. Again, the defendant testified she did not fill out this check and did not know who filled out the check. Tr. 91-92. It too appears to have been signed by Maddie Woods.

The caption shows the check was intended for "Sitters - Dec - Jan - Feb." The defendant testified that she could not explain why this amount of money was being paid at one time for bills for three months, where two of those months were for expenses

that had not occurred. Tr. 91-92.  She did testify that she had documentation of who received the money and for what work it was paid. The Court notes again, there are no records that explain how the specific funds from this particular payment of nearly $8,000 to the defendant, and deposited into her personal bank account, were spent.

### (4)  Check No. 798 - Plaintiff's Exhibit 8

Check No. 798, dated January 29, 2003, was payable to LaShari Woods-Scott for $25,000. The caption reads, "Sitters cook - Bills." Like similar checks, the defendant deposited this one in her personal account at University Federal Credit Union and testified that she paid caregivers directly from that account. The amount of this check prompted a question of how so much money could have been spent in such a short time. In defense of the amount, the defendant testified:

A.      Yes, sir.  In some months, sitter bills, if they were ten, twelve, fifteen dollars an hour, I was spending anywhere from ten to fifteen thousand dollars with just sitters.  It depends on what they charge, what agency I went through to get these sitters.  If it was a holiday, they were paid time and a half.  I had to pay sitters.

Q.      Okay.  Can you give me any kind of breakdown on how – I mean, you were involved in this.  How thirty-six thousand could be – so you said it could be up to fifteen thousand a month?

A.      Yes, sir.

Q.      How would that break down?  Can you give me an example of a month where you would spend that much?

A.      For example, the Helping Hand Agency probably was the cheapest agency we had.  Their sitters, if they cooked, they got paid an additional ten, fifteen dollars an hour.  They were just sitters.  That was not my doing.  That was Helping Hand.  They came in making nine dollars an hour and it was left up to them to cook.  Mildred Mixon's agency charged twelve dollars to fifteen dollars an hour and, if they did anything additional, on a holiday, it was thirty dollars maybe because they got time and a half.  This was not what I made up.  This was the service.  And she had to have sitters around-the-clock.  It was ordered.

Tr. 94-95.[38]

---

[38]Another troubling fact about the defendant's method of accounting for payment of Maddie Woods' expenses is that it appears that the defendant did not pay the "sitter" agency who provided the "sitters." The defendant paid the "sitters" themselves, and they then had to account to the agency. Tr. 100-104. That in and of itself causes some concern. As explained in the note to Defendant's Exhibit 13 above, the defendant testified that at times she would give a "sitter" two receipts for the same work on the same day. She explained this was because the "sitter" would have to account to the agency for one amount and the defendant would have to account for an additional amount. See Tr. 184 and Tr. 648-50.

51

In contrast to the problems identified above, the defendant did produce numerous receipts and checks representing money paid to Maddie Woods' caregivers. The receipts are listed above in Defendant's Exhibits 12-23. The checks are included in Plaintiff's Exhibits 7 and 8.

These receipts have been part of the defendant's defense throughout this proceeding that she paid most of the money from the checks made payable to her, (see testimony quoted above), to caregivers, either in cash or with cashiers checks from the accounts where those funds were deposited. The Court has attempted to compare that amount to the amount paid to the defendant through the above checks.

First, the Court added the amounts from check numbers 738 for $5,500, 749 for $3,600, 768 for $5,750, 786 for $7,992, 797 for $2,980, and 798 for $25,550 (all from Plaintiff's Exhibits 7 and 8) where the defendant was the payee on money that she testified she used to pay caregivers and related expenses. That total is $51,372.

Second, the Court added the amounts from receipts the defendant testified represented payments to caregivers. That total, from records included in Defendant's Exhibits 12 through 23, is about $43,546. The Court then included about $5,480.36 from the defendant's "other expenses" receipts from Defendant's Exhibits 24-26 and 28-34 and 39 and 44-46.[39] Thus, the total amount of expenses for which the defendant provided receipts is about $49,226.36.[40]

---

[39]The missing exhibit numbers were for exhibits not introduced.

[40]The Court acknowledges that the defendant suggested that some of the expenses represented by some of these exhibits were paid for from withdrawals other than the Mutual Savings account against which the Court is comparing amounts. This difficult situation begs the question: Is it the Court's responsibility to excavate facts to reconcile these payments where the parties did not?

The defendant testified:

Q.    Okay. In spite of the fact that you were a court-appointed guardian for Ms. Woods and that you attempted to become a conservator for Ms. Woods, can you explain why you have never tried to go back and do an accounting or in preparation for this trial, why you have never tried to prove that all of this money was spent for Ms. Woods?

A.    I have tried to prove, more than once.

Q.    Tell me why you haven't gone back and added up all of your receipts and all of your –

A.    Oh, I have added receipts. I have added cashier's checks. I have given documentation. I sent papers back and forth between you and Leon Garmon. I don't know where the shuffle got mixed up at, but I have done my part.

Q.    I see.

Of course these amounts are not equal, but there is only $2,145.64 paid to the defendant (from these six Mutual Savings Credit Union withdrawals) that is not included in the receipts to caregivers, receipts or checks for other expenses such as "attorney fees and court costs," and other general expenses. In the context of the amount of money involved in this case, that is relatively small. As such, the Court is willing to, and is required by law to, give the defendant the benefit of the doubt.[41] Clearly she paid caregivers. Anyone who has dealt with care for elderly or infirmed persons, or knows someone who has, knows how expensive that care can be. As the defendant testified, the hourly rate for caregivers was twelve dollars and up and could be as much as thirty dollars on a holiday.[42]

On the other hand, as the findings of fact from the broader issue of defalcation show, the Court must find that the defendant did not properly account for these funds,

---

A.      Yes.
Q.      So you think it is somewhere around seventy or eighty thousand, the best of your guess?
A.      Maybe more.
Q.      Maybe more, maybe less, right?
A.      Yes.
Q.      I mean, I went through and added up. If I told you that there was around thirty-eight hundred paid to Ms. Alexander and twelve thousand paid to Ms. Hammonds – this is according to your receipt – and around twenty-seven hundred to Lizzie Bell, around a thousand dollars to Stella Foster, eighty-eight dollars to Shelia Green, twenty-one thousand, five hundred, to Marilyn Hall. And I am missing some exhibits. I think there is a couple thousand more. I add up about forty or fifty thousand.
A.      **Then I would think that you don't have all of the receipts or statements then**.
Q.      **Well, if all of the receipts and statements haven't been submitted to the court, then where are they?**
A.      **I have turned them in, sir. I don't know. I had about five receipt books and I don't know how many cashier's checks that were ran off.**

Tr. 549-51.

The Court has accounted for all receipts admitted into evidence. It cannot compare them one-on-one to all of the withdrawals in the defendant's name. The best the Court can do is, as it has above, give the defendant credit for total amounts.

[41]"[E]xceptions to the general rule of discharge, such as § 523(a)(1)(C), are to be strictly construed in favor of the debtor." In re Mitchell, 633 F.3d 1319, 1327 (11th Cir. 2011).

[42]Consequently, when the Court calculates the amount of the defendant's nondischargeable debt, it will not include any amount from these six Mutual Savings Credit Union withdrawals.

53

did not keep satisfactory records, and did not explain how much money was <u>not</u> spent on caregivers. For example, there is testimony above about check number 786. That was the check payable to the defendant for $7,992.00. The legend on the check reads, "Sitters-Dec-Jan-Feb." The check was deposited in the defendant's personal account. She testified that she paid caregivers from that personal account. While there are receipts for payment to caregivers for December 2002, January 2003, and February 2003, do they represent payments from this $7,992.00? Was all of the $7,992.00 paid? Did the defendant keep any of these funds? The Court cannot answer these questions. And the reason it cannot, is because the defendant did not keep adequate records. There are no ledgers. There are no spreadsheets. Her methods were careless and as this Court's conclusions of law explain later in this opinion, under the law in this Circuit, she was "reckless."

### b. Checks Written Directly to Caregivers

As indicated above, the Court found numerous checks where caregivers were paid directly from the Mutual Savings account. These payments assist the defendant in her defense of "accounting" for the amount of money she spent for caregivers. From Plaintiff's Exhibits 7 and 8, those checks are:

| Check No. | Dated: | Payable to: | Amount |
|---|---|---|---|
| 699 | 02/27/02 | Lizzie Green | $1,750.00 |
| 728 | 05/09/02 | Lizzie Bell | $1,200.00 |
| 734 | 05/30/02 | Lizzie Bell | $2,400.00 |
| 737 | 06/14/02 | Lizzie Bell | $1,200.00 |
| 764 | 07/25/02 | Reaver Daniel | $1,728.00 |
| 776 | 09/17/02 | Lizzie G. Bell | $350.00 |
| 779 | 11/17/02 | Dorothy Johnson | $88.00 |
| 780 | 11/25/02 | Marilyn Hall | $616.00 |
| 784 | 12/02/02 | Marilyn Hall | $616.00[43] |

### c. Checks Written to the Defendant, Her Husband, or Her Mother which were <u>Not</u> Associated with Payments to Caregivers

Plaintiff's Exhibits 7 and 8 include three Mutual Savings' checks payable to the defendant, her husband, or her mother which were not related to a Maddie Woods' expenses. Those include:

---

[43]These amounts are for information only. While the dates and payees offer some insight into the Defendant's payment of caregivers, as explained in this opinion, the amounts did not figure into the Court's calculation of the amount of the non-dischargeable debt the defendant owes the plaintiff.

54

1.      Check No. 736, dated May 30, 2002, is payable to F.D. Scott - Helping Hand Ministry for $2,700 – The defendant testified that she filled out this check and that the payment to her husband was for help he provided to Maddie Woods, and that it was a donation to his ministry. Tr. 72-73. The check appears to have been signed by Maddie Woods;

2.      Check No. 750, dated July 16, 2002, is payable to LaShari Scott / Mattie Woods for $5,000 – The defendant deposited this check into her personal University Federal Credit Union account and then paid her mother, Mattie Woods, the $5,000. Tr. 83-85. The defendant did not know who filled out the check but knew that it was both a gift to her mother and to compensate her mother for help she had provided to Maddie Woods. Id. There are no other records of how and why this money was transferred.[44]

3.      Check No. 817, dated May 30, 2003, one day before Maddie Woods died, is payable to LaShari W. Scott for $2,000. The defendant testified:

Q.      Now let's flip to check number 817 and I believe it is dated May 30, 2003, for two thousand dollars payable to you and there is nothing in the memo line. Do you recall receiving that check?
A.      Yes.
Q       And what was that for?
A.      She gave it to me. It was just –
Q.      And she signed that the day before she died?
A.      Actually she signed that check the day – yeah, that was the 30th, yes.
Q.      Where was she at, that day before she died?
A.      In the nursing home.
Q.      She was in the nursing home?
A.      Yes.
Q       Was she still, you know, aware of her finances and everything at that point in time?
A.      Yes.
Q.      What was that for?
A.      She just gave me a check. She didn't say no specifics. She gave it to me.
Q.      What did you think it was for?
A.      For me, a gift for caring for her.
Q.      Okay. Is there a reason why that wasn't put on there?

_____

[44]Certainly the numerous bank statements that included entries for many of these checks could be considered records, but of course, those statements do not offer any evidence of how these funds were spent.

A. No, sir.  I mean, I would just let the check stand for itself.  That was my record of it.
Q Does that look like a check that you wrote or –
A. No, that's a check that I wrote.
Q. **You did write that one?**
A. **Yes.**

Tr. 122-23 (emphasis added).

### d.  Check Written to the Defendant for
### Maddie Woods'
### Pre-Funeral Arrangements

Plaintiff's Exhibit 8 includes Mutual Savings' check number 807 payable to the defendant for payment of expenses associated with Maddie Woods' stay in a nursing home and for pre-funeral arrangements.  That check, dated April 14, 2003, was payable to LaShari W. Scott, for $22,000.00.

The defendant's accounting of this money, explained through her trial testimony is not satisfactory. It reads:

Q. It says on the memo line that this is for nursing home and burial. Now help me understand why twenty-two thousand dollars is owed for Maddie Woods' nursing home and Maddie Woods' burial; why checks weren't written directly to those people from this account, why was it written to you?
A. I deposited it in the bank and took cash money to pay for her funeral out of it and also I think I took a cashier's check to the nursing home.
Q. Why?
A. That's the way I did it.  I had a record of the check.  I have a record of the burial.  I have a record of the nursing home.
Q. And they add up to twenty-two thousand?
A. They may not add up exactly to twenty-two thousand, but I think I paid roughly, for her burial, anywhere from ten to eleven thousand.
Q. There is a pre-need funeral arrangement contract that I think is – let me get my exhibit list – is somewhere deep down there in your stack, Plaintiff's No. 20, and it has on it  – it is right in the middle of all of these smaller documents.  It has on it that the balance owed, it looks like about the total amount is seven thousand, one hundred and thirty-six dollars.  Does that sound about right for how much the funeral expense was or at least the part that was paid to the funeral home?
A. Probably about eight – I don't know the additional that I had to go back and pay but, yes.

Q.   I mean was that seven – what I was getting at, I guess, is was that seven thousand, was that part of this twenty-two thousand?

A.   Yes.

Q.   And why did it have to be paid in cash?

A.   It didn't have to be paid in cash but she wasn't there. I went and did this. I paid for her funeral out of her money.

Q.   Actually there's a note on there that says cash paid 5-12-03, seven thousand, one hundred and thirty-six; right, on Plaintiff's Exhibit 20?

A.   Okay, 20, uh-huh.

Q.   Right there about the very middle of the page it is typed in there, cash paid, seven thousand, one thirty-six.

A.   Right. Okay.

Q.   And then on the second page it looks like, and this is dated June 6, '03, and it says a balance of three hundred and fifty dollars. Does that sound about right?

A.   Yes.

**Q.   Okay. Now if about seventy-five hundred dollars went for burial, what's the balance of this twenty-two thousand – how much was this cashier's check that you say you took to the nursing home?**

**A.   About fifteen hundred.**

**Q.   Fifteen hundred?**

**A.   Uh-huh.**

**Q.   So fifteen hundred to the nursing home and seventy-five hundred in burial is about nine thousand; right?**

**A.   Yes.**

**Q.   Okay. Where did the rest of this check for twenty-two thousand go?**

**A.   In the bank, in Southtrust Bank.**

**Q.   And what would have happened to it from there?**

**A.   Using it for different things, bills, sitters and anything else that was left.**

**Q.   Well, it's written April 14, '03, and she died May 31, '03; right?**

**A.   Yes.**

**Q.   So if there is another twelve thousand, five hundred dollars there that wasn't for the nursing home and the burial, do you think that all went to sitters during the last month and a half of her life?**

A.   Yes, sir, and if it did not – I mean, if it's not accounted for, then I can say that I had it.

Q.   You had it, when, at the time she died?

**A.   No, sir. I mean, the money was still there at Southtrust.**

**Q.   At the time she died or now?**

57

> **A.** No, not at the time she died. I don't think – I can't actually say what was left there when she died.
>
> **Q.** Why not?
>
> **A.** I mean, I don't know exactly. I have got a statement that could probably tell me, but –
>
> **Q.** You have bank statements from that account?
>
> **A.** Not all statements but I do have some bank statements from that account.
>
> Q. How long have those been in your possession?
>
> A. Ever since that account was opened.
>
> Q. Okay. Is there any reason why those were never turned over?
>
> A. No one asked me for those accounts and the account was opened in LaShari Woods Scott and Mattie Scott – and Maddie Woods.

Tr. 104-108 (emphasis added). Again, while the defendant has some general records supporting some of her payments, she has not, and cannot, account for all of the payments she made as Maddie Woods' fiduciary.[45] In this case $12,500 was unaccounted for.

### e. The $50,000 Transfer to SouthTrust Bank

Both parties presented extensive evidence regarding a $50,000 transfer from Mutual Savings to an account in SouthTrust Bank. The Court will attempt to explain how and why this transaction occurred before explaining the impact of it.

There is considerable evidence suggesting that Maddie Woods had a serious fear that someone, maybe the State of Alabama, for whatever reason, would take her money. With that concern, in August 2002, she asked Mrs. Viola Mae Lett, one of her caregivers, to take her to the Mutual Saving Credit Union, so she could withdraw $50,000 from her account. Tr. 373-75.

The defendant had testified earlier that she understood that Maddie Woods was not comfortable with the money remaining in the Mutual account. She testified, "She wanted it moved anywhere that she felt comfortable with controlling her money." Tr. 90.

Mrs. Lett testified that she often took Maddie Woods to the bank. On this occasion, she took Maddie Woods to Mutual Savings Credit Union and Mrs. Woods withdrew $50,000. Mrs. Lett testified that Maddie Woods told her that after she withdrew that money she wanted Mrs. Lett to take her to see the defendant so she could give the defendant that money. Mrs. Lett testified about what she thought was the reason Maddie Woods withdrew so much money. She said:

---

[45]The defendant testified about other funeral expenses. Tr. 120-121.

58

A.     And the reason of that is because there have been so many people
       around in Fairfield have lost what they had and she didn't want the state
       to take what she had, and that was the purpose of her getting it.

Q.     Okay.  So did you tell LaShari that she had withdrawn –

THE COURT:          Could you get Ms. Lett to repeat the last part of that, if
                    she could, please?  I didn't understand it and I am
                    afraid we didn't get a very good record of it.

BY MS. WINSTON:

Q.     Would you repeat that you took it – where did you take the money?

THE COURT:          You took Ms. Scott –

THE WITNESS:        Maddie.

THE COURT:          You took Ms. Woods over to Baptist Montclair?

THE WITNESS:        Montclair.

THE COURT:          And what was the reason for doing that?

THE WITNESS:        **Well, so many people in Fairfield own their home
                    and the state, if you don't have anybody to take
                    care of you, the state will get it, and that was the
                    purpose.  She said she didn't want the state to
                    have anything she had.**

Tr. 374-75.[46]

       The defendant testified further about this $50,000.  She explained the
disagreements she and Maddie Woods had over Maddie Woods' desire to move this
money:

              She was angry.  She was angry with me.  She wanted her money.  She
              was angry with everyone.  The statement of the hundred thousand dollars,
              she had two sitters, Ms. Lett and Lizzie, that I would give permission to
              take her to the bank, buy groceries, you know, because she trusted them,
              as well as I did.  They have been family friends forever, as long as I have.
              And Ms. Lett called me at work one day and said, "I took Maddie to get

_____

       [46]The defendant worked at a hospital near Montclair Road in Birmingham, Alabama.
SouthTrust Bank had a branch nearby.

Case 06-00011-BGC    Doc 49    Filed 09/27/12    Entered 09/27/12 09:07:32    Desc Main
Document        Page 59 of 128

her money." And I was, like, "Oh, Lord, I have been battling with her for the last three or four weeks about this. Why did you do it?" So she said it, she was in control of her money, that's what she wanted and that's what she did.

Tr. 480-81.

In the end, the defendant acquiesced. Based on what the defendant believed were Maddie Woods' wishes, she opened a new account at SouthTrust Bank and deposited the $50,000 into that account. Tr. 519, Pla. Ex 35. She testified:

> Q. And why did you do that? Why did you open this account?
> A. She wanted her money, you know, where she could have control over it. That's what she wanted. Well, she wanted all of her money from Mutual.
> Q. And she felt she didn't have control over it at Mutual Savings Credit Union?
> A. No.

Tr. 524.

The SouthTrust account is discussed in detail below.

### f. The Final Transaction from Mutual Savings Account

When Maddie Woods died in May 2003, there was $51,540.68 the Mutual Savings account. Tr. 532, Pla. Ex. 6 ("Statement from 5/1/03 through 5/31/03").[47] The defendant testified that she was aware that after Maddie Woods died, the plaintiff moved that balance from Mutual Savings to the plaintiff. Tr. 157-58.

The plaintiff acknowledged receiving, in her capacity as executrix of Maddie Woods' estate, the balance of the funds in the Mutual Savings account. Tr. 267-68. Her daughter, Betty Allen, confirmed the balance in the account. Tr. 334.

The defendant admitted that about $135,000 was spent from the Mutual Savings account from February 2002 through Maddie Woods' death. Tr. 136. Adding the $50,000 left at Maddie Woods' death, the Court can find that at least $185,000 went through that account during that time.

---

[47]This balance of about $50,000 was left in the Mutual account after the $50,000 transfer from this account to SouthTrust Bank. Tr. 523-24. Defendant's Exhibit 48 is a Mutual Savings bank statement for the account ending July 31, 2003, a month after Maddie Woods died. It shows a balance of $50,099.22. The Court understands that those funds were transferred to the plaintiff as executrix of Maddie Woods' estate.

60

## 2. SouthTrust Bank

As stated above, the defendant opened a joint account at SouthTrust Bank with the $50,000 Maddie Woods withdrew from Mutual Savings. The defendant set up the account in the names of Maddie Woods and LaShari W. Scott. The last page of Plaintiff's Exhibit 34 is a copy of the initial deposit slip for $50,000 on August 9, 2002. The first page of Plaintiff's Exhibit 35 shows a starting balance of $50,000 after an August 9, 2002, deposit.

The account was set up as a savings account. Copies of withdrawal receipts and statements in Plaintiff's Exhibits 34 and 35 track the frequent transactions in and out of that account. Withdrawals were made by the defendant either with "counter" slips filled out by, payable to, and signed by the defendant or through automated teller machines.

### a. Counter Slips Payable to the Defendant

Plaintiff's Exhibit 34 includes copies of "counter" slip withdrawals for these dates and amounts:

| | | |
|---|---|---|
| 1. | August 23, 2002 | $2,016.00 |
| 2. | September 27, 2002 | $650.00 |
| 3. | September 27, 2002 | $8,000.00 |
| 4. | October 25, 2002 | $1,850.00 |
| 5. | November 4, 2002 | $5,000.00 |
| 6. | November 20, 2002 | $3,000.00 |
| 7. | November 25, 2002 | $5,795.80 |
| 8. | January 21, 2003 | $1,056.00 |
| 9. | May 23, 2003 | $5,000.00 |
| 10. | May 23, 2003 | $1,000.00 |
| | Total | $33,367.80 |

The defendant was asked about these withdrawals. She testified that item 7 for $5,795.80 was a gift from Maddie Woods to help her with some personal problems. Tr. 520. She testified that item number 3 for $8,000.00 was money she withdrew from the account and gave to Maddie Woods. She did not know what Maddie Woods did with those funds. Tr. 520.

The defendant could not recollect the specific facts about any of the other withdrawals. She speculated that some could have been to purchase cashiers checks, presumably to pay caregivers. The Court compared the cashiers check receipts from Defendant's Exhibits 12-23 (listed above). It could not, however, match any specific amounts. And even if it could, as the discussion regarding those receipts concludes, the Court has already given the defendant "credit" for those amounts.

61

The defendant did again offer this basic defense. She testified:

> Q.    Okay.  Why would you just normally go and get thousands of dollars out of the bank?
> A     Because she would tell me to go and get it.
> Q.    And how often would she tell you to go?
> A.    Whenever she wanted her money at home or whenever she wanted to give someone something.  That was all the time.  Maddie wanted to be in control because she just did not want, as she said, the state to come in and take her away and her money.

Tr. 521.

The issue here, like that with some of the withdrawals from the Mutual account arises because the withdrawals were payable to the defendant personally. Unlike checks or receipts payable to a person other than the defendant, with the defendant's poor record keeping, there is no possible way to determine how these funds were spent.[48] And as the defendant testified many times, she could not recall.

### b.  ATM Withdrawals

The defendant made additional "cash" withdrawals from this SouthTrust account through automated teller machines (ATMs.) Plaintiff's Exhibit 35 includes copies of SouthTrust bank statements listing those withdrawals.

Plaintiff's Exhibit 35 shows that the defendant made about 46 ATM withdrawals for $300 between September 26, 2002, and May 23, 2003, for about $13,800.[49]  Two withdrawals for $300.00 each were made on March 3-4. 2003, at the Golden Moon Casino in Choctaw, Mississippi.

The defendant testified that she used these funds to pay caregivers. Tr. 525-26. And she continued to maintain that she had receipts to support those payments. If she does, and those are the ones described in Defendant's Exhibits 12-23 above, as stated, the Court has already given the defendant "credit" for those receipts. If the defendant has other receipts, they were not supplied to the Court.

As a final note regarding this account, the defendant testified:

_____

[48] See note 38 above.

[49] The defendant made about $5,500 in ATM withdrawals from SouthTrust _after_ Maddie Woods died, including about $125.00 from the Silver Star casino in Philadelphia, Mississippi. She defended her actions saying that this was a joint account which she owned after Maddie Woods died.  The defendant did not provide the Court with an accounting of the amount of "her" money she deposited into this account; however, the plaintiff did not prove otherwise.

62

> Q. On the death of Maddie Woods, how much money was in the account at SouthTrust?
> A. I don't exactly know the full amount, but I would have a statement from SouthTrust.
> Q. Give me a rough idea?
> A. I don't really know but it wasn't that much. It wasn't that much in that account.
> Q. Okay. What do you mean by not much?
> A. It wasn't like three, four, or five thousand dollars.

Tr. 532.

The SouthTrust account statement for May 31, 2003, in Plaintiff's Exhibit 35 shows a balance of that date as $2,326.39.

### 3. University Federal Credit Union

The defendant maintained her personal account at the University Federal Credit Union in Birmingham, Alabama. Tr. 152. She has had this account for at least twenty-three years. Tr. 585.

No details of this account were offered. No exhibits were introduced. The only information about it was the defendant's testimony and the backs of Mutual Savings account checks payable to the defendant showing four checks were deposited in the University Federal Credit Union account. From plaintiff's Exhibit 8, those were: Check No. 749 dated July 15, 2002 for $3,600; Check No. 750 dated July 16, 2002 for $5,000; Check No. 786 dated December 3, 2002 for $7,992; and Check No. 798 dated January 29, 2003 for $25,550.[50]

### 4. A Second SouthTrust Account

The defendant maintained a second personal account at SouthTrust Bank. Similarly, no details were offered for this account. While the defendant testified that she identified this account and gave that information to her attorney to supply to the plaintiff, plaintiff's attorney implied that she had not. Tr. 586-88.

The exchange before that revelation included:

> Q. What was your second account at SouthTrust opened for?
> A. That was my account. This was not that account. That was mine. But the numbers –

---

[50]As discussed above, all of these funds have been accounted for in regard to the defendant's defalcation through comparison to the receipts the defendant provided.

Q.      Why did you need your own account there?

MS. WINSTON: Objection, Your Honor.

A.      Why would I not?  That's where I cash my checks at.

THE COURT: Overruled.

Q.      I am asking you a question.  You have never mentioned in your deposition or anything that you had a personal account there and a joint account.

A.      My personal account does not have anything to do with Maddie Woods, does it?  My personal business is –

Q.      Ma'am, you cannot answer the question –

A.      Okay.  Well, I told you in the beginning I had two accounts, but my personal account is not Maddie Woods' account.  I didn't know which numbers because I wasn't seeing them at the time but, after I related the numbers, I could answer that.

Q.      Okay.  Did you have your personal account there before you opened the joint account for you and Maddie Woods?

A.      Yes.

Q.      You did?

A.      Yes.

Q.      Okay.  And what was that account for?  It was just another personal account?

A.      I work.  Payroll accounts, I cash, go across the street and I can cash my check directly across the street.

Q       Okay.  I mean, you mentioned in your deposition some account at, where is it, Legacy or something?

A.      That's University Federal Credit Union.

Q.      Okay.  Because you mentioned that and made it sound like that was your only account and you had had it forever and ever.

A.      Since I have been employed at Montclair twenty-three years ago.

Q.      Okay.  Okay.  I was just curious about the other SouthTrust account.  So it was just another personal account of yours?

A.      Yes, sir.

Q.      Okay.  And there is no particular reason why you have never produced any documents relating to that account, in spite of being asked for them?

A.      Out of my account, why would you want my documents from my account?  Plus my husband's name was on it.  That was our personal –

Q.      I think you understand why, do you not?

A.      No, sir, I do not.

Q.      We were trying to figure out where all of this money went.

> A.    Well, it is not in my personal account.
>
> Q.    Okay.  Is there a reason why you never divulged the existence of that account?
>
> A.    Mr. Bugge, I don't feel like I should have to empty my whole personal life out to you and that's why because, I mean – and let me explain.  I mean, ever since this has been back and forth, you and Leon Garmon, battling who is going to take who to court, who is going to do this, who is going to do that, and I have tried to be as open with you, but you dipped into my private life, you searched up all of my husband's outside children and you really just pried into my personal life.  Okay.

Tr. 584-87. Little else is known about this account.

### 5.  Citizens Federal Saving Bank Accounts

There are five Citizens Federal Saving Bank accounts to discuss. These accounts include the bulk of the evidence supporting the conclusion that the defendant committed acts of defalcation while acting as a fiduciary for Maddie Woods. These accounts are: (a) Citizens Federal - Five Points South; (b) Citizens Federal Savings Account - Power of Attorney; (c) Citizens Federal - Son (C.A.S.) Account; (d) Citizens Federal - Son (S.D.S.) Account; and (e) Citizens Federal - Unidentified Account.  The transactions among three of them contain more than sufficient evidence for this Court to find that the defendant committed acts of defalcation while acting as a fiduciary for Maddie Woods with a power of attorney, as a guardian, or as a conservator. Each account, and its relationships to the other accounts, is discussed below.

### (a)  Five Points South Account

Plaintiff's Exhibit 9 is a copy of the opening document for a Citizens Federal account in the name of "Maddie Woods Depositor for Johnnie C. Allen (Beneficiary)." The account was opened on October 16, 1996, with an initial deposit of $105,028.98. The account was named "Five Points West."

The defendant explained what she knew about this account.  She testified:

> Q.    Okay.  Do you know what happened to this Maddie Woods and Johnnie Allen account that had a hundred and five thousand in it back in '96?
>
> A.    No.
>
> Q.    So it would be your testimony that this money that was used to open this account [the power of attorney account discussed next] came from Citizens Federal but you don't believe it came from this account?
>
> A.    I don't know about that account.  I can't –

Tr. 127 (parenthetical added).

**(b)  Power of Attorney Account**

This account was opened on December 18, 2001, by the defendant. This account was Maddie Woods' primary Citizens Federal account. When it was opened it was specifically identified as a "**POWER OF ATTORNEY**" account in the "Ownership of Account - Consumer Purpose" section of the initial paperwork. See Plaintiff's Exhibit 10.

The initial deposit was $113,433.82. Pla. Ex 10. The defendant testified that those funds came from, "An account of Eddie Woods and Maddie Woods." Tr. 126-27. That account, she confirmed, was also a Citizens Federal account. Tr. 127.

Plaintiff's Exhibit 11 is a copy of the "Savings account History" for this account for January 1, 2002 through December 31, 2002, generated on January 19, 2003.  That history is as follows:

| Date | Transaction | Amount | Balance |
|------|-------------|--------|---------|
| Beginning Balance | | | $113,499.08[51] |
| 1. Jan. 14, 2002 | Withdrawal | $25,500.00 | $87,999.08 |
| 2. Jan 14, 2002 | Withdrawal | $25,000.00 | $62,999.08 |
| 3. Feb. 14, 2002 | Withdrawal | $6,000.00 | $56,999.08 |
| 4. Feb. 22, 2002 | Withdrawal | $40,000.00 | $16,999.08 |
| 5. Mar. 23, 2002 | Interest Paid | $186.18 | $17,185.26 |
| 6. Apr. 24, 2002 | Withdrawal | $6,000.00 | $11,185.26 |
| 7. May 30, 2002 | Check Cashing | $3,148.92 | $11,185.26 |
| 8. Jun. 22, 2002 | Interest Paid | $47.50 | $11,232.76 |
| 9. Jul. 5, 2002 | Withdrawal | $3,000.00 | $8,232.76 |
| 10. Jul. 13, 2002 | Withdrawal | $6,000.00 | $2,232.76 |

---

[51]Plaintiff's Exhibit 10 shows an initial deposit of $113,433.82. Plaintiff's Exhibit 11 does not include a beginning balance. The Court added the first withdrawal amount to the balance after that withdrawal to arrive at a beginning balance of $113,499.08, which is $65.26 more than the initial deposit. There is no evidence to allow the Court to reconcile this amount.

66

| | | | | |
|---|---|---|---|---|
| 11. Jul. 18, 2002 | Interest Paid | $5.01 | $2,237.77 |
| 12. Jul. 18, 2002 | Closing Withdrawal | $2,237.77 | 00.00 |

Pla. Ex. 11.

This was the defendant's "Power of Attorney" account! And as the discussion below will demonstrate, the defendant spent about $113,500 from this account <u>in seven months</u> without keeping <u>any</u> records to prove how those funds were spent. The pertinent transactions are discussed below.

The defendant's testimonies about items 1, 2, and 4 were related because she initially identified these transaction incorrectly. Tr. 128-130. She corrected herself later. Tr. 130-32.

The defendant testified that she withdrew $40,000 on February 22, 2002, from her Citizens "power of attorney" account and used those funds to set up two $20,000 savings accounts, one for each of her minor sons. Tr. 131. The defendant offered this explanation of why she made these transactions:

> Q.    And what would you say that this twenty thousand was spent on over the course of the last couple of years since these were opened?
> A.    Places for me to live.  As I said, I lived in an apartment, hotels. She really was just looking out for the safety and me and my two sons.
> Q.    So is there anything you have to document that Maddie Woods intended to give you forty thousand dollars just to spend on your living expenses?
> A.    No, sir, but **I have a power of attorney that Maddie Woods gave to me that stated that I could give gifts** or do any type of transactions that was needed to be done to handle things.  You know, this is what I can say that she did say was set aside for me and my children.

Tr. 133 (emphasis added).

And finally, consistent with her other testimony about payments or withdrawals made payable to her, the defendant testified she withdrew this $40,000 for her sons because, "she," Maddie Woods, "told me to...." Tr. 564.  Other than this general testimony, the defendant could not explain how these funds were spent.

If possible, there is even less information about her withdrawal on January 14, 2002, of the $50,500 listed above as items 1 and 2.  In fact, the parties agree that not only is there no explanation of how this money was spent, but also that these funds cannot be identified or located.

67

Plaintiff's counsel asked the defendant, "We know the forty thousand went to your sons' accounts, but what do you think the rest of it went to?" Tr. 136-37. The following exchange then occurred. It is the basis for this Court's finding that this $50,500 was not only unaccounted for, but that no one can locate it. The transcript reads:

A.    Well, a lot of it I took to Ms. Woods herself.
Q.    How, in cash?
A.    Cash.
Q.    Okay.  Do you think that's the explanation for the twenty-five thousand, five hundred dollar withdrawal and the twenty-five thousand dollar withdrawal?
A.    I am sorry for saying it but I just cannot remember withdrawing and taking that amount.  I honestly do not.  But I do know that I took money to Maddie Woods to distribute in other gifts also.  I wasn't the only one she gave money to.
Q.    I have never withdrawn twenty-five thousand from a bank. If I did, I think –

MS. WINSTON:        Objection, Your Honor.

THE COURT:        Sustained.

BY MR. BUGGE:

Q.    Ms. Scott, this is a bank account in your name and  your eighty something year-old aunt's name and these statements – did you get statements from this account?
A.    Yes.
Q.    Okay.  When you saw a statement that said that in one day fifty thousand, five hundred dollars was withdrawn from this account, you are telling me you don't know what that was for?
A.    It was not removed from the bank.  It may have been placed in another account.  I did not –
Q.    Where?
A.    At the same bank, the same bank, the same bank.
Q.    So are you telling me that this fifty thousand, five hundred dollars, was used to open another account?
A.    Yes, sir, that's what I am saying.  I never moved it – I never took twenty-five thousand, five hundred, nor twenty thousand dollars from the bank at one time.  And this was before all of this went on. This was before.
Q.    January of '02; right?
A.    If I am correct, it was in '01 that we did this.  I mean, I have to go back through my records because I really don't – but I had the

68

power of attorney papers and I did not make any type of transaction without Ms. Woods' knowledge of anything. But that money was not moved from the bank. And then I would have had tax papers on that one, if I am correct.

Q. There ought to be tax papers on it, that's for sure.

A. Yeah. Okay.

Q. Is that all of the answer you have for that fifty thousand, five hundred, is that you just don't really know; you think it was moved to another account but you don't really know?

A. What I am saying is the two accounts that I have there, my son, myself and my brother, one of my brothers was also on that account.

Q. On what account?

A. This one at Citizens.

Q. He is not named on Exhibit 10.

A. Well, Larry Woods should be on the one that I have.

THE COURT: You need to identify which account, Ms. Scott, because I know there were a number of accounts at –

THE WITNESS: It's the one at Citizens Federal Savings & Trust.

THE COURT: But I think there were more than one account at Citizens Federal, so you need to identify which one you are talking about.

THE WITNESS: But my brother was on each – of all of them, with me and my sons.

BY MR. BUGGE:

Q. Let's look at Exhibits 23 and 24. They are the two accounts that were opened for your sons. It looks like at the time they were opened, the only names in the account owner's box on the top right on 23 and 24 are ...[C.A.S.] and LaShari Woods Scott on Exhibit 23. On Exhibit 24, Steve and ...[S.D.S] and LaShari Woods Scott. Now, those are your sons and you?

A. Yes.

Q. And now is it your testimony that your brother has been on these two accounts?

A. Yes.

Q. Okay. Was he added later?

A. Yes.

Q. Okay. Now what about the fifty thousand, five hundred dollars we were just talking about that did not go in these two accounts? Are you saying that went into even another account?

69

| | |
|---|---|
| A. | At the bank, yes, sir. |
| Q. | At that bank? |
| A. | That bank. |
| Q. | Whose name would have been on that account? |
| A. | Mine and probably Larry's was on that one. |
| Q. | Now why was that money put in there? |
| A. | Because Maddie Woods told me to move those accounts. |
| Q. | Fifty thousand, five hundred dollars in one day to an account in yours and your brother's name and then twenty thousand to each of your sons? |
| A. | Yes. |

Tr. 137-140 (parentheticals added).

The defendant testified about items 3, 6, 9, and 10 from the Court's above list. Those are the $3,000 and $6,000 additional withdrawals from this Citizens Federal account. Plaintiff's Exhibit 12 includes copies of the negotiated savings withdrawal slips for each of these amounts. Each shows that the defendant filled out the withdrawal slip, signed it, and cashed it, presumably under the authority of her power of attorney.

The defendant testified about why these withdrawals were made and what was done with the money. That testimony is consistent with all of her testimony about these large-types of payments she made to herself. That testimony is she withdrew either cash, or converted a withdrawal to cash, then gave that cash to either caregivers or Maddie Woods. While there are some receipts for some of the money paid to the caregivers, the defendant apparently did not keep any records for the cash she gave to Maddie Woods. Her testimony is that Maddie Woods took the cash and gave it away.

In regard to the $3,000 and $6,000 withdrawals from this Citizens account, she testified:

| | |
|---|---|
| Q. | And do you remember – do you have any documentation of what that money was used for? |
| A. | I do not have documentation but I have sitters that can testify that that money was given to other family members. |
| Q. | What other family members would have gotten that money? |
| A. | She had a nephew – well, one of my brothers, Larry Woods, got money.  She had a niece in Atlanta whose husband came and got money.  And like I said, this is just statements that what she was giving to people.  I know my brother and the niece got money and one of my uncle's friends, she gave money. |
| Q. | Now did she do it or did you do it?  I mean these are withdrawals that you made. |
| A. | She gave – I withdrew it but she gave it. |

70

> Q. Are any of those people going to be here to testify that they got money from your aunt?
>
> A. Mary Woods is in Cleveland. I have no idea where Mr. Samuel is, and I don't know about the other family members because really, truly, I don't think anybody is going to come forth and own up to getting money but they did.
>
> Q. Why is that? Why do you think that would be?
>
> A. Because they don't want to be involved in it.

Tr. 143-44.

While the Court understands the defendant's frustration with people who do not want to get "involved," this is a serious situation. The point to be made is this – the defendant, <u>not</u> Maddie Woods, <u>not</u> any other family member, and certainly <u>not</u> any of the caregivers, was the <u>fiduciary</u>. As discussed above, the defendant understood her responsibilities. She was responsible for this money, and she is the one that must account for it. She has not.

### (c) Son (C.A.S.) Account

Plaintiff's Exhibit 23 is a copy of the paperwork used to open this account. Consistent with the evidence reviewed above, this exhibit shows that the account was opened on February 21, 2002, at the Citizens Federal Savings Bank in the names of C.A.S. (one of the defendant's minor sons) and LaShari Woods Scott. The initial deposit was $20,000 corresponding to the $40,000 withdrawal from the primary Citizens account.

The above explains the nature of and lack of accounting for, this account. All that remains is to explain what happened to the account near the time of and after Maddie Woods' death.

The defendant testified that at the time of trial, these accounts were still open. Tr. 149. She added later that there was no money left in either. She testified:

> Q. Okay. And now you can't tell me what happened to the money?
>
> A. I put the money in accounts for my sons, which she told me to do, and the money that was withdrawn was given to her.
>
> Q. That was the forty thousand; right?
>
> A. There was numerous withdrawals on this account.
>
> Q. And now there is no money in the account in your son's name right now; is there?
>
> A. No.
>
> Q. Okay. Because it was all spent; correct?
>
> A. Yes.

71

Q.     Okay.  **Do you have any documents to suggest that Maddie Woods wanted you to take this money, anything to suggest that she gave you this money, gave your sons this money, anything at all other than your testimony?**

A.     **No.**

Tr. 564 (emphasis added).

### (d) Son (S.D.S.) Account

Plaintiff's Exhibit 24 is a copy of the paperwork used to open this account.  With a few exceptions, it is consistent with the other son's account.  This exhibit shows that the account was opened on February 21, 2002, at the Citizens Federal Savings Bank in the names of S.D.S. (the other of the defendant's minor sons) and LaShari Woods Scott. The initial deposit again was $20,000, also corresponding to the $40,000 withdrawal from the primary Citizens account. All else is the same.

### (e) Unidentified Account

As explained above, both parties believe that this account was set up at Citizens Federal Bank with the $50,500 withdrawn from the primary Citizens account. In addition to the testimony quoted above about it, it is enlightening to learn the following.

Plaintiff's counsel asked,"I think we established that you used the forty thousand to open the twenty thousand dollar accounts in your sons' names, correct?" Tr. 562. The defendant responded "yes" (Tr. 562), and the following ensued:

Q.     And I thought that you said that the twenty-five thousand and twenty-five thousand, five hundred dollars, probably went to your brother?

A.     No, I never told you that money went to my brother.

Q.     Okay.  What did happen to it?

A.     I told you I did not understand that account in the beginning.  There is no date.  I never told you that went to my brother.

Q.     Okay.  What did happen to that money?

A.     That's what I told you that **I don't know**.  I really don't.  Now, I know at one time I went to that bank because the bank had withdrawn money.  There is no date here to say when this was done. They had taken fifty thousand dollars out and had to put it back, but I am not going to agree to this money when I don't know – there is no date there to say I did it, and I sure didn't tell you my brother got it.

Tr. 562-63 (emphasis added).

72

Through the Court's questioning, counsel for the parties ultimately agreed that whatever account this $50,500 was moved to, (presumably within the Citizens Federal Savings Bank), no one has yet to identify it and certainly no one has accounted for this money.

Counsel for the plaintiff began by asking the defendant, "Was it not your testimony a moment ago that those withdrawals were used to open another account with Citizens Federal Savings Bank in your brother's and your name?"  Tr. 159.  The defendant responded and the following exchange occurred:

A.    Yes.
Q.    And did you not testify that your Aunt Maddie Woods just wanted you all to have that money?
A.    She did not, and all of this did not give to us and, if I am correct, I told you different ones, when she would say go bring me "x" amount of dollars or whatever, that's what I did.  I did not say all of this money was given to my brother.
Q.    Well, let me make sure.  I thought you said that the large withdrawals of twenty-five thousand, that you didn't take that money out of the bank, that stayed in the bank?
A.    Yes.
Q     Okay.  And it was put in another account in your brother's and your name.  And what was that money used for then?
A.    Whenever she asked for me to go and get something, I went and got money and I took it to Ms. Woods.  And Ms. Woods is deceased.  She can't tell you but, if she was here, she would say she did what she wanted to do when she got ready, and all of her family knew that.  And I could sit up here and I could testify that the Allen family also got money.  Do you think they are going to defend me in what I am saying?  No.  So I am just speaking the truth.
Q.    Let me ask you this –

THE COURT:        **Has that additional account been identified?  Have I missed one or not?**

MR. BUGGE:        **I don't know, Judge.**

THE COURT:        **I just want to make sure I know whatever accounts have been identified and what numbers I have got, but there hasn't been one identified where that fifty thousand, five hundred dollars went.**

73

| THE WITNESS: | **It was at the same – this is the same account. This is –** |
|---|---|
| THE COURT: | **When you say "this same account," which one are you –** |
| THE WITNESS: | **Citizens Federal, and I think on his it says deposit item checks unable to locate. Well, they were still at Citizens Trust Bank.** |
| MR. BUGGE: | **The particular account, I don't believe has been identified, Judge. There is no account number that I have any documentation of.** |
| THE COURT: | **Do you agree, Ms. Winston?** |
| MS. WINSTON: | **Yes, Your Honor**. |

Tr. 159-160 (emphasis added).

## G. EDDIE WOODS' ESTATE

Eddie and Maddie Woods were husband and wife. Eddie and the defendant's father Tom Woods were brothers. Therefore, Eddie was the defendant's uncle and Maddie was her aunt. Tr. 15-16, 462, 465.

The defendant had a very special relationship with Eddie and Maddie. She explained:

Q.    And in what year did Eddie Woods pass?
A.    1994.
Q.    And in 1994, prior to Eddie Woods' death, did you make a promise to Eddie Woods to take care of Maddie Woods?
A.    Yes.
Q.    And did you keep that promise to Maddie?
A.    Yes.
Q.    And what does it mean in your opinion taking care of Maddie Woods?
A.    All of my adult life, I had taken care of Eddie and Maddie Woods. They had no children. I took care of him through his sickness up until his death, and that was just one of the promises that – I did the grocery shopping; I assisted him with medication, doctor trips, as so did I do with her since as far back as I can remember. It was 1988 when I finished nursing school. They had always been there for me, so I was there for them. I was their care giver. I was –

Q.      All right.  So you are a nurse?

A.      Yes.

Q.      Okay.  Are you a registered nurse or an LPN?

A.      LPN.

Q.      You are an LPN.  And how long have you been in this profession?

A.      Twenty-three years.

Q.      And during the time you were assisting Eddie – during the time Eddie Woods was sick, you were helping him with your skills, your nursing skills. What else were you doing with respect to helping him?

A.      I did the cooking, paid bills.  I went grocery shopping.  I did everything.  I have always been the one to write the bills out for them, go make bank transactions, take him to the bank when he wasn't feeling good because he had been back and forth battling his cancer for about five years prior to his death.  So I did just about everything.

Q.      So would it be safe to say you were their fill-in child at that time?

A.      Yes.

Q.      Did you testify earlier that you used to live with them?

A.      I did.

Q.      Okay.  And also during the time that you were helping Eddie Woods during his sickness, did he have to pay you for any of this?

A.      No.

Q.      Okay.  Did he ever give you any money, any gifts for helping him?

A.      Yes.  My uncle, if I may say, was a free-hearted person.  My brothers, there are seven of us, and he took two of us under his wing because my father had eight children, and his nickname to us was big-hearted Eddie because that's just the type of person he was.  I didn't charge.  He just gave to me because I was the  only girl out of the seven boys and that was it.

Q.      Did he give you a car one time?

A.      Yes.

Q.      Did he start you a bank account at one time?

A.      Yes.

Q.      Okay.  And what year was this that he gave you a car?

A.      Him and my uncle, Frank Hibbler, bought me a used car in '89, and then they bought me a new one in '91.

Tr. 462-65.

Before he died, Eddie Woods was one of a number of beneficiaries of an environmental litigation trust established for workers exposed to asbestos.  Tr. 43, in passim. Eddie Woods died in 1994. Tr. 16. Maddie Woods was the sole beneficiary of his estate, Tr. 16, including his right to continue to receive his share of the litigation trust proceeds. Tr. 43. Maddie Woods became the administrator of that estate. Tr. 44. As Eddie Woods' wife, she received death benefits from the trust. Tr. 171-72.

The defendant was appointed successor administrator for Eddie Woods' estate on August 12, 2002. Tr. 483. She posted a $10,000 as required by the appointment. Def. Ex. 2.

At the time the defendant became the successor of Eddie Woods' estate, Maddie Woods was still receiving checks from the litigation trust. Tr. 164-65. After Maddie Woods died, the defendant began receiving them. Tr. 164-65.

All of the trust litigation transactions into and out of Eddie Woods' estate were well documented through the law firms of Gordon, Silberman, Wiggins, and Childs and Wiggins, Childs, Quinn, and Pantazis. Def. Ex. 47. That exhibit includes a chart of all transactions. It shows three checks were sent to the defendant after Maddie Woods died. Those checks, with amounts and locations of deposit by the defendant are:

| Check No. | Date | Amount | Payable to: | Deposited by/in |
|-----------|------|--------|-------------|-----------------|
| 92466 | 10-1-03 | $3,496.32 | Maddie Woods | LaShari Woods-Scott/ SouthTrust Jt Account |
| 92748 | 11-06-03 | $1,728.00 | Maddie Woods | LaShari W. Scott (also signing Maddie Woods)/ SouthTrust Jt Account |
| 97781 | 04-27-04 | $2,629.27 | Maddie Woods | Mary N. Allen/ First Illinois Bank |

The defendant testified that she contacted the trust attorneys and ask them whether she could cash the checks she negotiated. Tr. 165-66. She testified that they told her she could. Tr. 165-66. She explained that she did not understand that her authority under the power of attorney, guardianship, and conservatorship ended when Maddie Woods died. Tr. 166. And she stated that she believed that when Maddie Woods executed the "Consent to Settlement," that Maddie Woods was giving her all rights to receive the litigation trust funds. Tr. 168.[52] Defendant's Exhibit 47 shows that at the time of trial there was a balance of $ 44,977.90 in Eddie Woods' litigation trust account.

## IV. CONCLUSIONS OF LAW

### A. BURDEN OF PROOF

To succeed, the plaintiff must prove each element of her surviving claims by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279 (1991).

---

[52]That document was a routine consent to settlement that allowed the defendant to assume administration of Eddie Woods' estate. Def. Ex. 49. In it, Maddie Woods did not relinquish any right to the funds in Eddie Woods' litigation trust account.

76

## B.  THE PLAINTIFF'S SURVIVING CLAIMS

As explained above, the plaintiff has two surviving claims with the possibility of a third. Those are: (1) her breach of fiduciary objection to dischargeability of a debt under section 523(a)(4); (2) her count to revoke the debtor's discharge under section 727(d)(1); and (3) her state law claim of unjust enrichment.  Each is discussed below.

## 1. Objection to Dischargeability of a Debt
## Under Section 523(a)(4) – Breach of a Fiduciary Duty

### a.  Applicable Law

Courts universally apply a two-part test to determine whether a debt is nondischargeable under section 523(a)(4). That test is:

(1)     Was the defendant acting in a fiduciary capacity; and,

(2)     Did the defendant commit an act of defalcation while acting in that capacity.

United Food & Commercial Worker's Union v. Eldridge (In Matter of Eldridge), 210 B.R. 188, 192 (Bankr. N.D. Ala.1997).  But as discussed below, that two-part test has many subparts.  A court cannot find nondischargeability unless all are satisfied.

### (1)  Part One of the Two-part Test – Fiduciary Capacity

### (a) Federal Law

Courts agree that federal law determines the concept of "fiduciary capacity" for purposes of section 523(a)(4).[53] In Nevels v. Caples (In the Matter of Caples), 454 B.R. 191 (Bankr. N.D. Ala.2011), Judge Jack A. Caddell, a member of this Court, offered this excellent explanation:

Although the Bankruptcy Code does not define the term "fiduciary capacity" for purposes of § 523(a)(4), federal case law narrowly construes same.FN5 Federal law provides that the traditional definition of fiduciary is not applicable in bankruptcy. "The traditional meaning of fiduciary under state law—loyalty, good faith and fair dealing—is too broad for purposes of this section." FN6 Instead, federal courts have "articulated a requirement that the trust relationship have

_____

[53]"Whether a relationship is a fiduciary relationship within the meaning of 11 U.S.C. § 523(a)(4) is an issue of federal law. Tudor Oaks Ltd. Partnership v. Cochrane ( In re Cochrane),124 F.3d 978, 984 (8th Cir.1997), cert. denied, 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998)." Homes v. Hrabik (In re Hrabik), 330 B.R. 765, 773 (Bankr. D.N.D. 2005).

77

existed prior to the act which created the debt in order to fall within the statutory [fiduciary *198 capacity] exception." FN7 "Involuntary trusts such as constructive or resulting trusts do not satisfy § 523(a)(4) because the act which created the debt simultaneously created the trust relationship." FN8 "It is not enough that by the very act of wrongdoing out of which the contested debt arose, the bankrupt has become chargeable as a trustee ex maleficio. He must have been a trustee before the wrong and without reference thereto." FN9 Thus, § 523(a)(4) only applies to "a person who was already a fiduciary when the debt was created." FN10 Fiduciary trusts relationships that are implied in law as a remedy for some dereliction of duty are not excepted from discharge.FN11

      FN5. Guerra v. Fernandez–Rocha ( In re Fernandez–Rocha), 451 F.3d 813, 816 (11th Cir.2006).

      FN6. In re Hosey, 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006).

      FN7. In re Fernandez–Rocha, 451 F.3d 813, 816 (11th Cir.2006).

      FN8. Ex rel. Conner, 2010 WL 1709168 *3 (Bankr. M.D. Ga. 2010).

      FN9. In re Fernandez–Rocha, 451 F.3d 813, 816 (11th Cir.2006) (quoting Davis v. Aetna Acceptance Co., 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934)).

      FN10. Id.

      FN11. In re Fernandez–Rocha, 451 F.3d 813, 816 (11th Cir.2006); Moore v. Murphy (In re Murphy), 297 B.R. 332, 348 (Bankr. D. Mass. 2003).

Rather, federal case law limits the § 523(a)(4) exception to situations involving express or technical trusts. FN12 Express trusts are voluntary trusts created by contract.FN13 An express trust must generally be in writing and must express the parties intent to create a trust, specifically define the trust property, and name both a beneficiary and a trustee.FN14 Technical trusts include relationships in which trust-type obligations are imposed pursuant to statute or common law. FN15 For there to be a technical trust, property must be entrusted to the debtor.FN16

      FN12. Quaif v. Johnson, 4 F.3d 950, 953–954 (11th Cir. 1993); McDowell v. Stein, 415 B.R. 584, 594 (Bankr. S.D.

78

Fla. 2009); In re Hosey, 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006).

FN13. In re Fernandez–Rocha, 451 F.3d 813, 816 (11th Cir. 2006) (express trust); Telfair v. First Union Mortg. Corp., 216 F.3d 1333 (11th Cir.2000).

FN14. Telfair v. First Union Mortg. Corp., 216 F.3d 1333, 1341 (11th Cir.2000); In re Darby, 226 B.R. 126, 129 (Bankr. M.D. Ala. 1998); Coosa River Water, Sewer and Fire Protection Authority v. SouthTrust Bank of Alabama, 611 So.2d 1058, 1062–1063 (Ala.1993) (settlor of an express trust must give up control of the res or trust property under Alabama law)

FN15. Quaif v. Johnson, 4 F.3d 950, 953–954 (11th Cir. 1993) (statutory trust imposed on insurance agent under Georgia law); In re Fernandez–Rocha, 451 F.3d 813 (11th Cir.2006) (failure to maintain funds under Florida's Financial Responsibility Act did not result in breach of fiduciary duty); LSP Inv. P'ship v. Bennett (In re Bennett), 989 F.2d 779 (5th Cir.1993) (trust obligations under § 523(a)(4) can arise pursuant to statute, common law, or formal trust agreements); Moreno v. Ashworth, 892 F.2d 417, 421 (5th Cir.1990) (corporate officer owed common law fiduciary duty to corporation and stockholders for purposes of § 523(a)(4)); Lewis v. Short (In re Short), 818 F.2d 693, 695–96 (9th Cir. 1987) (common law imposed trustee-like duties on partners); Lanier v. Futch (In re Futch), 2011 WL 576071, *23 (Bankr. S.D. Miss. 2011) (finding commodities broker owed a fiduciary duty to customer under Mississippi law); In re Murphy, 297 B.R. 332, 348 (Bankr. D. Mass. 2003) ("A technical trust is one that is imposed by either statutory or common law.").

FN16. Tarpon Point, LLC v. Wheelus (In re Wheelus), 2008 WL 372470 (Bankr. M.D. Ga. 2008).

Id. at 197-98.[54]

---

[54]In In re Bullock, Case No. 09-84300, 2010 WL 2202826 (Bankr. N.D. Ala. May 27, 2010), subsequently affirmed, 670 F.3d 1160 (11th Cir. 2012), petition for certiorari filed June 14, 2012, Judge Caddell explained the state of this law in the Eleventh Circuit. He wrote:

79

It is this express or technical trust requirement that has become the keystone of any fiduciary review. In an earlier opinion on the same subject, Judge Caddell outlined the elements that must exist for a technical or express trust to exist. He wrote:

The term "fiduciary" has traditionally been defined as a special relationship of confidence, trust, and good faith, but most courts have found this definition to be far too broad for purposes of § 523(a)(4). The Eleventh Circuit has discussed the definition of fiduciary capacity under § 523(a)(4) in Quaif v. Johnson (In re Quaif), 4 F.3d 950, 953–54 (11th Cir.1993) and Guerra v. Fernandez–Rocha (In re Fernandez–Rocha), 451 F.3d 813, 816 (11th Cir. 2006) and explained in both cases that the exception to dischargeability is to be narrowly construed. The Eleventh Circuit most recently explained the breadth of the term fiduciary for purposes of § 523(a)(4) as follows:

> In Quaif, this Court further noted that the 1934 Davis decision is the last Supreme Court case to speak to the issue and that the Supreme Court has left "the lower courts to struggle with the concept of 'technical' trust." Quaif, 4 F.3d at 953. Quaif also discussed the trends in judicial interpretation of the § 523(a)(4) exception and noted that courts seemed to include the voluntary, express trust created by contract within the scope of "fiduciary capacity" as used in § 523(a)(4). In contrast, courts have excluded the involuntary resulting or constructive trust, created by operation of law, from the scope of the exception. Id. Additionally, Quaif noted that cases have "also articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory [fiduciary capacity] exception." Accordingly, "constructive" or "resulting" trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception "because the act which created the debt simultaneously created the trust relationship." Id.

In re Fernandez–Rocha, 451 F.3d at 816 (emphasis added).

In Quaif, the Eleventh Circuit determined that a Georgia insurance statute created a technical trust for purposes of § 523(a)(4), while the court determined that a Florida physician licensing statute did not create a technical trust in Fernandez–Rocha.

Id. at *4-*5.

80

A technical or express trust requires (1) a declaration of affirmative trust duties, (2) a segregated trust res, and (3) an intent to create a trust relationship. Council 49, <u>Am. Fed'n of State, County and Mun. Employees v. Boshell (In re Boshell)</u>, 108 B.R. 780, 783 (Bankr.N.D.Ala.1989). The trust relationship must have existed prior to the act which created the debt. <u>In re Quaif</u>, 4 F.3d at 952.

<u>United Food & Commercial Workers Union Local 1995 v. Eldridge (In re Eldridge)</u>, 210 B.R. 188, 192 (Bankr. N.D. Ala.1997).

This Court agrees. It wrote in <u>Houston v. Capps (In re Capps)</u>,193 B.R. 955 (Bankr. N.D. Ala.1995):

An express trust has the following characteristics: (1) it is a relationship; (2) it is a relationship of a fiduciary character; (3) it is a relationship with respect to property; (4) it involves the existence of equitable duties imposed upon the holder of the title to the property to deal with it for the benefit of another; and (5) it arises as a result of a manifestation of an intent to create the relationship.

<u>Id</u>. at 962 (citing Austin W. Scott, Abridgment of the Law of Trusts § 2.8 (1960) at 24).

### (b)  State Law

### I) General Principles

In addition to federal law, many courts recognize that they should look to state law when determining whether a fiduciary relationship exists.

Again in <u>Houston v. Capps</u> this Court wrote:

Section 523(a)(4)'s fiduciary defalcation exception is limited in application to situations involving express trusts, and does not have application to trusts implied by law, such as constructive or resulting trusts, or trusts implied from contract. The term "fiduciary" in Section 523(a)(4), according to federal case law, refers to a trustee of an express trust. Whether the relationship between Mr. Houston and Ms. Capps may properly be characterized as an express trust, however, must be determined by reference to Alabama state law.

Case 06-00011-BGC    Doc 49    Filed 09/27/12    Entered 09/27/12 09:07:32    Desc Main
Document      Page 81 of 128

Id. at 960 (citing In re Bennett, 989 F.2d 779, 784 (5th Cir.1993), cert. denied, 510 U.S. 1011 (1993) and others) (footnotes omitted).[55]

The relationship between federal and state law is important in evaluating fiduciary capacity. The opinion of the court in In re Brady, 458 B.R. 814 (Bankr. D.Del. 2011) is helpful in understanding that relationship. Relying in part on the Eleventh Circuit opinion in Quaif, Judge Brendan Linehan Shannon recently wrote:

> To ascertain the meaning of the term "fiduciary" as used in § 523(a)(4), the Court must look to federal law. Collier, supra at ¶ 523.10[d]. Under federal law, the qualification that the debtor be acting in a fiduciary capacity under § 523(a)(4) has consistently been limited in its application to what may be described as technical or express trusts. In re Moran, 413 B.R. at 185 n. 70. Thus, an exception to discharge cannot be based upon a constructive or implied trust. Id. at 185.

> Although federal law governs the determination of whether a person or entity is a "fiduciary," courts considering dischargeability under § 523(a)(4) have looked to state law to evaluate the presence of a technical trust relationship barring the discharge of a debt under § 523(a)(4). Collier, supra at ¶ 523.10[d]; Quaif, 4 F.3d 950 (insurance agent owed fiduciary duty to insurer under Georgia insurance law); In re Moran, 413 B.R. at 185–186 (contractor owed fiduciary duty to homeowner under Delaware construction trust fund statute); In re Manley, 135 B.R. 137 (Bankr. N.D. Okla.1992) (building contractor owed fiduciary duty to homeowners under Oklahoma mechanics' lien statute); Rhode Island Lottery Comm'n v. Cairone (In re Cairone), 12 B.R. 60 (Bankr. D.R.I.1981) (lottery sales agent owed fiduciary duty to state lottery commission under Rhode Island law); But see Matter of Marchiando, 13 F.3d 1111 (7th Cir.1994) (lottery sales agent not a fiduciary under Illinois law).

> For purposes of § 523(a)(4), the applicable state law creating a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property; if state law does not clearly and expressly impose

---

[55]Relying in part on Houston v. Capps, Judge Caddell recognized in Nevels v.Caples, "While federal law narrowly defines "fiduciary capacity" for purposes of § 523(a)(4) to include only relationships involving express or technical trusts, whether the relationship between the debtor and plaintiff may properly be characterized as an express or technical is determined by reference to state law." 454 B.R. at 198-99 (citing McDowell v. Stein, 415 B.R. 584, 594 (Bankr. S.D. Fla.2009); Ex rel Conner, 2010 WL 1709168 *3 (Bankr. M.D. Ga.2010); U, 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006); In re Murphy, 297 B.R. 332, 349 (Bankr.D.Mass.2003); In re Capps, 193 B.R. 955, 960 (Bankr. N.D. Ala.1995)).

trust-like obligations on a party, a court should not assume that such duties exist and should not find that there was a fiduciary relationship. Collier, supra at ¶ 523.10(d); In re Moran, 413 B.R. at 186. Therefore, to determine whether a trust existed here, the Court must look to... [state] law.

Id. at 820 (parenthetical added).

There are limits however. The discussion by the Court of Appeals for the Fifth Circuit in Tex. Lottery Comm'n v. Tran (In re Tran), 151 F.3d 339, (5th Cir.1998), explains the limits a court should consider in considering these issues. Writing for the court, Circuit Judge Jacques Loeb Wiener, Jr. explained:

Statutory trusts, by contrast, can satisfy the dictates of § 523(a)(4). It is not enough, however, that a statute purports to create a trust: A state cannot magically transform ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms "trust" or "fiduciary." Rather, to meet the requirements of § 523(a)(4), a statutory trust must (1) include a definable res and (2) impose "trust-like" duties.

The question whether a state statute creates the type of fiduciary relationship required under § 523(a)(4) is one of federal law. To make this determination a federal court must nevertheless look to state law-here, to the statute purporting to create a fiduciary relationship and to any regulations promulgated in regard thereto to discern whether the supposed fiduciary relationship possesses the attributes required under § 523(a)(4) which brings us to the case at hand.

Id. at 343.

Relying on In re Bennett and In re Angelle, (two prominent cases in this area from the Fifth Circuit), the district court in Cardwell v. Gurley, Case No. 4-10-CV-706, 2011 WL 6338813 (E.D. Tex. Dec 19, 2011) summarizes the general state law. It wrote:

The concept of fiduciary under Section 523(a)(4) "is narrowly defined." LSP Inv. P'ship v. Bennett ( In re Bennett ), 989 F.2d 779, 784 (5th Cir.1993) (citing Angelle v. Reed ( In re Angelle ), 610 F.2d 1335 (5th Cir.1980)). It applies only to technical or express trusts, and not to constructive trusts. Id. Further, the trust giving rise to the fiduciary relationship must exist prior to the act creating the debt, i.e. the debtor must have been a trustee prior to his or her wrongdoing. Id . However, the "technical" or "express" trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to state or common law. Id. at

83

784–85. The court must first look to state law in order to determine what obligations are imposed on the debtor with respect to the relationship at issue, and then decide whether the obligations imposed under state law are sufficient to meet the federal law requirements of "fiduciary capacity" under Section 523(a)(4). See id. ("The scope of the concept of fiduciary under 11 U.S.C. § 523(a)(4) is a question of federal law; however, state law is important in determining whether or not a trust obligation exists.")

Id. at *8.

### ii) Alabama Principles

Alabama law is similar to the general concepts discussed above. Judge Caddell explained in Nevels v. Caples:

> The Alabama Supreme Court has defined a fiduciary or confidential relationship as one in which:
>
>> [O]ne person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence acquired, and in all the variety of relations in which dominion may be exercised by one person over another.

454 B.R. at 198-99 (quoting Univ. Fed. Credit Union v. Grayson, 878 So.2d 280, 291 (Ala.2003)).

Based on the above, this Court will apply both federal law and state law in determining part one of the two-part test, that is, whether the defendant was acting in a fiduciary capacity in her relationships with Maddie Woods. But first, it must review the general law of part two of the two-part test.

## (2) Part Two of the Two-part Test – Defalcation
## While Acting in a Fiduciary Capacity

As stated above, the two-part test to determine whether a debt is nondischargeable under section 523(a)(4) is: (1) was the defendant acting in a fiduciary capacity; and (2) did the defendant commit an act of defalcation while acting in that capacity.  This portion reviews part two.

The Court of Appeals for the Eleventh Circuit recently addressed this issue in Bullock v. BankChampaign (In re Bullock), 670 F.3d 1160 (11th Cir.2012). Writing for the court Susan C. Buckelew, U.S. District Judge for the Middle District of Florida, sitting by designation, stated:

> This Court recognizes that there is a split among the circuits regarding the meaning of defalcation under § 523(a)(4). The Fourth, Eighth, and Ninth Circuits have concluded that even an innocent act by a fiduciary can be a defalcation. See In re Uwimana, 274 F.3d 806, 811 (4th Cir.2001) (stating that "even an innocent mistake which results in misappropriation or failure to account" can be a defalcation); In re Cochrane, 124 F.3d 978, 984 (8th Cir.1997) (concluding that defalcation does not require intentional wrongdoing; stating that it includes a fiduciary's innocent failure to fully account for money received); In re Sherman, 658 F.3d 1009, 1017 (9th Cir.2011) (noting that intent to defraud is not required; stating that defalcation includes a fiduciary's innocent failure to fully account for money received). The Fifth, Sixth, and Seventh Circuits require a showing of recklessness by the fiduciary. See In re Harwood, 637 F.3d 615, 624 (5th Cir.2011) (stating that defalcation is a willful neglect of a duty, which *1166 does not require actual intent; it is essentially a recklessness standard); In re Patel, 565 F.3d 963, 970 (6th Cir.2009) (stating that a defalcation requires a showing of more than negligence; instead, the fiduciary "must have been objectively reckless in failing to properly account for or allocate funds"); In re Berman, 629 F.3d 761, 766 n. 3 (7th Cir.2011) (stating that "defalcation requires something more than negligence or mistake, but less than fraud"). The First and Second Circuits require a showing of extreme recklessness.FN5 See In re Baylis, 313 F.3d 9, 20 (1st Cir.2002) (stating that "defalcation requires something close to a showing of extreme recklessness"); In re Hyman, 502 F.3d 61, 68 (2d Cir.2007) (stating that defalcation "requires a showing of conscious misbehavior or extreme recklessness"). The Third Circuit has not addressed the issue, and the Tenth Circuit has made the brief statement in an unpublished opinion that defalcation requires some portion of misconduct. See In re Millikan, 188 Fed.Appx. 699, 702 (10th Cir.2006).

[T]his Court finds that defalcation under § 523(a)(4) requires more than mere negligence. Instead, this Court concludes that defalcation requires a known breach of a fiduciary duty, such that the conduct can be characterized as objectively reckless. As such, this Circuit aligns itself with the Fifth, Sixth, and Seventh Circuits, which hold that defalcation under § 523(a)(4) requires a showing of recklessness by the fiduciary.

Id. at 1165-66 (footnote omitted).

********

Applying the recklessness standard for defalcation to the facts of the instant case, this Court concludes that the bankruptcy court was correct in determining that Bullock committed a defalcation by making the three loans while he was the trustee of his father's trust. Because Bullock was the trustee of the trust, he certainly should have known that he was engaging in self-dealing, given that he knowingly benefitted from the loans. Thus, his conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4). Accordingly, the bankruptcy court's order must be affirmed on the issue of whether the Illinois judgment debt was non-dischargeable under § 523(a)(4) as a debt arising from a defalcation while Bullock was acting in a fiduciary capacity.

Id. at 1166.

Judge Buckelew referred to the decision in In re Harwood, 637 F.3d 615 (5th Cir.2011) in the above.  It includes:

"Defalcation" for the purposes of Section 523(a)(4) "is a willful neglect of duty, even if not accompanied by fraud or embezzlement." Moreno, 892 F.2d at 421. Willful neglect "does not require **actual intent**, as does fraud," and is "essentially a recklessness standard."  Schwager v. Fallas (In re Schwager), 121 F.3d 177, 185 (5th Cir.1997). Willfulness in this context "is measured objectively by reference to what a reasonable person in the debtor's position knew or reasonably should have known." Office of Thrift Supervision v. Felt (In re Felt), 255 F.3d 220, 226 (5th Cir.2001).

Id. at 624 (emphasis added).

### (3)  Summary of Applicable Law

As the above demonstrates, the "two-part" test to determine whether a debt is nondischargeable under section 523(a)(4) has many parts.  Assembling all of those

86

parts, this Court finds that before any debt the defendant owes to the plaintiff, in her capacity as the executrix of the estate of Maddie Woods, may be declared nondischargeable under section 523(a)(4), the plaintiff must prove:

1.    the defendant was acting in a fiduciary capacity;

2.    the defendant was acting in that fiduciary capacity within an express or technical trust that was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship;

3.    the trust was created prior to the acts complained of; and,

4.    the defendant committed an act of defalcation while acting in her fiduciary capacity.

### b. Application of the Law

Applying this two-part test to the plaintiff's section 523(a)(4) claim, the Court finds that the defendant does have a non-dischargeable debt to the plaintiff.  The discussion begins with the three positions the defendant held with Maddie Woods.  These three positions are:  (1) power of attorney; (2) guardian; and (3) conservator.

The issue then is: Do any of these three positions satisfy the above "two-part" test? In other words: (1) was LaShari Scott acting as a fiduciary under any of them;[56] and (2) if yes, did she commit acts of defalcation while acting in that capacity?  Each position is reviewed below with those two questions in mind.

---

[56]As the law in this area explains, the question of whether someone was acting as a fiduciary is compounded.  In addition to the main question, a court must find that an express or technical trust existed between the parties, which trust was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship.  And a court must find that the trust was created prior to the acts complained of. Consequently, in addressing part one of the two-part "fiduciary" test, this Court must address all of the above.

87

### (1) Power of Attorney[57]

Maddie Woods' power of attorney reads:

### GENERAL POWER OF ATTORNEY

I, Maddie Woods, residing at 420 64th Street, Fairfield, Alabama 35064, hereby appoint Lashari Woods Scott of 115 62nd Street, Fairfield, Alabama 35064, as my Attorney-in-Fact ("Agent")

I hereby revoke any and all general powers of attorney and special powers of attorney that previously have been signed by me.

My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs, and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future. My Agent's powers shall include, but not be limited to, the power to:

1. Open, maintain or close bank accounts (including, but not limited to, checking accounts, savings accounts, and certificates of deposit), brokerage accounts, retirement plan accounts, and other similar accounts with financial institutions.

    a. Conduct any business with any banking or financial institution with respect to any of my accounts, including, but not limited to, making deposits and withdrawals, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to me by an person, firm, corporation or political entity.

    b. Perform any act necessary to deposit, negotiate, sell or transfer any note, security, or draft of the United States of America, including U.S. Treasury Securities.

---

[57]The State of Alabama adopted a uniform power of attorney act in 2011. See Ala. Code 1975, § 26-1A-101. The Comment to that section shows that the Act does not apply in this proceeding. It reads in part:

The Alabama adoption of this Act differs from the Uniform Act in that the Alabama adoption only governs Powers of Attorney executed on or after the effective date of this Act. Powers executed prior to the effective date of this Act continue to be governed by the laws in existence of the time of their creation. See, Section 403 of this Chapter.

Id.

c.  Have access to any safe deposit box that I might own, including its contents.

2.  Sell, exchange, buy, invest, or reinvest any assets or property owned by me. Such assets or property may include income producing or non-income producing assets and property.

3.  Purchase and/or maintain insurance and annuity contracts, including life insurance upon my life or the life of any other appropriate person.

4.  Take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

5.  Enter into binding contracts on my behalf.

6.  Exercise all stock rights on my behalf as my proxy, including all rights with respect to stocks, bonds, debentures, commodities, options or other investments.

7.  Maintain and or operate any business that I may own.

8.  Employ professional and business assistance as may be appropriate, including attorneys accountants, and real estate agents.

9.  Sell, convey, lease, mortgage, manage, insure, improve, repair, or perform any other act with respect to any of my property (now owned or later acquired) including, but not limited to, real estate and real estate rights (including the right to remove tenants and to recover possession).  This includes the right to sell or encumber any homestead that I now own or may own in the future.

10.  Prepare, sign, and file documents with any governmental body or agency, including, but not limited to, authorization to:

a.  Prepare, sign and file income and other tax returns with federal, state, local, and other governmental bodies.

b.  Obtain information or documents from any government or its agencies, and negotiate, compromise, or settle any manner with such government or agency (including tax matters).

c.  Prepare applications, provide information, and perform any other act reasonably requested by any government or its agencies in connection with governmental benefits (including medical, military and social security benefits).

89

11.  Make gifts from my assets to members of my family and to such other persons or charitable organizations with whom I have an established patters of giving, to file state and federal gift tax returns, and to file a tax election to split gifts with my spouse.  However, my Agent may not make gifts of my property to the Agent, the Agent's estate or creditors, or the creditors of the Agent's estate.  The Agent may not disclaim assets to which I would be entitled, if the result is that the disclaimed assets pass directly or indirectly to the Agent or the Agent's estate.  The Agent may not use my assets to discharge any of the Agent's legal obligations of support of another, except me and those I am legally obligated to support.

12.  Transfer any of my assets to the trustee of any revocable trust created by me, if such trust is in existence at the time of such transfer.

13.  Subject to other provisions of this document, disclaim any interest which might otherwise be transferred or distributed to me from any other person, estate, trust, or other entity, as may be appropriate.

This Power of Attorney shall be construed broadly as a General Power of Attorney.  The listing of specific powers is not intended to limit or restrict the general powers granted in this Power of Attorney in any manner.

Any power or authority granted to my Agent under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing: (I) my income to be taxable to my Agent, (ii) my assets to be subject to a general power of appointment by my Agent, or (iii) my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith.  However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney.  A successor Agent shall not be liable for acts of a prior Agent.

I authorize my Agent to indemnify and hold harmless any third party who accepts and acts under this document.

My Agent shall be entitled to reasonable compensation for any services provided as my Agent.  My Agent shall be entitled to reimbursement of all reasonable expenses incurred in connection with this Power of Attorney.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent, but only if I so request or if such a request is made by any authorized personal representative or fiduciary acting on my behalf.

90

This Power of Attorney shall become effective immediately, and shall not be affected by my disability or lack of mental competence, except as may be provided otherwise by an applicable state statute. This is a Durable Power of Attorney. This Power of Attorney shall continue effective until my death. This Power of Attorney may be revoked by me at any time by providing written notice to my Agent.

Dated: October 16, 2000, Fairfield, Alabama.

/s/Maddie Woods
Maddie Woods

Defendant's Substitute Exhibit 5.

The document was properly notarized, and was recorded in the Probate Court of Jefferson County, Alabama on December 4, 2001.

### (a) PART ONE of the Two-Part Test – Was the Defendant Acting in a Fiduciary Capacity Under the Power of Attorney?

The first general question is: Was the defendant acting as a fiduciary under the power of attorney Maddie Woods gave her? As stated above, determination of whether a fiduciary relationship exists is first a matter of federal law, but second, one decided with the aid of state law. The state law portion in regard to powers of attorney is the simplest. It is addressed first.

### I) As a General Rule Powers of Attorney Create Fiduciary Relationships Under <u>Alabama Law</u>

Quoting <u>Sevigny v. New South Fed. Savs. & Loan Ass'n</u>, 586 So.2d 884, 886-87 (Ala.1991), by way of <u>Harrelson v. Harrelson</u>, 7 So.3d 1004, 1009-10 (Ala. Civ. App. 2008), in his opinion for the Alabama Supreme Court in <u>Smith v. Wachovia Bank, N.A.</u>, 33 So.3d 1191 (Ala. 2009), Justice James Gregory Shaw wrote:

Alabama case law has historically viewed the execution of a power of attorney as creating an agency relationship.

A power of attorney is defined as "[a]n instrument in writing whereby one person, as principal, appoints another as his agent and confers authority to perform certain specified acts or kinds of acts on behalf of [a] principal. An instrument authorizing another to act as one's agent.... The agent is attorney in fact...." Black's Law *1196 Dictionary 1171 (6th ed.1990). When one accepts the agency, she implicitly

91

> covenants to use the powers conferred upon her for the sole
> benefit of the party conferring such power, consistent with
> the purposes of the agency relationship. See, <u>Dudley v.
> Colonial Lumber Co.</u>, 223 Ala. 533, 137 So. 429 (1931).
> Therefore, when one accepts the power of attorney, she
> impliedly covenants to use the powers bestowed upon her
> for the sole benefit of the one conferring that power on her,
> consistent with the purposes of the agency relationship
> represented by the power of attorney. Powers of attorney will
> be strictly construed, restricting the powers to those
> expressly granted and those incidental powers that are
> necessary to effectuate the expressed powers. <u>Hall v.
> Cosby</u>, 288 Ala. 191, 258 So.2d 897 (1972). The
> principal-agency relationship is **fiduciary** in nature and
> imposes upon the agent a duty of loyalty, good faith, and fair
> dealing. See, <u>Williams v. Williams</u>, 497 So.2d 481
> (Ala.[1986] ); <u>Lauderdale v. Peace Baptist Church of
> Birmingham</u>, 246 Ala. 178, 19 So.2d 538 (1944).

<u>Id</u>. at 1195-96.

Justice Shaw concluded, "Alabama caselaw, as indicated above, identifies a power of attorney as creating a fiduciary relationship." <u>Id</u>. at 1197 (footnote omitted).[58]

Based on the above, this Court finds that as a matter of Alabama law, Maddie Woods' power of attorney created a fiduciary relationship between the defendant and her. It satisfies all of the criteria identified above. But as we know, that conclusion does not end the inquiry. There is a second question.

---

[58]In contrast to this Court's holding that breach of a fiduciary duty is equitable in nature, relying on <u>Robbins v. Sanders</u>, 890 So.2d 998, 1011 (Ala.2004), Justice Shaw wrote in <u>Smith v. Wachovia</u>, "Because, as Wachovia's counsel admitted during trial, a breach of fiduciary duty "is a tort" and because no such tort claim was pending at the time of the husband's death, that claim is abated. This Court believes <u>Robbins v. Sanders</u> is distinguishable. In reaching the <u>Robbins v. Sanders</u> decision, that court relied on, "<u>Brooks v. Hill</u>, 717 So.2d 759, 764 (Ala.1998) ("A claim based on an alleged breach of the fiduciary duty owed by corporate officers under § 10–2B–8.32 [of the Alabama Code] sounds in tort.")." <u>Robbins</u> at 1011. As discussed above, "Federal courts are nearly unanimous in holding that a breach of fiduciary duty claim is an action in equity...." <u>Turner v. J.P. Bolduc, et al. (In re Crowe Rope Industries, LLC)</u>, 307 B.R. 1,5 (Bkrtcy. D.Me. 2004). And as also discussed above, federal law governs whether a person or entity is a fiduciary. See also <u>In re Barwick</u>, 24 B.R. 703 (Bankr. E.D.Va. 1982)("the concept of fiduciary is a question of federal law...." <u>Id</u>. at 705. "If state law were the sole measure of whether a trust existed for the purposes of 11 U.S.C. § 523(a)(4), then states through enlarging the area of excepted liabilities could thwart the purposes of the Bankruptcy Act. <u>In re Harrill</u>, 1 B.R. 76, 81 (Bkrtcy. E.D.Tenn.1979)." <u>Id</u>. at 706 n.1.

## ii) Did Maddie Woods' Power of Attorney
## Create a Fiduciary Relationship Under <u>Federal Law</u>?

As the above demonstrates, the issues before this Court are numerous and complex. This section is no different. While Justice Shaw's state law conclusion appears to resolve part one of the two-part fiduciary test, it does not.

As stated above, the issue of whether a fiduciary exists for purposes of bankruptcy dischargeability must be decided by federal law. The court in <u>Pioneer Bank & Trust v. Cameron (In re Cameron)</u>, Case Nos. 08–5007 and 08–50005, 2008 WL 5169513 (Bankr. D.S.D. October 17, 2008) explains:

> As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by section 523(a)(4). <u>Bast v. Johnson (In re Johnson)</u>, 174 B.R. 537, 541 (Bankr.W.D.Mo.1994). However, if a debtor has a sufficiently elevated level of fiduciary duty, section 523(a)(4) may apply to an agency relationship. See <u>id</u>.

<u>Id</u>. at *4 (citing <u>Homes v. Hrabik (In re Hrabik)</u>, 330 B.R. 765, 773 (Bankr. D.N.D. 2005)).

Consequently, the "simple" fiduciary that state law recognizes will not suffice for nondischargeability purposes. Under federal law, this Court must determine whether this defendant was acting under a sufficiently elevated level of fiduciary duty for section 523(a)(4) to apply?[59]

The opinion in <u>Pioneer Bank</u> and those from other courts offer guidance.

In <u>Pioneer Bank</u> the court found that its debtor had a sufficiently elevated level of fiduciary duty.  By way of example for this Court, that court explained the facts it considered as support for that conclusion.  It wrote:

> Here, as in <u>Hrabik</u>, both powers of attorney were to be exercised strictly for Sigloh's benefit, and the first power of attorney emphasized it was not to be exercised for the Camerons' benefit. Both powers of attorney delineated what property was governed by that particular power, and the first specifically excluded the power to convey any real estate. Thus, the res of each trust was clearly identified. <u>Cundy v. Woods (In re Woods)</u>, 284 B.R. 282, 289 (D.Colo.2001) (cites therein). Because of Sigloh's age

---

[59]If that part is satisfied, the Court can then apply the second part of the two-part fiduciary test, that is whether the defendant committed acts of defalcation while acting as a fiduciary.

Case 06-00011-BGC    Doc 49    Filed 09/27/12    Entered 09/27/12 09:07:32    Desc Main
Document      Page 93 of 128

and health when both powers of attorney were created, and because the first was designed to continue even in the event Sigloh's health and abilities continued to decline, there was no expectation or understanding Sigloh would monitor the Camerons' actions. Johnson, 174 B.R. at 541–42 (Bankr. W.D.Mo. 1994), and Rech v. Burgess (In re Burgess), 106 B.R. 612, 619–21 (Bankr. D.Neb. 1989). Further, the trust did not arise from a contract. See, e.g., BPS Guard Services Inc. v. Myrick (In re Myrick), 172 B.R. 633, 635–37 (Bankr. D.Neb. 1994) (only an employee-employer relationship existed, not a fiduciary one). Finally, the Camerons' fiduciary status did not arise from a constructive trust imposed as a matter of law based on their wrongdoing after the powers of attorney were signed. The fiduciary relationship arose from the powers of attorney themselves.

Id. at *4.

The same result was reached in In re Hrabik, 330 B.R. 765 (Bankr. D.N.D. 2005), cited by Pioneer Bank. Recognizing the same general rule that a power of attorney does not give rise to the fiduciary capacity required by section 523(a)(4) unless the debtor has a sufficiently elevated level of fiduciary duty, the Hrabik court discussed the reasons it found that higher level in its case. It wrote:

In this case, Wayne Hrabik's duty was sufficiently elevated to the level of a fiduciary duty. The power of attorney expressly stated that it was to be used solely for Marcella Hrabik's benefit and exercised only in a fiduciary capacity. Moreover, Wayne Hrabik transferred more than $13,000.00 to an account in his and his brother's names, thereby eliminating Marcella Hrabik's control over a considerable part of her own funds.

Id. at 773-74.

A final example, also cited by Pioneer Bank, provides additional factual considerations this Court may use in deciding the instant matter. The Court in Bast v. Johnson (In re Johnson), 174 B.R. 537 (Bankr.W.D.Mo.1994) provided this narrative:

Section 523(a)(4) excepts from discharge any debt for fraud or defalcation while acting in a fiduciary capacity. 11 U.S.C. § 523(a)(4). Plaintiff claims that Marvin Johnson held her power of attorney during all the transactions which gave rise to the debt at issue, therefore, section 523(a)(4) excepts such debt from discharge. In bankruptcy settings, the term "fiduciary" has been narrowly construed to apply only to relationships involving technical or express trusts. Barclays American/Business Credit v. Long (In re Long), 774 F.2d 875, 879 (8th Cir.1985); Energy Products Engineering, Inc. v. Reuscher (In re Reuscher), 169 B.R. 398, 400 (S.D.Ill.1994). An express or technical trust may be either one in which a

94

formal document is executed which establishes the rights and duties of the parties, or one in which trust-type obligations are imposed pursuant to statute or common law.FN5 Reuscher at 400 (citations omitted). **As a rule, the general fiduciary duty created by a power of attorney gives rise to an agency relationship, but does not give rise to the fiduciary capacity required by section 523(a)(4)**. Rech v. Burgess (In re Burgess), 106 B.R. 612, 620 (Bankr.D.Neb.1989). **However, "if the debtor has a sufficiently elevated level of fiduciary duty" section 523(a)(4) could apply to an agency relationship**. Wells Fargo Guard Service v. Myrick (In re Myrick), 172 B.R. 633, 636 (Bankr. D. Neb.1994); Burgess at 620. Such a fiduciary duty is found, for example, when one party to a fiduciary relationship is incapable of monitoring the other's behavior. Reuscher, 169 B.R. at 401. See, In re Marchiando, 13 F.3d 1111, 1116 (7th Cir.), cert. denied sub nom. Illinois Dep't of Lottery v. Marchiando, 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994).

The court then described the facts from Rech v. Burgess (In re Burgess),cited as support for the subject general rule. It wrote:

In Burgess the debtor's mother, Estelle Burgess, executed a power of attorney in favor of her son one week after her husband died. Mrs. Burgess gave her son the power to manage all of her assets and conduct all of her business affairs. The son subsequently "borrowed" funds from Mrs. Burgess's assets without her knowledge or consent. Ultimately, Mrs. Burgess became incapacitated and a conservator was appointed. When the son and his wife filed bankruptcy, the conservator of Mrs. Burgess's estate brought the dischargeability proceeding. Burgess at 614-17. The Burgess court found that the scope and nature of the agency relationship, and the facts and circumstances of the relationship between the parties, allowed the court to conclude that section 523(a)(4) was applicable. Id. at 620.

Id. at 542.

Next, the court discussed the facts in its case in conjunction with its decision that the fiduciary duty there did not rise to a sufficient level. It wrote:

Here, there is no dispute that plaintiff and Mr. Johnson entered into a principal/agency relationship under state law when they executed POA I. 3 Am.Jur.2d § 23 at 528. However, plaintiff never gave up any control of her assets to debtor, nor did she give up management of her business affairs. She testified that she was competent at all times when loans were made, and she appeared to be most intelligent and competent at trial. Plaintiff also testified that she willingly made every loan requested by Johnson

until he asked her to mortgage her farm. Each time debtor asked her to borrow bank funds, for his benefit, plaintiff dealt directly with the bank and authorized payment of the funds to debtor. When debtor wanted plaintiff to borrow additional funds secured by her farm he approached her, and she refused to do so. Neither party contends that Mr. Johnson ever used a power-of-attorney to obtain funds without plaintiff's knowledge and consent. Thus, the loans made were not made because of any actions or representations of the debtor while acting in a fiduciary capacity. Instead, they were made because debtor asked to borrow and plaintiff agreed to lend.

Id. at 542

This Court has applied the standards these cases discuss to the facts here and finds that Maddie Woods' power of attorney did, under federal law, create a fiduciary relationship between the defendant and her, and that this relationship was sufficiently elevated for section 523(a)(4) to apply.

First, as this Court stated early on, Maddie Woods was not capable of handling her own financial affairs. The medical evidence showed she had sever dementia. And, when the probate court gave the defendant the extensive powers it did, certainly it could not have believed that Maddie Woods could have done those things on her on. These facts alone elevated the defendant's responsibility over Maddie Woods' life. Consequently, this power of attorney must qualify for section 523(a)(4) status.

Second, the examples discussed above from courts that have applied section 523(a)(4) demonstrate the similarity to the instant case. For example, as quoted from Pioneer Bank:

powers of attorney were to be exercised strictly for Sigloh's benefit, and the first power of attorney emphasized it was not to be exercised for the Camerons' benefit. Both powers of attorney delineated what property was governed by that particular power

Pioneer Bank at *4.  And another example, as quoted from Hrabik:

Wayne Hrabik transferred more than $13,000.00 to an account in his and his brother's names, thereby eliminating Marcella Hrabik's control over a considerable part of her own funds.

In re Hrabik at 773-74.  And another example, as quoted from Bast v. Johnson:

The Burgess court found that the scope and nature of the agency relationship, and the facts and circumstances of the relationship between the parties, allowed the court to conclude that section 523(a)(4) was applicable.

96

Bast v. Johnson (In re Johnson) at 542.

       Third, with or without Maddie Woods knowledge, the defendant transferred over $150,000 to herself or members of her immediate family. These are funds for which she cannot now account. And, while she testified that they were spent in various ways by herself or at times given away by Maddie Woods, she cannot identify how. What the defendant can confirm is this: she transferred these funds under the power of attorney Maddie Woods gave her; and she understood the importance of that power when she executed it. In that sense, her own words demonstrate that there was a fiduciary relationship, and it was one sufficiently elevated for section 523(a)(4) to apply. She testified:

> Q.    So bringing it up to the last couple of years of her life at that point. Now when do you claim, if ever, other than by being put on an account, that you were authorized to take independent action regarding Maddie Woods' money?
> A.    When she gave me power of attorney.
> Q.    Okay. And when do you claim that she gave you power of attorney?
> A.    In October of 2000.
> Q.    **Okay. And do you have an understanding at that time of why you were being given the power of attorney?**
> A.    **Yes.**
> Q.    **Why was that?**
> A.    **She needed help. No one was there to take care of her, and she asked me to come back in and start seeing about her.**

Tr. 24 (emphasis added).

*******

> Q.    **Okay. What documents would you show people?**
> A.    **When I had to do what? Meaning –**
> Q.    **Dealing with banks, going to Southtrust Bank, opening joint accounts –**
> A.    **I had a power of attorney on her that was established back in 2000.**
> Q.    **Okay. So you filed the petition for guardianship and conservatorship and got these letters of guardianship and this order, but then you were still just using your old power of attorney?**
> A.    **Yes.**
> Q.    Why is that?

> A. Because I had the power of attorney in place before all of this started.
>
> Q. Well, why did you go and file a petition for guardianship and conservatorship if you were just going to use the power of attorney?
>
> A. Because that was the proper channel that I was told by Leon Garmon and the courts at that time that I needed for Ms. Woods.

Tr. 49-50 (emphasis added).

*******

> Q. Okay. And would this be during the time that you were helping your aunt? **I guess the whole year of 2002 pretty much you were pretty much acting as her power of attorney; is that correct?**
>
> A. **Yes.**

Tr. 56 (emphasis added).

*******

> Q. So is there anything you have to document that Maddie Woods intended to give you forty thousand dollars just to spend on your living expenses?
>
> A. No, sir, but **I have a power of attorney that Maddie Woods gave to me that stated that I could give gifts or do any type of transactions that was needed to be done to handle things.** You know, this is what I can say that she did say was set aside for me and my children.

Tr. 134 (emphasis added).

*******

> Q You said something a minute ago about feeling comfortable having your name on some checks and not on others. What do you mean by that?
>
> A. Utility bills, I would write it and sign her name on it. For things like this, I just did not touch it, you know, I really didn't.
>
> Q. Why?
>
> A. Because this would be saying, if I wrote this, that I am doing it.
>
> Q. Okay.
>
> A. **Even though I had the power of attorney to do, but I did not.**

Q.   **You were concerned about people thinking that you were handling this inappropriately or something?**

A.   **Yes, sir.**

Tr. 87-88 (emphasis added).

*******

A.   **I had a power of attorney over Maddie Woods** before any of this even came into existence.

Tr. 203 (emphasis added).

*******

Q.   Okay. And request number three says "Admit that you signed the name Maddie Woods to checks without any written authorization to do so," and you denied that?

A.   Yes.

Q.   Tell me what written authorization –

A.   **I still had a power of attorney that gave me the right to sign, withdraw, deposit.** I had – can I ask for my copy of my power of attorney? I have it in my box, but can I get it? I had a right to, so, I mean

Tr. 203-04 (emphasis added).

Based on the above, the Court finds: (1) the defendant was acting as a fiduciary under the power of attorney Maddie Woods gave her; and (2) that fiduciary relationship was sufficiently elevated for section 523(a)(4) to apply.

With that question answered, as explained above, the Court must now answer the two questions from the "expanded" first part of the "two-part" test. The first question is: Was there an express or technical trust between LaShari Scott and Maddie Woods which trust was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship? The second is: Was that trust created prior to the acts complained of?

99

### iii) The Two "Expanded" Questions Relating
### to the Defendant's Fiduciary Capacity under the Power of Attorney

#### a) Did the Power of Attorney Create
#### an Express or Technical Trust?

Based on the language of the power of attorney and the defendant's actions pursuant to that language, the Court finds that Maddie Woods' power of attorney: (1) included a declaration of affirmative trust duties, (2) there was a segregated trust res, and (3) there was a clear intent to create a trust relationship. Consequently, the Court concludes that there was an express or technical trust between LaShari Scott and Maddie Woods.

#### b) When was the
#### Express or Technical Trust Created?

The final "expanded" question is whether the trust was created prior to the acts complained of. This power of attorney was given on October 16, 2000; consequently, the trust it created was established before the acts complaint of in this litigation.

### iv) Conclusion to Part One of the Two-part Test

Based on the above, the Court finds:

1.    the defendant was acting in a fiduciary capacity under the power of attorney;

2.    the defendant was acting in that fiduciary capacity within an express or technical trust that was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship; and,

3.    that express or technical trust was created prior to the acts complained of.

#### (b) PART TWO – Did the Defendant Commit Acts of Defalcation
#### While Acting as a Fiduciary Under the Power of Attorney?

The final question of the two-part test, as to the "power of attorney" position, is: Did the defendant commit acts of defalcation while acting in her fiduciary capacity under the power of attorney? If she did, whatever debt she owes the plaintiff, in the plaintiff's capacity as executrix of Maddie Woods' estate, will be nondischargeable.

As discussed above, in the very recent opinion from the Court of Appeals for the Eleventh Circuit in <u>Bullock v. BankChampaign (In re Bullock)</u>, 670 F.3d 1160 (11th Cir.

100

2012), that court adopted the "defalcation standard applied by the "Fifth, Sixth, and Seventh Circuits [which] requires a showing of recklessness by the fiduciary." Id. at 1165 (parenthetical added). And, important to the instant matter, that court then suggested that the reader consider In re Harwood, 637 F.3d 615, 624 (5th Cir.2011) which states, "that defalcation is a willful neglect of a duty, which does not require actual intent; it is essentially a recklessness standard." Id. at 1165-66) (emphasis added).

The Eleventh Circuit court concluded:

[T]his Court finds that defalcation under § 523(a)(4) requires more than mere negligence. Instead, this Court concludes that **defalcation requires a known breach of a fiduciary duty, such that the conduct can be characterized as objectively reckless**. As such, this Circuit aligns itself with the Fifth, Sixth, and Seventh Circuits, which hold that defalcation under § 523(a)(4) requires a showing of recklessness by the fiduciary.

Id. at 1165-66 (emphasis added).

Applying that standard the court ruled:

Applying the recklessness standard for defalcation to the facts of the instant case, this Court concludes that the bankruptcy court was correct in determining that Bullock committed a defalcation by making the three loans while he was the trustee of his father's trust. Because Bullock was the trustee of the trust, he certainly should have known that he was engaging in self-dealing, given that he knowingly benefitted from the loans. Thus, his conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4). Accordingly, the bankruptcy court's order must be affirmed on the issue of whether the Illinois judgment debt was non-dischargeable under § 523(a)(4) as a debt arising from a defalcation while Bullock was acting in a fiduciary capacity.

The instant situation is quite similar to that in Bullock. This Court's findings of fact contain numerous examples of why the defendant should have known she was "engaging in self-dealing."  In addition, there are numerous examples of the defendant's utter failure to account for Maddie Woods' assets.  These examples include:

The defendant withdrew over $113,000 from her power of attorney Citizens Federal Savings Bank in less than eight months. She deposited $40,000 of that amount in two $20,000 separate accounts, one for each of her minor sons, and spent the entire $40,000 before Maddie Woods died about a year later. She transferred over $50,000 to another Citizens Federal account, which to this date remains unidentified and unaccounted for.

101

The defendant opened a joint account with Maddie Woods at SouthTrust bank with $50,000 Maddie Woods withdrew from another account. From August 2002 through May 2003, she made ten withdrawals for a total of over $30,000. She testified that one withdrawal for $5,795.80 was a gift from Maddie Woods to help her with some personal problems. She testified that one for $8,000 was money she withdrew from the account and gave to Maddie Woods, although she testified that she did not know what Maddie Woods did with those funds. From there, the defendant could not recollect the specific facts about any of the other withdrawals. She speculated that some could have been to purchase cashiers checks, presumably to pay caregivers. The Court compared the cashiers check receipts the defendant supplied, but it could not, however, match any specific amounts.

The defendant cashed checks written to her husband, to her mother, and to herself for over $9,700. She testified that those were gifts, or maybe for assistance her husband or her mother gave to Maddie Woods.

The defendant made about 46 ATM withdrawals for $300 between September 2002 and May 2003, totaling about $13,800. Two of those withdrawals were made on March 3-4, 2003, at the Golden Moon Casino in Choctaw, Mississippi.

The defendant could not account for $12,500 of a $22,000 check written to her which was supposedly for Maddie Woods' pre-arranged funeral expenses and nursing home expenses.

And finally, the defendant maintained a personal account separate from any of Maddie Woods accounts, for which she did not offer any details, although the evidence shows that she routinely deposited large sums of money into this personal account. For example, the Court calculates that the defendant deposited over $40,000 into this account which she had withdrawn from Maddie Woods primary account. Some of that $40,000 was from a check payable to the defendant for $7,992.00. The legend on the check reads, "Sitters-Dec-Jan-Feb." The check was deposited in the defendant's personal account. She testified that she paid caregivers from that personal account. While there are receipts for payment to caregivers for December 2002, January 2003, and February 2003, there is no way for the Court to match up those payment with the defendant's receipts. Do these receipts represent payments from this $7,992.00? Was all of the $7,992.00 paid? Did the defendant keep any of these funds? The Court cannot answer these questions. And the reason it cannot, is because the defendant did not keep adequate records. There are no ledgers. There are no spreadsheets. Her methods were careless, and as this Court's conclusions of law explain, under the law in this Circuit, she was "reckless."

In all, the defendant failed to keep specific records. She did not keep any cumulative accounting, and there was no reconciliation of the specific amounts withdrawn from these various accounts. Simply put, the defendant did not keep, and did

not provide this Court with even the simplest form of her credit and debit transactions, that is, balanced bank statements.

Paraphrasing the court in <u>Bullock</u>, it could easily be said of this defendant:

> [b]ecause [she]... was the trustee of the trust..., [she] certainly should have known that... [she] was engaging in self-dealing, given that... [she] knowingly benefitted.... Thus,... **[her] conduct can be characterized as objectively reckless, and as such, it rises to the level of a defalcation under § 523(a)(4)**.

<u>Id</u>. (parentheticals added) (emphasis added).

### (c) Conclusion to Power of Attorney

Based on the above, the Court finds that the plaintiff satisfied, by a preponderance of the evidence, the two-part test for determining dischargeability of a debt in regard to Maddie Woods' power of attorney.

Specifically, the Court finds:

1.   the defendant was acting in a fiduciary capacity under the power of attorney;

2.   the defendant was acting in that fiduciary capacity within an express or technical trust that was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship;

3.   the trust was created prior to the acts complained of; and,

4.   the defendant committed an act of defalcation while acting in her fiduciary capacity.

Consequently, the Court concludes that whatever debts due the plaintiff the defendant generated while holding Maddie Woods' power of attorney are not dischargeable in this case under section 523(a)(4) of the Bankruptcy Code.

This same analysis is applied below to the guardian and conservator positions the defendant also held.[60] The result is the same.

---

[60]The relationship of a power of attorney to a guardianship or conservatorship in Alabama is an interesting one.   The comment to Ala. Code 1975, § 26-2A-148 includes:

This section permits independent administration of the property of the protected

103

### (2)  Guardian and Conservator

### (a) PART ONE – Was the Defendant Acting
### in a Fiduciary Capacity as Maddie Woods' Guardian and Conservator?

The probate court appointed the defendant Maddie Woods' guardian and conservator on March 14, 2002, pursuant to the Alabama Uniform Guardianship and Protective Proceedings Act.  This Court's analysis of that appointment begins with the probate court's order.  That order reads:

---

person once the appointment of a conservator has been obtained. Any interested person may require the conservator to account in accordance with section 26-2A-147. As a trustee, a conservator holds title to the property of the protected person. In subsection (a), the Uniform Act provides that the appointment of a conservator vests title in that person to property "held for the protected person" and continues "by custodians or attorneys in fact." This chapter expressly provides for a different effect with respect to custodianships under either the Uniform Gifts to Minors Act or the Uniform Transfers to Minors Act and with respect to durable powers of attorney. Appointment of a conservator does not affect the legal relationship of a custodian for the minor created under a Uniform Gifts to Minors Act or a Uniform Transfers to Minors Act. Subsection (a) further expressly provides that a valid **durable power of attorney** is not terminated on the appointment of a conservator. In this regard, Ala. Code section 26-1-2(c)(1) (1975, as amended by Acts 1981, No. 81-98, p. 117) provides that if there is an appointment of a conservator, subsequent to execution of a durable power of attorney, the attorney in fact under the durable power of attorney "is accountable to the [conservator] as well as to the principal. The [conservator] has the same power to revoke or amend the power of attorney that the principal would have had if the principal were not disabled, incompetent or incapacitated." The statutes are compatible, but consistent application may require that the conservator know the termination provisions under the applicable durable power of attorney instrument and to exercise those termination powers through an order of court. However, a springing durable power of attorney, which is to become effective on the disability of the principal, may not come into effect because of the appointment of a conservator, but the attorney-in-fact under the **durable power of attorney** is given a priority in the appointment of the conservator under section 26-2A-138.

Id.

Case 06-00011-BGC    Doc 49    Filed 09/27/12    Entered 09/27/12 09:07:32    Desc Main
Document      Page 104 of 128

IN THE MATTER OF THE ESTATE )  IN THE PROBATE COURT OF
                                 )  JEFFERSON COUNTY, ALABAMA
MADDIE JENKINS WOODS a/k/a  )  BESSEMER DIVISION
MADDIE J. WOODS,              )  CASE NO. 37270
INCAPACITATED PERSON

## ORDER APPOINTING GUARDIAN AND CONSERVATOR
## UPON POSTING BOND

      This cause came on to be heard upon the Petitions heretofore filed by State of Alabama Department of Human Resources praying for the appointment of a Guardian and Conservator over the Estate of Maddie Jenkins Woods a/k/a Maddie J. Woods, an alleged incapacitated person, and Amended Petitions for the appointment of Guardian and Conservator over the said purposed ward as filed by LaShari Woods Scott, pursuant to the provisions of the Alabama Uniform Guardianship and Protective Proceedings Act, proper notice having been perfected on all interested parties as provided by law. Appearing in Court This date was Honorable Scott Allums, who was heretofore appointed by the Court to act as Guardian ad Litem to represent and protect the interest of Maddie Jenkins Woods a/k/a Maddie J. Woods, in this matter. Whereupon, the Court took and received oral testimony and evidence, and upon consideration of same, the Court finds that Maddie Jenkins Woods a/k/a Maddie J. Woods is an incapacitated person and a need exists for the appointment of a guardian and conservator for said person.

      It is, therefore, ORDERED, ADJUDGED AND DECREED BY THE Court that LaShari Woods Scott be appointed as Guardian and Conservator upon posting bond of $300,000.00; that said guardian and conservator shall have all the powers and authority as set forth in Section 26-2A-152 of the Code of Alabama, 1975.

      The Conservator is ORDERED to file an inventory within ninety days from this hearing without further notice from this Court. The Conservator is ORDERED **to keep proper records in order that all transactions can be verified upon date of settlement**.

      **DONE AND ORDERED** this the 14th day of March, 2002.

                      /s/Michael F. Bolin_____
                      Judge of Probate

Case 06-00011-BGC   Doc 49   Filed 09/27/12   Entered 09/27/12 09:07:32   Desc Main
Document    Page 105 of 128

Plaintiff's Exhibit 4 (emphasis added).[61]

The Letters of Guardianship issued pursuant to that order reads:

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF | IN THE PROBATE COURT OF |
| MADDIE JENKINS WOODS a/k/a | JEFFERSON COUNTY, ALABAMA |
| MADDIE J. WOODS, An Incapacitated Person | CASE NO. 37270 |

### LETTERS OF GUARDIANSHIP

BE IT REMEMBERED, AND MADE KNOWN TO ALL WHOM IT MAY CONCERN:

That on the application of LaShari Woods Scott to my said Court for guardianship by court's appointment, I have caused these LETTERS OF GUARDIANSHIP to issue to LaShari Woods Scott as Guardian of Maddie Jenkins woods [sic] a/k/a Maddie J. Woods, an incapacitated person and, in every case which occasion may require, the said Guardian is authorized and directed to exercise the following powers and duties:

All powers and duties conferred under Alabama Code §26-2A-78 as the lawful Guardian of the said ward.

Witness my hand and official seal this date, March 14, 2002.

/s/Michael F. Bolin
Judge of Probate

Plaintiff's Exhibit 4.[62]

---

[61]The defendant contends that this appointment is void. She makes two arguments. One, she argues that the order's requirement of, "posting bond of $300,000" was a condition of appointment, and that when the defendant failed to obtain that bond, the appointment was not effective. Two, the defendant argues that if the defendant's appointment was based on Maddie Woods' mental incompetency, the order fails because a physician did not testify at the hearing on which the order was based. Both arguments are discussed in the section below relating to the fiduciary capacity of the appointment.

[62]Section 26-2A-20 of the Alabama Uniform Guardianship and Protective Proceedings Act includes these helpful definitions:

(2) Conservator. A person who is appointed by a court to manage the estate of a protected person and includes a limited conservator described in Section 26-2A-148(a).

106

### i) As a General Rule, Guardian and Conservator Appointments
### Create Fiduciary Relationships Under Alabama Law

As stated above, determination of whether a fiduciary relationship exists is a matter of federal law, but one decided with the aid of state law.

Writing for the Court in Boyd v. Franklin, 919 So.2d 1166 (Ala. 2005), Alabama Supreme Court Justice Thomas A. Woodall defined the relationships of a guardian and a conservator to the person being protected.  He wrote:

> The Alabama Uniform Guardianship and Protective Proceedings Act, Ala.Code 1975, §§ 26-2A-1 to -160, as supplemented by Ala.Code 1975, §§ 26-5-1 to -54, "recognizes two fiduciary capacities--i.e., a 'guardian' who is 'of the person' and analogous to the role of the parent, and a 'conservator' who is 'of the property' and more closely analogous to the role of a trustee." Comment to § 26-2A-1. Although under this statutory scheme a guardianship terminates automatically on the death of the ward, § 26-2A-109, the ward's death does not terminate the "guardian's liability for prior acts or the obligation to account for funds and assets of the ward." Id. "The fiduciary relationship does not cease until there is an order discharging the guardian, which has been granted in accordance with the procedure prescribed by statute. The death of the ward ... does not of itself operate as a discharge." 39 C.J.S. Guardian & Ward § 42 (2003) (footnotes omitted). The order in this case does not purport to discharge Boyd from liability as conservator.

Id. at 1173 ( emphasis added).

---

(7) Guardian. A person who has qualified as a guardian of a minor or incapacitated person pursuant to parental or spousal nomination or court appointment and includes a limited guardian as described in Sections 26-2A-78(e) and 26-2A-105(c), but excludes one who is merely a guardian ad litem.

(8) Incapacitated person. Any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, physical or mental infirmities accompanying advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions.

(22) Ward. A person for whom a guardian has been appointed. A "minor ward" is a minor for whom a guardian has been appointed solely because of minority.

Id.

Consequently, based on Alabama law, and the expansive powers the probate court bestowed on the defendant, this Court finds the answer to the first question of part one of the two-part test is yes. The defendant was acting as a fiduciary under her appointment as a guardian and a conservator. But again, before deciding whether the defendant was a fiduciary for purposes of bankruptcy dischargeability, the Court must address part one's expanded questions.

### ii) The "Expanded" Questions Relating to the Defendant's Fiduciary Capacity as a Guardian and a Conservator

#### a) Did the Power of Attorney Create an Express or Technical Trust?

As discussed above, federal law requires that only express or technical trust relationships are subject to nondischargeability. In the area of guardians and conservators, that requirement relates directly to the probate court's <u>appointment authority</u> and the <u>powers it bestowed on the defendant</u> in exercising that authority.

### 1) The Probate Court's Guardian Appointment Authority

The probate court appointed the defendant guardian in part pursuant to section 26-2A-105 of the Alabama Guardianship and Protective Proceedings Act which provides for appointment of guardians for incapacitated persons. It includes:

> (a) The court shall exercise the authority conferred in this division so as to encourage the development of maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's mental and adaptive limitations or other conditions warranting the procedure.

> (b) The court may appoint a guardian as requested if it is satisfied that the person for whom a guardian is sought is incapacitated and that the appointment is necessary or desirable as a means of providing continuing care and supervision of the person of the incapacitated person. The court, on appropriate findings, may (i) treat the petition as one for a protective order under Section 26-2A-130 and proceed accordingly, (ii) enter any other appropriate order, or (iii) dismiss the proceedings.

> (c) The court, at the time of appointment or later, on its own motion or on appropriate petition or motion of the incapacitated person or other interested person, may limit the powers of a guardian otherwise conferred by this chapter and thereby create a limited guardianship. Any limitation on the statutory power of a guardian of an incapacitated person must be endorsed on the guardian's letters or, in the case of a guardian by

108

parental or spousal appointment, must be reflected in letters issued at the time any limitation is imposed. Following the same procedure, a limitation may be removed or modified and appropriate letters issued.

Ala.Code 1975, § 26-2A-152.

## 2) The Probate Court's Conservator Appointment Authority

The probate court appointed the defendant conservator in part pursuant to section 26-2A-130 of the Alabama Guardianship and Protective Proceedings Act which provides for protection of property of disabled persons. It includes:

(a) Upon petition and after notice and hearing in accordance with the provisions of this division, the court may appoint a conservator or make any other protective order for cause as provided in this section.

(b) Appointment of a conservator or other protective order may be made in relation to the estate and affairs of a minor if the court determines that a minor owns funds or property requiring management or protection that cannot otherwise be provided or has or may have business affairs that may be jeopardized or prevented by minority, or that funds are needed for health, support, education, or maintenance and that protection is necessary or desirable to obtain or provide funds.

(c) Appointment of a conservator or other protective order may be made in relation to the estate and affairs of a person if the court determines that (i) the person is unable to manage property and business affairs effectively for such reasons as mental illness, mental deficiency, physical illness or disability, physical or mental infirmities accompanying advanced age, chronic use of drugs, chronic intoxication, confinement, detention by a foreign power, or disappearance; and that (ii) (aa) the person has property that will be wasted or dissipated unless property management is provided, or that (bb) funds are needed for the health, support, education, or maintenance of the person or of those entitled to the person's support and that protection is necessary or desirable to obtain or provide the funds.

Ala. Code 1975, § 26-2A-130.

In addition, section 26-2A-148, Ala. Code 1975, which is also applicable here, reads:

(a) The appointment of a conservator vests in the conservator title as trustee to all property, or to the part thereof specified in the order, of the protected person, presently held or thereafter acquired, including title to any property theretofore held for the protected person. Appointment of a

109

conservator does not terminate a custodianship created under a Uniform Gifts to Minors Act or a Uniform Transfers to Minors Act, or a valid durable power of attorney, except on order of the court. An order specifying that only a part of the property of the protected person vests in the conservator creates a limited conservatorship.

(b) Except as otherwise permitted herein, the interest of the protected person in property vested in a conservator by this section is not transferable or assignable by the protected person. An attempted transfer or assignment by the protected person, though ineffective to affect property rights, may generate a claim for restitution or damages which, subject to presentation and allowance, may be satisfied as provided in Section 26-2A-156.

Ala.Code 1975, § 26-2A-148.[63]

### 3) Powers Bestowed on the Defendant

As discussed in the Guardian and Conservator section of this opinion, the probate court bestowed broad powers on the defendant. Its appointment order stated, "**that said guardian and conservator shall have all the powers and authority as set forth in Section 26-2A-152 of the Code of Alabama, 1975.**" Id. (emphasis added). The Letters of Guardianship it issued to the defendant pursuant to that order stated, "**the...Guardian is authorized and directed to exercise... [a]ll powers and duties conferred under Alabama Code §26-2A-78**...." Id. (emphasis added).

As stated above, these directives are telling when read in conjunction with the portion of section 26-2A-105 quoted above which directs the appointing court on what power to bestow.  It tells that court to include powers, "**only to the extent necessitated by the incapacitated person's mental and adaptive limitations or other conditions warranting the procedure,**" Id. at §26-2A-105 (emphasis added).  Similarly, section 26-2A-148 allows an order which specifies, "**only a part of the property of the protected person vests in the conservator [which] creates a limited conservatorship.**" Id. at §26-2A-148(a).[64]

_____

[63]As quoted above, the Act defines a conservator as, "A person who is appointed by a court to manage the estate of a protected person and includes a **limited** conservator described in Section 26-2A-148(a)." Ala.Code 1975, § 26-2A-20.

[64]Ala. Code 1975, § 26-2A-136, entitled "Permissible Court Orders" includes, "The court shall exercise the authority conferred in this division to encourage the development of maximum self-reliance and independence of a protected person and **make protective orders only to the extent necessitated by the protected person's mental and adaptive limitations** and other conditions warranting the procedure." Id. (emphasis added).

110

The official Comment to the section 26-2A-105 explains:

The purpose of subsections (a) and (c) is to remind an appointing court that a guardianship under this legislation should not confer more authority over the person of the ward than appears necessary to alleviate the problem caused by the ward's incapacity. This is a statement of the general principle underlying a "limited guardianship" concept. For example, if the principal reason for the guardianship is the ward's inability to comprehend a personal medical problem, the guardian's authority could be limited to making a judgment, after evaluation of all circumstances, concerning the advisability and form of treatment and to authorize actions necessary to carry out the decision. Or, if the ward's principal problem stems from memory lapses and associated wanderings, a guardian with authority limited to making arrangements for suitable security against this risk might be indicated. Alabama adopted the concept of limited guardianship by a 1982 amendment to the Alabama law. Ala. Code (1975, as amended by Act No. 82-384) section 26-2-45. This chapter proposes to give body and detail to that skeleton principle.

******

As with prior Alabama law, the partially incapacitated person retains all legal rights which the court has not seen fit to delegate to the limited guardian. Thus, if the court determines that most of a respondent's demonstrated problems probably could be alleviated by the institution of an appropriate authority to manage the ward's property and make appropriate expenditures for the ward's well-being, the court should utilize subsection (b) to recast the proceedings so that a conservator, rather than a guardian, would be appointed. If the respondent's problems call for both a guardian and a conservator, subsection (b) authorizes the court to direct that the proceedings be recast to seek both forms of relief. In this connection, the case of an incapacitated person differs from that of a minor who needs both a personal guardian and a conservator. This difference is recognized in that the second sentence of section 26-2A-152(a), which applies only to conservators of estates of unmarried minors, enables a minor's conservator, but not a conservator for an incapacitated person, to exercise the powers of a personal guardian.

Id.

So, within these confines, <u>what powers did this probate court give the defendant</u>? Were they limited to the care of a physically impaired individual? Were they limited to specific property? Were they restricted in any way? As we know, the answer to each question is, no. The powers the probate court gave the defendant were, as quoted below, as expansive as possible.

111

The section 26-2A-152 conservator powers the probate court bestowed on the defendant were:

(a) Subject to limitation provided in Section 26-2A-154, a conservator shall have all of the powers conferred in this section and any additional powers now or hereafter conferred by law on trustees in this state. In addition, a conservator of the estate of an unmarried minor as to whom no one has parental rights, has the powers of a guardian of a minor described in Section 26-2A-78 until the minor attains the age of 19 years, or the disabilities of nonage have been removed, but the parental rights so conferred on a conservator do not preclude appointment of a guardian as provided in Division 1 of this article.

(b) A conservator without court authorization or confirmation may invest and reinvest funds of the estate as would a trustee.

(c) A conservator, acting as a fiduciary in efforts to accomplish the purpose of the appointment, may act without court authorization or confirmation, to

(1) Collect, hold, and retain assets of the estate including land in another state and stocks of private corporations, until determining that disposition of the assets should be made, and the assets may be retained even though they include an asset in which the conservator is personally interested;

(2) Receive additions to the estate;

(3) Acquire an undivided interest in an asset of the estate that is otherwise an investment authorized for the conservator and in which the conservator, in any fiduciary capacity, holds an undivided interest;

(4) Invest and reinvest estate assets in accordance with subsection (b);

(5) Deposit estate funds to the extent insured in a state or federally insured financial institution, including one operated by the conservator;

(6) Acquire an asset for the estate that is an authorized investment for conservators, including land in another state, for cash or on credit, at public or private sale, and manage, develop, improve, partition, or change the character of an estate asset;

(7) Dispose of an asset, other than real property, of the estate for cash or on credit, at public or private sale, and manage or change the character of an estate asset;

112

(8) Make ordinary or extraordinary repairs or alterations in buildings or other structures;

(9) Enter for any purpose into a lease as lessor or lessee for a term not exceeding five years;

(10) Enter into a lease or arrangement for exploration and removal of minerals or other natural resources or enter into a pooling or unitization agreement;

(11) Grant an option for a period not exceeding one year involving disposition of an estate asset;

(12) Vote a security, in person or by general or limited proxy;

(13) Pay calls, assessments, and any other sums chargeable or accruing against or on account of securities;

(14) Sell or exercise stock-subscription or conversion rights;

(15) Deposit any stocks, bonds, or other securities at any time held in any pool or voting trust containing terms or provisions approved by the conservator;

(16) Consent, directly or through a committee or other agent, to the reorganization, consolidation, merger, dissolution, or liquidation of a corporation or other business enterprise;

(17) Insure the assets of the estate against damage or loss and the conservator against liability with respect to third persons;

(18) Borrow money for the protection of the estate to be repaid from estate assets or otherwise; advance money for the protection of the estate or the protected person and for all expenses, losses, and liability sustained in the administration of the estate or because of the holding or ownership of any estate assets, for which the conservator has a lien on the estate as against the protected person for advances so made;

(19) Pay or contest any claim; settle a claim by or against the estate or the protected person by compromise, arbitration, or otherwise; and release, in whole or in part, any claim belonging to the estate to the extent the claim is uncollectible;

(20) Pay reasonable annual compensation of the conservator, subject to final approval of the court in an accounting under Section 26-2A-147;

(21) Pay taxes, assessments, and other expenses incurred in the collection, care, administration, and protection of the estate;

(22) Allocate items of income or expense to either estate income or principal, as provided by the applicable principal and income act or other law, including creation of reserves out of income for depreciation, obsolescence, or amortization, or for depletion in mineral or timber properties;

(23) Pay any sum distributable to a protected person or dependent of the protected person by -- (i) paying the sum to the distributee, (ii) applying the sum for the benefit of the distributee, or (iii) paying the sum for the use of the distributee to the guardian of the distributee, or, if none, to a relative or other person having custody of the distributee;

(24) Employ persons, including attorneys, auditors, investment advisors, or agents, even though they are associated with the conservator, to advise or assist in the performance of administrative duties;

(25) Prosecute or defend actions, claims, or proceedings in any jurisdiction for the protection of estate assets and of the conservator in the performance of fiduciary duties;

(26) Execute and deliver all instruments that will accomplish or facilitate the exercise of the powers vested in the conservator; and

(27) Hold a security in the name of a nominee or in other form without disclosure of the conservatorship so that title to the security may pass by delivery, but the conservator is liable for any act of the nominee in connection with the stock so held.

(d) A conservator, acting as a fiduciary in efforts to accomplish the purpose of the appointment, may act with prior court authorization, to

(1) Continue or participate in the operation of any business or other enterprise;

(2) Demolish any improvements and raze or erect new party walls or buildings;

(3) Dispose of any real property, including land in another state, for cash or on credit, at public or private sale, and manage, develop, improve, partition, or change the character of estate real property;

(4) Subdivide, develop, or dedicate land or easements to public use; make or obtain the vacation of plats and adjust boundaries;

(5) Enter for any purpose into a lease as lessor or lessee for a term of five or more years or extending beyond the term of the conservatorship;

(6) Grant an option for a term of more than one year involving disposition of an estate asset; and

(7) Take an option for the acquisition of any asset.

Id.

The section 26-2A-78(b) guardian powers the probate court bestowed on the defendant were:

(b)    In particular and without qualifying the foregoing, a guardian shall:

(1)    Become or remain personally acquainted with the ward and maintain sufficient contact with the ward to know of the ward's capacities, limitations, needs, opportunities, and physical and mental health;

(2)    Take reasonable care of the ward's personal effects and commence protective proceedings if necessary to protect other property of the ward;

(3)    Apply any available money of the ward to the ward's current needs for health, support, education, or maintenance;

(4)    Conserve any excess money of the ward for the ward's future needs, but if a conservator has been appointed for the estate of the ward, the guardian, at least quarterly, shall pay to the conservator money of the ward to be conserved for the ward's future needs; and

(5)    Report the condition of the ward and of the ward's estate that has been subject to the guardian's possession or control, as ordered by the court on petition of any person interested in the ward's welfare or as required by court rule.

(c)    A guardian may:

(1)    Receive money payable for the support of the ward to the ward's parent, guardian, or custodian under the terms of any statutory

115

benefit or insurance system or any private contract, devise, trust, conservatorship, or custodianship, and money or property of the ward paid or delivered pursuant to Section 26-2A-6;

(2)    If consistent with the terms of any order by a court of competent jurisdiction relating to detention or commitment of the ward, take custody of the person of the ward and establish the ward's place of abode within or without this state;

(3)    If no conservator for the estate of the ward has been appointed, institute proceedings, including administrative proceedings, or take other appropriate action to compel the performance by any person of a duty to support the ward or to pay sums for the welfare of the ward;

(4)    Consent to medical or other professional care, treatment, or advice for the ward without liability by reason of the consent for injury to the ward resulting from the negligence or acts of third persons unless a parent would have been liable in the circumstances;

(5)    Consent to the marriage or adoption of the ward; and

(6)    If reasonable under all of the circumstances, delegate to the ward certain responsibilities for decisions affecting the ward's well-being.

Ala.Code 1975, §26-2A-78.[65]

From the probate court's appointment authority and the powers it bestowed on the defendant, this Court finds that the defendant's appointment as guardian and conservator: (1) included a declaration of affirmative trust duties, (2) there was a segregated trust res, and (3) there was a clear intent to create a trust relationship. Consequently, the Court concludes that there was an express or technical trust between LaShari Scott and Maddie Woods.

---

[65]It is actually section 26-2A-108 of the Act that defines a guardian's powers. It reads:

Except as limited pursuant to Section 26-2A-105(c), a guardian of an incapacitated person is responsible for health, support, education, or maintenance of the ward, but is not liable to third persons by reason of that responsibility for acts of the ward. In particular and without qualifying the foregoing, a guardian has the same duties, powers, and responsibilities as a guardian for a minor as described in Section 26-2A-78(b), (c), and (d).

Ala. Code 1975, § 26-2A-108.

116

**b) When was the
Express or Technical Trust Created?**

The final "expanded" question is whether the guardian and conservator trusts were created prior to the acts complained of. The order appointing the defendant was entered on March 14, 2002.  Consequently the trusts it created were established before some of the acts complaint of in this litigation were committed.

### iii) Conclusion to Part One of the Two-part Test

Based on the above, the Court finds:

1.     the defendant was acting in a fiduciary capacity as Maddie Woods' guardian and conservator;

2.     the defendant was acting in that fiduciary capacity within an express or technical trust that was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship; and,

3.     that express or technical trust was created prior to the acts complained of.

### (b)  PART TWO – Did the Defendant Commit Acts of Defalcation While Acting as Maddie Woods' Guardian and Conservator?

The final question of the two-part test is: Did the defendant commit acts of defalcation while acting in her fiduciary capacity as guardian and conservator?  The answer is yes.  The evidence is the same as discussed above.

Specifically, the Court's findings of fact are replete with examples of the defendant's defalcations.  While some occurred after the power of attorney was bestowed but before the defendant was appointed a guardian and conservator,[66] many were ongoing.[67]  Even if they started before the guardian and conservator appointments, they continued well after them. Consequently, the Court will not recount

---

[66]Other than identifying acts of defalcation that occurred during the two years between the beginning of the power of attorney and the entry of the guardianship order, clearly, this Court cannot link specific acts of defalcation with a particular fiduciary position, except as to time. As of March 14, 2002, the defendant was acting concurrently under a power of attorney, as a guardian, and as a conservator. She did not separate her actions. Consequently, neither can this Court.

[67]For example, while the defendant's acts in regard to the Citizens Federal accounts started in January 2002, her acts of spending the money from those accounts was ongoing well beyond March 14, 2002, the date she was appointed guardian and conservator.

117

them here. It is sufficient that the Court finds, based on the findings of fact, that the defendant committed acts of defalcation while acting as Maddie Woods' guardian and conservator.[68]

### (c) Conclusion to Guardian and Conservator

Based on the above, the Court finds that the plaintiff satisfied, by a preponderance of the evidence, the two-part test for determining dischargeability of a debt in regard to the defendant's guardianship.

Specifically, the Court finds:

1.     the defendant was acting in a fiduciary capacity as Maddie Woods' guardian and conservator;

2.     the defendant was acting in that fiduciary capacity within an express or technical trust that was created by: (a) a declaration of affirmative duties; (b) a segregated trust res; and (c) the intent to create a trust relationship;

3.     the trust was created prior to the acts complained of; and,

4.     the defendant committed an act of defalcation while acting in her fiduciary capacity as either a guardian or conservator.

Consequently, the Court concludes that whatever debts due the plaintiff the defendant generated while acting as Maddie Woods' guardian and conservator are not dischargeable in this case under section 523(a)(4) of the Bankruptcy Code.

### (d) The Defendant's Two Argument that
### Her Guardian and Conservator Appointments are Void

The defendant contends that the guardian and conservator appointments are void. She makes two arguments. One, she argues that the order's requirement of, "posting bond of $300,000" was a condition of appointment, and that when the defendant failed to obtain that bond, the appointment was not effective. Two, the defendant argues that if the defendant was appointed because Maddie Woods was mentally incompetent, the order fails because a physician did not testify at the hearing on which the order was based.

---

[68]The Court summarized these findings above as they pertained to the "power of attorney."

## 1) The Bond

In her written <u>Closing Argument</u> the defendant argues that the probate court's order's requirement of, "posting bond of $300,000" was a condition of appointment, and that when the defendant failed to obtain that bond, the appointment was not effective.

The facts are not disputed. The order of the Probate Court of Jefferson County Alabama was entered on March 14, 2002. The <u>Letters of Guardianship</u> were issued on March 14, 2002.[69]  Def. Ex. 4; Pla. Ex. 4.  The probate court's order required the defendant to obtain a bond of $300,000.  <u>Id</u>.  The defendant did not obtain that bond.

And the law in Alabama is not disputed. Ala.Code 1975, § 26-3-1 provides:

> Before the issue of letters of conservatorship, other than letters to the general conservator or to the sheriff, the judge of probate **must require** the conservator appointed to enter into bond with sufficient sureties, payable to the judge of probate, in a penalty prescribed by him.

<u>Id</u>. (emphasis added).[70]

Given these facts and this law, this Court must ask: If a fiduciary fails to satisfy a condition of appointment, but nonetheless continues to act under that appointment, may the fiduciary use its own failure later as a defense to a charge of defalcation while acting under the appointment? Common sense says no. The law on the subject is sparse.

In <u>Cromer-Tyler v. Teitel</u>, Case No. 1:01-CV-1077, 2007 WL 2684863 (M.D.Ala. Sep 11, 2007) affirmed by <u>Cromer-Tyler v. Teitel</u>, 294 Fed.Appx. 504 (11th Cir.(Ala.)), the defendant Edward R. Teitel, M.D. ("Dr.Teitel") was the Plan Administrator for a Money Purchase Pension Plan. Contrary to statute and plan requirements, Dr. Teitel failed to obtain a fiduciary bond. Even though Dr. Teitel did not have that bond, the court found that he breached his fiduciary duties, "in the way he operated the Plan...," and entered a judgment against him.

In <u>Chao v. Magic P.I. & Sec., Inc.</u>, Case No. 1:04CV205, 2007 WL 689987 (W. D. Mich. Mar 02, 2007), one of the defendants, a manager of a 401(k) profit sharing plan, failed to obtain a fidelity bond for the Plan. The court noted that:

---

[69]There is no evidence that letters of conservatorship were issued.

[70]Ala.Code 1975, § 26-2A-139 also states, "The **court must require a conservator to furnish a bond** payable to the judge of probate...." <u>Id</u>. It is interesting that the law is written such that the probate judge must <u>require</u> a bond rather than that the appointee must <u>obtain</u> a bond.

119

ERISA, 29 U.S.C. § 1112(a), which requires that every fiduciary of an employee benefit Plan and every person who handles funds of such Plans be bonded to protect the Plan against loss by reason of acts of fraud or dishonesty. At all relevant times in this action, defendant Magett was a Plan fiduciary and received, disbursed, and exercised control over Plan funds, without being bonded, in violation of this requirement of ERISA.

Id. at *6. On that basis the court entered judgment against the defendants.

In In re Moylan, Case No. CVA08-016, 2011 WL 4915003, (Guam Terr., October 18, 2011) the court held that even where the law required bonds for guardians, no bond was necessary to be, "required to be posted by guardians who are to look after the person and not the estate of a ward." Id.

The defendant's reasoning here appears to be that she should not be held accountable in this capacity because she was technically not Maddie Woods' guardian or conservator. Her reasoning is this. Her appointment was dependant on her obtaining a $300,000 bond. Because she did not get that bond, she was not the guardian or conservator. She concludes that if she was not either, she could not have been acting in a fiduciary capacity. Consequently, she could not have breached that fiduciary causing any debt she owes to be nondischargeable.

In response, this Court must ask: If the appointment order of the defendant as guardian and conservator is void, when is it void? The order reads, "upon posting of bond of $300,000...." Pla. Ex 4. That requirement was created on March 14, 2002. On May 6, 2003, over a year later, the principal court clerk for the probate court wrote the defendant's lawyer and said:

We need a $300,000.00 bond on LaShari Scott as conservator over the estate of Maddie Jenkins Woods a/k/a Maddie J. Woods, an incapacitated person, within 15 days or the County Conservator may be appointed.

Pla. Ex 4.

From this letter we know:

1.    Even though the defendant did not obtain a bond, the probate court considered the appointment valid;

2.    Even after 14 months without a bond, the probate court still considered the defendant's appointment valid;

3.    Even if the defendant never provided a bond, because the probate court threatened that the County Conservator may be appointed, the defendant could still keep her appointment.

120

It appears to this Court that at worst, the defendant's appointment was voidable – <u>not void</u>. The probate court recognized the appointment. The defendant thought that any bond she had was sufficient. Tr. 39.[71]  And the defendant considered herself to be Maddie Woods' guardian and conservator, regardless of whether she had a bond or not. Tr. 475.[72]  Therefore, this Court must reject the defendant's first argument for why the appointment order is void.  It may be voidable, but it is not void.

## 2) Testimony by a Physician

The defendant's second argument for why the guardian and conservator appointments order is void is that if the order was based on a finding that Maddie Woods was mentally incompetent, that basis is flawed. The defendant cites section 26-2-43, Code of Ala. 1975, and contends that the testimony of a physician (or some other qualified person) is required before a probate court in Alabama may declare someone mentally incompetent. She states that no such qualified person testified at the hearing on Maddie Woods' competency, if that was the basis of the hearing in the first place.

---

[71]The defendant testified:

> I applied for the three hundred thousand dollar bond and I think you and Leon Garmon both went through all of the paper work through the other court system that we were in, and I did not receive it at that time.  When I got this bond, I was told, as long as I had a bond, it could be from Albert and the Chipmunks.  As long as there was a bond posted on the care of  Maddie Woods, I was okay.

Tr. 566.

[72]The defendant was asked, "Okay.  Now it is also stated in the order that it was based on you posting a three hundred thousand dollar bond; is that correct?"  As partially quoted above, the following exchange occurred:

> A.     Yes.
> Q.     And was that bond ever posted?
> A.     Not the three hundred thousand dollar bond, no.
> Q.     Okay.  So you were never the actual conservator of Maddie Woods' estate; is that correct?
> A.     Yes.
> Q.     Okay.  My statement is correct?
> A.     That I was not the conservator?
> Q.     Yes.
> A.     No, the – well, to my understanding, I had a bond that was posted and I also, prior to that, had papers on her that gave me power of attorney.  So I always felt that I had guardianship and conservatorship over Maddie Woods.

Tr. 475.

She concludes there cannot be a finding of mental incompetence without that testimony.

This Court <u>is not</u> finding that the probate court specifically found Maddie Woods to be mentally incompetent. This Court <u>is</u> finding that based on the actions of the probate court, this Court finds that the probate court believed that Maddie Woods was so lacking in her ability to manage her own affairs that it gave her guardian and conservator the most extensive powers it had the authority to convey. In that sense, it really does not matter whether the probate court made a finding of incompetency with or without the assistance of a physician or some other qualified person. Therefore, this Court must reject the defendant's second argument for why the appointment order is void.

## 2. Unjust Enrichment

The plaintiff's second surviving allegation is her claim that the defendant was enriched unjustly. As quoted above, the plaintiff contends:

> Defendants have been unjustly enriched at the expense of, and to the proximate damage of, the plaintiff, entitling plaintiff to an award of damages.

<u>Complaint</u> at 10, A.P. Docket No 1.

Unjust enrichment was defined by the Alabama Supreme Court in <u>Funliner of Alabama, L.L.C. v. Pickard</u>, 873 So.2d 198 (Ala.2003). Associate Justice Jacquelyn L. Stuart wrote, "To prevail on... [a claim for unjust enrichment], the plaintiffs must establish that the defendants hold money that, in equity and good conscience, belongs to the plaintiffs, or that the defendants hold money that was improperly paid to the defendants because of mistake or fraud." <u>Id</u>. at 209.

Justice Michael F. Bolin explained further in <u>Mantiply v. Mantiply</u>, 951 So.2d 638 (Ala.2006):

> In order for a plaintiff to prevail on a claim of unjust enrichment, the plaintiff must show that
>
> > "the ' "defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendant because of mistake or fraud." ' <u>Dickinson v. Cosmos Broad. Co.</u>, 782 So.2d 260, 266 (Ala.2000) (quoting <u>Hancock-Hazlett Gen. Constr. Co. v. Trane Co.</u>, 499 So.2d 1385, 1387 (Ala.1986))....  'The doctrine of unjust enrichment is an old equitable remedy permitting the court in equity and good conscience to

122

disallow one to be unjustly enriched at the expense of another.' <u>Battles v. Atchison</u>, 545 So.2d 814, 815 (Ala.Civ.App.1989)."

<u>Avis Rent A Car Sys., Inc. v. Heilman</u> 876 So.2d 1111, 1123 (Ala.2003). " 'One is unjustly enriched if his retention of a benefit would be unjust.' " <u>Welch v. Montgomery Eye Physicians, P.C.</u>, 891 So.2d 837, 843 (Ala. 2004) (quoting <u>Jordan v. Mitchell</u>, 705 So.2d 453, 458 (Ala. Civ. App.1997)). The retention of a benefit is unjust if

> " '(1) the donor of the benefit ... acted under a mistake of fact or in misreliance*655 on a right or duty, or (2) the recipient of the benefit ... engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship. In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been <u>unjustly</u> enriched.' "

<u>Welch</u>, 891 So.2d at 843 (quoting <u>Jordan</u>, 705 So.2d at 458). The success or failure of an unjust-enrichment claim depends on the particular facts and circumstances of each case. <u>Heilman</u>, supra.

<u>Mantiply v. Mantiply</u>, 951 So.2d 638, 654-55 (Ala.2006) (quoting <u>Welch v. Montgomery Eye Physicians, P.C.</u>, 891 So.2d 837, 843 (Ala.2004) (emphasis in original)).

This Court has found that the defendant owes a nondischargeable debt to the plaintiff based on the defendant's taking and not accounting for money that should be someone else's. It appears then that such a debt would qualify as one where the defendant, "hold[s] money that, in equity and good conscience, belongs to the plaintiff. As such, this Court concludes that the defendant, when she failed to account for all of the money spent from Maddie Woods' bank accounts, was unjustly enriched.

### 3. Revocation of Discharge

The plaintiff's final surviving allegation is her request to revoke the debtor's discharge.

Because the Court has found that the plaintiff is a creditor of the debtor, the plaintiff has standing to challenge the debtor's discharge. In that capacity, the plaintiff requests, "revocation of defendant's discharge obtained in... [this case], under § 727(d)(1) of the Bankruptcy Code. <u>First Amended Complaint</u> at 3, A.P. Docket No. 11 (parenthetical added).

Section 727(d)(1) reads:

> On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if--

> such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge;

11 U.S.C. § 727(d)(1).

The defendant filed her Chapter 7 bankruptcy petition in this Court on October 8, 2005. Case Docket No. 1. A "suggestion of bankruptcy" was filed in the state court case on December 29, 2005. Based on the bankruptcy filing, the state court placed its case on its administrative docket on January 29, 2006. Pla. Ex. 19. The debtor's discharge was entered on February 6, 2006. Case Docket No. 23.

The plaintiff filed the pending adversary proceeding in this Court on January 6, 2006. A.P. Docket No. 1. That complaint did not include a count for revocation of discharge, but the defendant filed an Amended Complaint on June 8, 2006, that did. A.P. Docket No. 11.[73]

The situation here is similar to the one described in In re Matos (The Cadle Company, v. Parks-Matos), Case No. 07–12628, 2008 WL 596744 (11th Cir. Mar 06, 2008) (unpublished opinion).[74] The per curiam opinion in Matos includes:

---

[73]Section 727(e)(1) requires a complaint for revocation to be filed within one year of entry of the discharge. The law in this Circuit requires any amendment to be filed also within that one year. Solove v. Chase Manhattan Bank, 388 F.2d 874, 877 (5th Cir.1968). See Dery v. Rosenberg, Case No. 02–73274, 2003 WL 21919267 (E.D. Mich. Jan. 13, 2003) for an excellent discussion of and explanation of Solove.

[74]This opinion is cited pursuant to Unpublished Opinions, 11th Circuit Rule 36–2. It reads:

> An opinion shall be unpublished unless a majority of the panel decides to publish it. Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority. If the text of an unpublished opinion is not available on the internet, a copy of the unpublished opinion must be attached to or incorporated within the brief, petition, motion or response in which such citation is made.

11th Cir. R. 36–2.

In the instant case, Cadle suggested that the Debtors had obtained their discharge through fraud, in the form of "material false oaths," within the meaning of § 727(a)(4)(A). The bankruptcy judge disagreed, noting that the errors identified by Cadle did not constitute an attempt by the Debtors to conceal assets. As the bankruptcy judge put it: "[The errors identified by Cadle] are the types of errors that may readily be attributed to inadvertence or honest mistake ... [and] at least two of the alleged errors (the scheduling of Bank of America as an unsecured creditor and the nondisclosure of transfers between non-debtors) were not clearly erroneous at all." Moreover, the court found that the identified errors, some of which were scheduling errors, were not significant or material to the administration of the bankruptcy estate. Indeed, the bankruptcy court concluded, Cadle could not establish that the Debtors received any benefit as a result of the identified errors, since many of the errors, even if uncorrected, would not improperly enable the Debtors to retain property that otherwise would be property of the bankruptcy estate. From our review of the record, we discern no clear error in the district court's findings of fact and ultimate conclusion that Cadle failed to show that the Debtors' actions and mistakes were knowingly and fraudulently made, or that the errors and mistakes were of a material nature. Accordingly, Cadle did not meet its burden of proof on the first prong of a prima facie case under § 727(d)(1)-to show that the discharge was obtained through fraud-and revocation on this basis was properly denied.

Id. at *3.

While the record here is extensive, the Court cannot find anything in it that specifically identifies acts of the debtor that could be characterized as fraud in obtaining a Chapter 7 discharge.

This Court's explanation in In re Barnes (Barnes v. Vision Bank), Case No. 09-00600, 2010 WL 1254876 (Bankr. N.D. Ala. Mar 24, 2010), citing Matos, may explain why. This Court wrote:

The per curiam opinion of the Court of Appeals for the Eleventh Circuit in In re Matos, Case No. 07–12628, 2008 WL 596744 (11th Cir. Mar 06, 2008) (unpublished opinion) explains why the burden to revoke discharge is different. It includes:

An individual debtor's pre-bankruptcy debts are generally dischargeable in a Chapter 7 bankruptcy case. 11 U.S.C. § 727(a), (b). "Moreover, courts generally construe the statutory exceptions to discharge in bankruptcy 'liberally in favor of the debtor,' and recognize that '[t]he reasons for denying a discharge ... must be real and substantial, not

125

merely technical and conjectural.' " In re Miller, 39 F.3d 301, 304 (11th Cir.1994) (quoting In re Tully, 818 F.2d 106, 110 (1st Cir.1987)). This is so because revocation of a discharge in bankruptcy is an extraordinary remedy. See In re Bowman, 173 B.R. 922, 924 (9th Cir.BAP1994).

Id. at *1 (emphasis in original) (footnote omitted).

The opinion includes later:

> In considering whether to grant revocation of a discharge, a bankruptcy court should consider these factors: "[1] the detriment to the proceedings and the dignity of the court against the potential harm to the debtor if the discharge is denied ... [;][2] the intent behind the bankrupt's acts-were they wilful or was there a justifiable excuse; [3] was there injury to the creditors; and [4] is there some way the bankrupt could make amends for his conduct." In re Jones, 490 F.2d 452, 456 (5th Cir.1974) (citation omitted).

Id. at *2 (footnote omitted).

Id. at *2.

The Court cannot find that the plaintiff satisfied this standard. Consequently, based on the above, the Court finds for the defendant and against the plaintiff on this section 727 count.

## V.  AMOUNT OF DEBT OWED

What remains is for this Court to set the amount of the nondischargeable debt the defendant owes the plaintiff. The components are: (A) the unaccounted for funds from the various bank accounts discussed above; and (B) certain funds from Eddie Woods' estate. The components of each are listed below with an amount.

A.  Amount from the Bank Accounts:

    1.    Mutual Savings Credit Union

        a.    Checks Written to the Defendant for Funds to Be Paid to Caregivers = Zero (credit given for all receipts)

        b.    Checks Written Directly to Caregivers = Zero (not applicable)

126

    c.      Checks Written to the Defendant, Her Husband, or Her Mother which were <u>Not</u> Associated with Payments to Caregivers = $9,700

    d.      Check Written to the Defendant for Maddie Woods' Pre-Funeral Arrangements = $12,500

    e.      <u>The</u> $50,000 Transfer to SouthTrust Bank = Zero

    f.      The Final Transaction from Mutual Savings Account = Zero

2. SouthTrust Bank

    a.      Counter Slips Payable to the Defendant = $33,367

    b.      ATM Withdrawals = $13,800 (does not include the $5,500 the defendant withdrew by ATM from the joint SouthTrust account after Maddie Woods died.)

3.      University Federal Credit Union = Zero

4.      A Second Personal SouthTrust Bank Account = Zero

5.      Citizens Federal Saving Bank Accounts

    a.      Five Points South Account = Zero

    b.      Power of Attorney Account = $113,499

    c.      Son's Account = Zero ($20,000 included in POA account)

    d.      Son's Account = Zero ($20,000 included in POA account)

    e.      Unidentified Account = Zero ($50,500 included in POA account)

B.      From Eddie Woods' Estate = $5,224.[75]

---

[75]The funds that the defendant took from Eddie Woods' litigation trust after Maddie Woods died were taken without authority. The defendant's power of attorney, guardian, and conservator powers had expired. She was not Maddie Woods' executrix. Those funds totaled $5,224. Therefore, that amount is also nondischargeable.

Therefore, based on the above, the Court finds that the defendant's nondischargeable debt to the plaintiff, in the plaintiff's role as executrix of Maddie Woods' estate, is $188,090.[76]

## VI. CONCLUSION

When the defendant accepted the responsibility of caring for Maddie Woods, she gave her all. When no one else was available, she was there, day after day, week after week, month after month. Maddie Woods was fortunate to have had someone so giving to care for her. But when the defendant accepted the responsibilities that came with a power of attorney, a guardianship, and a conservatorship, she agreed to act in a fiercely regulated area of the law that was neither giving nor forgiving. That circumstance resulted in a nondischargeable judgment against her of over $188,090. The Court hopes both parties will consider both sides of this equation when they decide the course of the next phase of their litigation.

A separate Order will be entered contemporaneously with this Memorandum Opinion.

Dated: September 27, 2012            /s/Benjamin Cohen
                                                    BENJAMIN COHEN
                                                    United States Bankruptcy Judge

BC:pb

---

[76]$181,867 represents the funds the defendant could not account for from the various bank accounts discussed above. These funds were those paid directly to the defendant, or members of her family.  $5,224 is the amount the defendant withdrew from Eddie Woods' estate after Maddie Woods died.

In deciding the total of the nondischargeable debt, the Court did not consider the $50,099 already transferred to the plaintiff. Those funds were not part of the equation and the parties agree that the plaintiff received those funds as executrix of Maddie Woods' estate. Similarly, the Court did not consider the $44,977.90 balance in Eddie Woods' litigation trust account at the time of trial. And finally, the Court did not consider the $2,629.27 the plaintiff received from Eddie Woods estate as executrix of Maddie Woods' estate. None of these funds are part of the debt the defendant owes the plaintiff and are not under consideration for nondischargeability. While this almost $98,000 is not a credit against the defendant's debt, this Court presumes it is part of Maddie Woods' estate to be administered by her executrix. The probate court, however, not this Court, has jurisdiction to decide that question.